## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

AARON SIEGEL; JASON COOK; JOSEPH DELUCA; NICOLE CUOZZO; TIMOTHY VARGA; CHRISTOPHER STAMOS; KIM HENRY; *and* ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.,

)
)
)
)
)
)
)
)

        *Plaintiffs*,

)
)

    v.

)
)

MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey,

)
)
)
)

PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police,

)
)
)
)
)

        *Defendants*.

Civil Action No. 1:22-cv-7463-KMW-AMD

Oral Argument Requested

Motion Date: January 9, 2023

**<u>CIVIL ACTION</u>**

**(ELECTRONICALLY FILED)**

## PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER AND FOR A PRELIMINARY INJUNCTION

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com
*Attorneys for Plaintiffs*

## **Table of Contents**

INTRODUCTION ................................................................ 1

BACKGROUND ................................................................ 4

A. New Jersey's Prior Permit Regime Burdens the Right to Public Carry. ............ 5

B. In *Bruen*, the Supreme Court Invalidates Permitting Regimes Like New Jersey's. ................................................................ 7

C. New Jersey Announces "Massive Resistance" to *Bruen* and Re-tools Its Permitting Regime in A4769 to Burden Public Carry. ...................................... 8

   1. Prohibited Sensitive Places ........................................... 11

   2. Insurance Coverage Requirement ............................... 16

   3. Fee Increases ........................................................... 17

   4. Onerous New Application Requirements................................ 18

   5. Novel and Undefined Offense of "Unjustifiable Display" ......................... 21

   6. Discriminatory Treatment Among Rights Holders .................................... 21

D. A4769 Will Predictably Burden Plaintiffs' Ability to Exercise Their Second Amendment Rights. ............................................................ 22

   1. Section 7(a)(6) – Prohibition on Carry Within 100 Feet of a Public Gathering Requiring a Government Permit. ............................... 24

   2. Section 7(a)(7),(8), (9), N.J.S. 2C:39-5(e) – Prohibition on Carry at a Schools and Daycares................................................. 24

   3. Section 7(a)(9) – Prohibition on Carry at a Zoo. ....................... 27

4. Section 7(a)(10); N.J.A.C. 7:2–2.17(b) – Prohibition on Carry at Parks and Recreational Facilities. .......................................................................... 27

5. Section 7(a)(11) – Prohibition on Carry at Youth Sports Events. .............. 28

6. Section 7(a)(12) – Prohibition on Carry at Public Library or Museum. ...... 28

7. Section 7(a)(15) – Prohibition on Carry at Bar or Restaurant Where Alcohol is Served. ...................................................................................... 28

8. Section 7(a)(17) – Prohibition on Carry at Entertainment Facility............. 28

9. Section 7(a)(18); N.J.A.C. 13:69D–1.13 – Prohibition on Carry at Casinos. ...................................................................................................... 29

10. Section 7(a)(20) – Prohibition on Carry at Airport or Transportation Hub. ........................................................................................................... 29

11. Section 7(a)(21), (22) – Prohibition on Carry at Health Care and Treatment Facilities. .................................................................................. 30

12. Section 7(a)(23) – Prohibition on Carry at Public Filming Location. ....... 31

13. N.J.A.C. 7:25–5.23(m); N.J.A.C. 7:25–5.23(i); N.J.A.C. 7:25–5.23(a), (c), and (f); N.J.A.C. 7:25–5.23(f)(5) – Prohibition on Carry Under Fish and Game Regulations............................................................. 31

14. Section 7(a)(24) – Prohibition on Carry on Private Property without Express Consent or Signage. ...................................................................... 31

15. Section 7(b) – Prohibition on Carry in a Vehicle ...................................... 32

16. Section 4 – Insurance Requirement ........................................................... 33

17. Sections 2 and 3 – Fees and Onerous Permitting Requirements............... 33

18. Sections 8 – Special Elite Status for Judges, Prosecutors, and Attorneys General......................................................................................... 33

ARGUMENT ...................................................................................... 34

I.  Plaintiffs Are Likely To Succeed on the Merits of Their Second Amendment, First Amendment, Due Process, and Equal Protection Claims. . 35

    A. Plaintiffs Are Likely To Succeed on the Merits of Their Second Amendment Claims. ................................................................... 36

    B. Plaintiffs Are Likely To Succeed on the Merits of Their First Amendment Claims. .................................................................... 40

    C. Plaintiffs Are Likely To Succeed on the Merits of Their Due Process and Vagueness Claims ................................................................. 42

    D. Plaintiffs are Likely to Succeed on the Merits of Their Equal Protection Claims. .................................................................... 44

II. Plaintiffs Are *Currently* Suffering Irreparable Harm and Will Continue to Suffer Irreparable Harm if the Court Denies Relief. ........................................ 45

III. The Remaining Factors Favor Injunctive Relief. ........................................... 46

CONCLUSION .................................................................................. 47

## Table of Authorities

**Page(s)**

### Cases

*Antonyuk v. Hochul*,
  2022 WL 16744700 (W.D.N.Y. November 7, 2022) (PI)............................10, 38

*Antonyuk v. Hochul*,
  2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022)........................................................9

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004)...................................................................................35, 46

*Caetano v. Massachusetts*,
  577 U.S. 411 (2016).........................................................................................37

*Christian v. Negrelli*,
  2022 WL 17100631 (W.D.N.Y.) (PI)........................................................10, 38

*City of Cleburne v. Cleburne Living Ctr.*,
  473 U.S. 432 (1985).........................................................................................44

*Clark v. Jeter*,
  486 U.S. 456 (1988).........................................................................................44

*Connally v. Gen. Constr. Co.*,
  269 U.S. 385 (1926).........................................................................................42

*Connection Distrib. Co. v. Reno*,
  154 F.3d 281 (6th Cir. 1998)...........................................................................46

*Cox v. New Hampshire*,
  312 U.S. 569 (1941).........................................................................................39

*District of Columbia v. Heller*,
  554 U.S. 570 (2008).......................................................................................4, 5

*Ezell v. City of Chicago*,
  651 F.3d 684 (7th Cir. 2011)...........................................................................46

*Garcia v. Harris*,
  2016 WL 9453999 (C.D. Cal. Aug. 5, 2016)...................................................44

*Hardaway v. Negrelli*,
    2022 WL 11669872 (W.D.N.Y. Oct. 20, 2022) ................................................... 9

*Hardaway v. Negrelli*,
    2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ............................................ 9, 38

*Hereas Materials Tech. LLC v. Pham*,
    2011 WL 13227724 (E.D. Pa. May 5, 2011) ..................................................... 47

*Hoffinan Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ............................................................................................. 42

*Kolbe v. Hogan*, 813 F.3d 160, 201 (4th Cir. 2016) ................................................. 45

*Kolender v Lawson*,
    461 U.S. 352 (1983) ............................................................................................. 42

*Kreimer v. Town of Morristown*,
    958 F.2d 1242 (3d Cir. 2015) .............................................................................. 41

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013) .................................................................................. 46

*Lewis v. Kugler*,
    446 F.2d 1343 (3d Cir. 1971) .............................................................................. 46

*Mazahreh v. Platkin*,
    1:20-cv-17598, ECF No. 51 (D.N.J. Oct. 12, 2022) ............................................ 1

*McDonald v. City of Chicago*,
    561 U.S. 742 (2010) ......................................................................................... 4, 44

*Melrose, Inc. v. City of Pittsburgh*,
    613 F.3d 380 (3d Cir. 2010) ................................................................................ 44

*Murdock v. Pennsylvania*,
    319 U.S. 105 (1943) ............................................................................................. 39

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
    138 S. Ct. 2361 (2018) ......................................................................................... 41

*New York State Rifle & Pistol Association v. Bruen*,
 142 S. Ct. 2111 (2022) .................................................................................*passim*

*Ortho Pharm. Corp. v. Amgen, Inc.*,
 882 F.2d 806 (3d Cir. 1989) .............................................................................47

*Pemberthy v. Beyer*,
 19 F.3d 857 (3d Cir. 1994) ................................................................................44

*In re Preis*,
 573 A.2d 148 (N.J. 1990) ....................................................................................7

*Reilly v. City of Harrisburg*,
 858 F.3d 173 (3d Cir. 2017), *as amended* (June 26, 2017) ...............................34

*Simmons v. United States*,
 390 U.S. 377 (1968) ....................................................................................17, 41

*Tolchin v. Supreme Court of N.J.*,
 111 F.3d 1099 (3d Cir. 1997) ............................................................................44

*Wrenn v. District of Columbia*,
 864 F.3d 650 (D.C. Cir. 2017) ...........................................................................46

**Statutes**

N.J.S.A. 2C:12-1(b)(4) ........................................................................................43

N.J.S.A. 2C:39-5(a) ............................................................................................21

N.J.S.A. 2C:39-5(b) ..............................................................................................6

N.J.S.A. 2C:39-5(e) ............................................................................................14

N.J.S.A. 2C:39-6(c) ...............................................................................................6

N.J.S.A. 2C:43-3(a)(2) ...........................................................................................6

N.J.S.A. 2C:43-6(a)(2) ...........................................................................................6

N.J.S.A. 2C:58-3(c) ...............................................................................................6

N.J.S.A. 2C:58-3(f) ..............................................................................................17

N.J.S.A. 2C:58-4(b) ...................................................................................6, 19

N.J.S.A. 2C:58-4(c) ...............................................................................6, 7, 17

A4769 .......................................................................................................passim

**Rules**

49 C.F.R. §1540.111 ........................................................................................30

N.J.A.C. 7:2–2.17(b)...................................................................................14, 27

N.J.A.C. 7:25–5.23(i) ..................................................................................15, 31

N.J.A.C. 7:25–5.23(a), (c), and (f)..............................................................15, 31

N.J.A.C. 7:25–5.23(f)(5)..............................................................................15, 31

N.J.A.C. 7:25–5.23(m).................................................................................15, 31

N.J.A.C. 13:54-2.4(b) ........................................................................................6

N.J.A.C. 13:69D–1.13 ............................................................................14, 15, 29

N.J. Ct. R. 1:43...............................................................................................17

**Constitutional Provisions**

U.S. CONST. amend. I .............................................................................passim

U.S. CONST. amend. II............................................................................passim

U.S. CONST. amend. XIV ........................................................................passim

**Other Authorities**

D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston
    L. Rev. 205, 233-34, 244-45 (2018) ....................................................38

Executive Order 299 (https://nj.gov/infobank/eo/056murphy/pdf/EO-
    299.pdf)...................................................................................................8

## INTRODUCTION

**"The Second Amendment's plain text . . . presumptively guarantees [the people] a right to "bear" arms in public for self-defense."**

-*New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2135 (2022).

**"[D]oes anybody really want to put more guns in the hands of people that live in Paterson and Newark and Elizabeth and Camden . . . ?"**

-New Jersey Assemblyman John McKeon, Co-Sponsor of A4769 (the legislation at issue in this case), at a hearing of the New Jersey Assembly Judiciary Committee on November 14, 2022.

https://njleg.state.nj.us/archived-media/2022/AJU-meeting-list/media-player?committee=AJU&agendaDate=2022-11-14-10:00:00&agendaType=M&av=A, at marker 1:54:20. (Last visited 12/23/22)

For 56 years, New Jersey required a person to first prove that they meet the nearly impossible "justifiable need" standard in order to obtain a permit to carry a handgun pursuant to N.J.S 2C:58-4 ("Handgun Carry Permit"). Through that mechanism, New Jersey for decades has broadly suppressed the people's right to carry a handgun for self-defense. But the Supreme Court finally put a stop to that earlier this year, holding that States cannot suppress the fundamental right of the people to carry arms in public to protect themselves and their loved ones by imposing a "special need" requirement. *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2135 (2022).[1]

---

[1] "Justifiable need" was formally sent to its grave by order of the court in *Mazahreh v. Platkin*, 1:20-cv-17598, ECF No. 51 (D.N.J. Oct. 12, 2022).

1

Almost immediately, in open defiance of the Supreme Court, New Jersey responded with A4769—a comprehensive new scheme to, once again (but by a new method), suppress the fundamental right of the people to carry arms in public.  The new law prohibits the carry of arms nearly everywhere in the State, including, by default, on all private property, in common public places, and even in one's own vehicle.  In other words, although people now have a fundamental right to *obtain* permits to carry firearms thanks to *Bruen*, New Jersey has made sure they cannot actually *use* those permits in most places, by falsely labelling vast swaths of common public areas as "sensitive places" where firearms carry is categorically prohibited.  This creates the illusion that carry rights are upheld, while it actually blocks those rights nearly everywhere. In multiple legislative committee hearings and floor debates, lawmakers sponsoring A4769 were repeatedly asked by their colleagues where citizens can lawfully carry handguns under the bill, and each time they were asked, they refused to answer.  That is because the answer is "almost nowhere" which would reveal their sleight of hand.

But even this new and improper place-based restriction was not enough for lawmakers.  New Jersey also made it more difficult and costly to even obtain the predicate permit, improperly ballooning the fee four-fold and adding arbitrary new hurdles for applicants and new impermissible discretionary prerogatives for licensing officials to deny permits on a whim.

Even with a carry permit in hand, the State now requires a person to purchase an

*insurance policy* just to exercise the fundamental right to bear arms—as if it were conceivable to require insurance to read a book, attend church, write a blog post, or attend a government meeting.

Compounding all these problems, New Jersey drafted its new law not with a fine point pen, but with a giant paint roller.  By speaking in sweeping, broad, undefined, and unclear terms, the law is designed to ensure that the people cannot be quite sure what they may and may not do, thereby massively chilling the right to bear arms.

This litany of burdens on Second Amendment rights makes clear that, despite the Supreme Court's ruling just months old, New Jersey simply does not want law abiding people to be able to carry handguns for self-defense. In a moment of astonishing candor, A4769 co-sponsor Assemblyman John McKeon admitted as much in a hearing before the New Jersey Assembly Judiciary Committee on November 14, 2022:

> [D]oes anybody really want to put more guns in the hands of people that live in Paterson and Newark and Elizabeth and Camden . . . ?

https://njleg.state.nj.us/archived-media/2022/AJU-meeting-list/media-player?committee=AJU&agendaDate=2022-11-14-10:00:00&agendaType=M&av=A, at marker 1:54:20. (Last visited 12/23/22)

Assemblyman McKeon and others may believe the Second Amendment should be relegated to a "second-class right." *Bruen*, 142 S. Ct. at 2156.  But that is not their choice to make.  The Supreme Court has spoken, and the law-abiding citizens of Paterson, Newark, Elizabeth, and Camden—just like others across New Jersey—have the same constitutional rights as all Americans.

The bottom line is that before *Bruen*, New Jersey blocked right to carry by suppressing issuance of permits.   After *Bruen*, New Jersey is blocking carry by prohibiting it nearly everywhere.

This Court should issue a temporary restraining order and preliminary injunction to stop New Jersey's latest effort to end-run a constitutional right.

## BACKGROUND

The Second Amendment guarantees "the right of the people to keep and bear Arms." U.S. CONST. amend. II. Through the Second Amendment, the People, enshrined in their fundamental charter the right to "carry weapons in case of confrontation" for the "core lawful purpose of self-defense," *District of Columbia v. Heller*, 554 U.S. 570, 592, 630 (2008). They did not mean to leave the freedom to exercise that right at the mercy of the very government whose hands they sought to bind. No, "[t]he very enumeration of the right takes out of the hands of government—even the Third Branch of Government— the power to decide on a case-by-case basis whether the right is really worth insisting upon." *Id.*; s*ee also McDonald v. City of Chicago*, 561 U.S. 742, 778, 791 (2010).

In the 12 years following *McDonald*, many lower courts effectively lost their way, treating the Second Amendment as am inferior stepchild. Many of the lower courts adopted an improper interest-balancing approach that allowed the courts, using means-ends scrutiny analysis, to balance away the right in favor of upholding nearly every law that came before them. *Bruen* 142 S. Ct. at 2131.

*Bruen* roundly rejected such interest balancing. *Id. Bruen* held that States may not regulate the right to keep and bear arms by deciding how important or valuable the regulation is compared with the exercise of the right itself. That calculation was already performed when the Second Amendment was adopted in 1791, and that balancing was decided in favor of the fundamental right of the people to keep and carry arms for lawful purposes in most places and in most situations, subject to narrow restrictions in exceptional circumstances. *Heller*, 554 U.S. at 635; *Bruen* 142 S. Ct. at 2123.

The net result is that the power of a State to regulate the right to keep and bear arms is severely limited by the historical tradition of the right to keep and bear arms as understood at the time of the Founding. In *Bruen*, the Court explained it as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen,* 142 S. Ct. at 2129-30.

New Jersey chose to thumb its nose at the Supreme Court and the Constitution by enacting A4769, a law wildly and intentionally at odds with *Bruen* that violates the fundamental constitutional rights of all New Jerseyans. Accordingly, Plaintiffs immediately need temporary, preliminary, and ultimately permanent injunctive relief.

**A. New Jersey's Prior Permit Regime Burdens the Right to Public Carry.**

New Jersey law forbids any person to "ha[ve] in his possession any handgun . . . ,

without first obtaining a permit to carry the same." N.J.S.A. 2C:39-5(b). While state law provides certain exceptions to this ban—including one for "keeping or carrying [a firearm] about [one's] place of business, residence, premises or other land owned or possessed by him," *id*. § 2C:39-6(c), these exceptions do not allow the carrying of a handgun in public, either openly or concealed, without a permit. Violating this ban is a crime in the second degree, punishable by between five and ten years imprisonment and a fine of up to $150,000. *Id*. §§ 2C:39-5(b), 2C:43-3(a)(2), 2C:43-6(a)(2).

New Jersey allows an individual to carry a handgun in public only if he first obtains a permit ("Handgun Carry Permit"). Prior to A4769, to be eligible for a Handgun Carry Permit, an applicant had to satisfy certain statutory criteria. For example, he must not have been convicted of any offense of domestic violence; must not be addicted to controlled substances, mentally infirm, or an alcoholic; and must not be subject to certain restraining orders. *Id*. §§ 2C:58-4(c); 2C:58-3(c). An applicant must also pass criminal and mental health background checks, *id*. § 2C:58-4(c), had to provide three reputable references who certify that he "is a person of good moral character," *id*. § 2C:58-4(b), and must have satisfied extensive firearms training requirements, N.J.A.C. 13:54-2.4(b).

In addition to these rigorous screening and training requirements, a law-abiding citizen could only be granted a Handgun Carry Permit if he demonstrated "that he has a justifiable need to carry a handgun." N.J.S.A. 2C:58-4(c).

N.J.S.A. 2C:58-4(c) previously provided that "in the case of a private citizen," the "justifiable need" requirement was satisfied only if the applicant could "specify in detail

6

the urgent necessity for self-protection, as evidenced by specific threats or previous attacks, which demonstrate a special danger to the applicant's life that cannot be avoided by reasonable means other than by issuance of a permit to carry a handgun." *Id*.

In interpreting this "justifiable need" requirement, New Jersey's Supreme Court determined that "[g]eneralized fears for personal safety are inadequate, and a need to protect property alone does not suffice." *In re Preis*, 573 A.2d 148, 152 (N.J. 1990). Accordingly, typical law-abiding citizens of New Jersey—the vast majority of responsible citizens who could not "demonstrate a special danger to [their] life" as "evidenced by specific threats or previous attacks," N.J.S.A. 2C:58-4(C)—effectively remained subject to a flat ban on carrying handguns outside the home.

Through the "justifiable need" rule, for 56 years, New Jersey prevented nearly all New Jerseyans from exercising the basic, fundamental right to carry a firearm for self-defense in public.

**B.    In *Bruen*, the Supreme Court Invalidates Permitting Regimes Like New Jersey's.**

On June 23, 2022, in *Bruen*, the Supreme Court swept away the notion that States could materially interfere with the fundamental right to carry a handgun in public for self-defense. The Court made clear that, *by default*, the people have a fundamental right to carry handguns, and they have the right to do so in most places and under most circumstances. That is*, public carry of handguns is the rule, not the exception*.

In *Bruen*, the Court invalidated the easiest and most common method of denying

the fundamental right to carry a handgun—requiring that an applicant for a permit to carry a handgun show some sort of "need." Under the New York law (at issue in *Bruen*) the requirement was called "proper cause," which was similar to New Jersey's "justifiable need." The Court did not merely rule that requiring a showing of "need' is unconstitutional. The Court ruled that any scheme that broadly impairs the right to carry a handgun is unconstitutional. The Court was unambiguous that a general right to carry is the irreducible constitutional minimum, and any attempt to interfere with that right is constitutionally suspect.

**C.      New Jersey Announces "Massive Resistance" to *Bruen* and Re-tools Its Permitting Regime in A4769 to Burden Public Carry.**

On June 24, 2022, one day after the *Bruen* decision, New Jersey Governor Phil Murphy held a press conference. (https://www.youtube.com/watch?v=EJ9ZJR-Sk24). Like his predecessors in the Southern states in 1954 in the wake of *Brown v. Board of Education*, Governor Murphy blasted the Supreme Court's decision upholding fundamental constitutional rights and vowed to find ways to undermine and/or circumvent the ruling. In addition to announcing a wish list of new legislation aimed at preventing law abiding individuals from carrying handguns, Governor Murphy signed Executive Order 299 (https://nj.gov/infobank/eo/056murphy/pdf/EO-299.pdf), which declared the *Bruen* decision "deeply flawed," stated that "the vast majority of New Jerseyans do not support

relaxing restrictions on who may carry a gun in public,"[2] and directed all State agencies to "immediately review their statutes, rules, regulations, and program requirements to identify actions that may be taken under existing authority determining whether, and in what manner, firearms may be carried, displayed, or otherwise regulated." *Id*. In other words, the Governor announced his clear intention to resist the Supreme Court's ruling in *Bruen* in any and every way possible.

On July 1, 2022, New York fired its first salvo at the broadside of *Bruen* and failed to sink it.[3] New Jersey then followed suit.  On December 22, 2022, Governor Murphy

---

[2] To the contrary, a November poll from Marquette University Law School shows that 64% of the people either "strongly favor" or "somewhat favor" the *Bruen* decision. https://law.marquette.edu/poll/wp-content/uploads/2022/11/MLSPSC11Toplines_CourtItems.html#J2:_Expand_2nd_Amendment.

[3] On July 1, 2022, after calling an extraordinary session of the legislature, New York enacted a new law, Senate Bill S51001, which placed massive new restrictions on the carrying of handguns in public through the state. *See* NEW YORK GOV.'S PRESS OFFICE, *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision,* July 1, 2022, available at https://on.ny.gov/3nXWrvA (last visited Dec. 1, 2022).

Multiple lawsuits were commenced challenging S51001. As a result of these lawsuits, major portions of S51001 were enjoined, first through temporary restraining orders ("TRO"), and then through preliminary injunctions ("PI"). *See Antonyuk v. Hochul*, 2022 WL 5239895 *10 (N.D.N.Y. Oct. 6, 2022) (TRO: "Simply stated, instead of moving toward becoming a shall-issue jurisdiction, New York State has further entrenched itself as a shall-not-issue jurisdiction."); *Hardaway v. Negrelli*, 2022 WL 11669872 *15 (W.D.N.Y. Oct. 20, 2022) (TRO: "The Constitution requires that individuals be permitted to use handguns for the core lawful purpose of self-defense. . . . And it protects that right outside the home and in public."); *Hardaway v. Negrelli*, 2022 WL 16646220 (W.D.N.Y.

signed into law A4769—solidifying New Jersey's defiance of the Supreme Court and its ruling in *Bruen*. (*See* Declaration of Daniel L. Schmutter, Exhibit A). A4769 picks up where "justifiable need" left off. A4769 so comprehensively precludes the lawful carry of handguns in public that one would not know, by reading A4769, that the Supreme Court ever decided *Bruen*. **Bruen holds that the Constitution precludes a State from broadly preventing the law abiding from carrying a handgun in public. A4769 does exactly that which the Constitution forbids.**

First, A4769 creates an enormous list of places and circumstances where carrying a handgun is off limits, including in one's own car and, presumptively, all private property. Handgun carry is banned in nearly all common public places, places where the people have a fundamental constitutional right to defend themselves with a handgun in the event they encounter violent crime—places such as parks, beaches, theatres, stadiums, restaurants, hospitals, malls, casinos, museums, libraries, trains, buses, and even one's own car. The effect is that there are almost no places in New Jersey, other than one's own home, where one can lawfully carry a handgun—exactly the state of affairs under "justifiable need" prior to *Bruen*.

Second, A4769 imposes massive fees increases and a new requirement to purchase liability insurance, both calculated to impose a substantial financial burden as an obstacle

---

Nov. 3, 2022) (PI); *Antonyuk v. Hochul*, 2022 WL 16744700 (W.D.N.Y. November 7, 2022) (PI); *Christian v. Negrelli*, 2022 WL 17100631 (W.D.N.Y.) (PI).

to exercising the right to bear arms in public.

Third, A4769 creates new and onerous procedures and standards for obtaining a Handgun Carry Permit—all obvious obstacles to exercising the fundamental right to bear arms in public.

### 1.    Prohibited Sensitive Places

A4769[4] renders nearly the entire State of New Jersey a "sensitive place" where handgun carry is prohibited. Section 7 of A4769 provides in pertinent part as follows:

7. (New section) Places where the carrying of a firearm or destructive device is prohibited.

a. Except as otherwise provided in this section and in the case of a brief, incidental entry onto property, which shall be deemed a de minimis infraction within the contemplation of N.J.S.2C:2-11, it shall be a crime of the third degree for any person, other than a person lawfully carrying a firearm within the authorized scope of an exemption set forth in N.J.S.2C:39-6, to knowingly carry a firearm as defined in subsection f. of N.J.S.2C:39-1 and a crime of the second degree to knowingly possess a destructive device as defined in subsection c. of N.J.S.2C:39-1 in any of the following places, *including in or upon any part of the buildings, grounds, or parking area of* [emphasis added]:

  (1) a place owned, leased, or under the control of State, county or municipal government used for the purpose of government administration, including but not limited to police stations;

  (2) a courthouse, courtroom, or any other premises used to conduct judicial or court administrative proceedings or functions;

  (3) a State, county, or municipal correctional or juvenile justice facility, jail and any other place maintained by or for a governmental entity for the detention of criminal suspects or offenders;

---

[4] The full text of A4769 is attached to the Declaration of Daniel L. Schmutter as Exhibit A.

(4)   a State-contracted half-way house;

(5)   a location being used as a polling place during the conduct of an election and places used for the storage or tabulation of ballots;

(6)   within 100 feet of a place where a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event;

(7)   a school, college, university or other educational institution, and on any school bus;

(8)   a child care facility, including a day care center;

(9)   a nursery school, pre-school, zoo, or summer camp;

(10)  a park, beach, recreation facility or area or playground owned or controlled by a State, county or local government unit, or any part of such a place, which is designated as a gun free zone by the governing authority based on considerations of public safety;

(11)  youth sports events, as defined in N.J.S.5:17-1, during and immediately preceding and following the conduct of the event, except that this provision shall not apply to participants of a youth sports event which is a firearm shooting competition to which paragraph (3) of subsection b. of section 14 of P.L.1979, c.179 (C.2C:58-6.1) applies;

(12)  a publicly owned or leased library or museum;

(13)  a shelter for the homeless, emergency shelter for the homeless, basic center shelter program, shelter for homeless or runaway youth, children's shelter, child care shelter, shelter for victims of domestic violence, or any shelter licensed by or under the control of the Juvenile Justice Commission or the Department of Children and Families;

(14)  a community residence for persons with developmental disabilities, head injuries, or terminal illnesses, or any other residential setting licensed by the Department of Human Services or Department of Health;

(15)   a bar or restaurant where alcohol is served, and any other site or facility where alcohol is sold for consumption on the premises;

(16)   a Class 5 Cannabis retailer or medical cannabis dispensary, including any consumption areas licensed or permitted by the Cannabis Regulatory Commission established pursuant to section 31 of P.L.2019, c.153 (C.24:6I-24);

(17)   a privately or publicly owned and operated entertainment facility within this State, including but not limited to a theater, stadium, museum, arena, racetrack or other place where performances, concerts, exhibits, games or contests are held;

(18)   a casino and related facilities, including but not limited to appurtenant hotels, retail premises, restaurant and bar facilities, and entertainment and recreational venues located within the casino property;

(19)   a plant or operation that produces, converts, distributes or stores energy or converts one form of energy to another;

(20)   an airport or public transportation hub;

(21)   a health care facility, including but not limited to a general hospital, special hospital, psychiatric hospital, public health center, diagnostic center, treatment center, rehabilitation center, extended care facility, skilled nursing home, nursing home, intermediate care facility, tuberculosis hospital, chronic disease hospital, maternity hospital, outpatient clinic, dispensary, assisted living center, home health care agency, residential treatment facility, residential health care facility, medical office, or ambulatory care facility;

(22)   a facility licensed or regulated by the Department of Human Services, Department of Children and Families, or Department of Health, other than a health care facility, that provides addiction or mental health treatment or support services;

(23)   a public location being used for making motion picture or television images for theatrical, commercial or educational purposes, during the time such location is being used for that purpose;

13

(24) private property, including but not limited to residential, commercial, industrial, agricultural, institutional or undeveloped property, unless the owner has provided express consent or has posted a sign indicating that it is permissible to carry on the premises a concealed handgun with a valid and lawfully issued permit under N.J.S.2C:58-4, provided that nothing in this paragraph shall be construed to affect the authority to keep or carry a firearm established under subsection e. of N.J.S.2C:39-6; and

(25) any other place in which the carrying of a firearm is prohibited by statute or rule or regulation promulgated by a federal or State agency.

b.

(1) A person, other than a person lawfully carrying a firearm within the authorized scope of an exemption set forth in subsection a., c., or l. of N.J.S.2C:39-6, who is otherwise authorized under the law to carry or transport a firearm shall not do so while in a vehicle in New Jersey, unless the handgun is unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle.

(2) A holder of a valid and lawfully issued permit to carry a handgun shall not leave a handgun outside of their immediate possession or control within a parked vehicle, unless the handgun is unloaded and contained in a closed and securely fastened case, or gunbox, and is not visible from outside of the vehicle, or is locked unloaded in the trunk or storage area of the vehicle.

A violation of paragraph (1) or (2) of this subsection is a crime of the fourth degree.

Pre-existing law already contains a smattering of prohibited places. For example, N.J.S. 2C:39-5(e) prohibits possession of firearms "in or upon any part of the buildings or grounds of any school, college, university or other educational institution . . . ." N.J.A.C. 7:2–2.17(b) already contains certain prohibitions on the possession of firearms and other weapons "while on State Park Service property without the specific approval of the Superintendent or designee." And, N.J.A.C. 13:69D–1.13 already contains

prohibitions on the possession of firearms and other weapons "within a casino . . . without the express written approval of the Division." To the extent this provision operates to the same unconstitutional effect as A4769, Plaintiffs bring the same challenges to N.J.A.C. 13:69D–1.13 as A4769.

Pre-existing New Jersey fish and game regulations also have several unconstitutional firearm prohibitions sprinkled throughout. N.J.A.C. 7:25–5.23(m) prohibits the simultaneous possession of both a bow and a firearm while hunting. Thus, bow hunters are denied the right to carry as a matter of course. N.J.A.C. 7:25–5.23(i) prohibits firearm possession "within the limits of a state game refuge unless authorized by the Division." N.J.A.C. 7:25–5.23(a), (c), and (f) restrict the type of ammunition a person may possess while "in the woods, fields, marshlands, or on the water," or while hunting various game. These prohibitions preclude possession of defensive handgun ammunition and therefore entirely prohibit the carry of a handgun for self-defense—the very fundamental right protected under *Bruen*. Notably, these rules do not merely regulate what ammunition can be used *for hunting* but rather they regulate mere possession regardless of use.

N.J.A.C. 7:25–5.23(f)(5) of the fish and game regulations prohibits possession of a firearm in a vehicle unless it is "enclosed in a securely fastened case."

These provisions operates to the same unconstitutional effect as A4769, and Plaintiffs bring the same challenges as to each of them.

Rather than identify the rare exceptions to the right to carry a handgun in public,

15

A4769 is so sweeping and comprehensive as to make it largely impossible for most people to carry a handgun during the course of their typical day—a direct affront to the fundamental constitutional right to bear arms as made clear by the Supreme Court in *Bruen*. 142 S. Ct. at 2133-34. A4769 is merely "justifiable need" by a new name.

Pursuant to A4769 Section 12, the provisions of Section 7 took effect immediately upon A4769 being signed into law, and therefore Plaintiffs urgently need a temporary restraining order enjoining the unconstitutional provisions of Section 7 as well as the foregoing unconstitutional provisions of pre-existing law.

### 2.    Insurance Coverage Requirement

Section 4 of A4769 also creates a costly and onerous insurance requirement as a predicate to exercise of the right to bear arms—one with no precedent in American history:

a. **Every private citizen who carries a handgun in public in this State shall maintain liability insurance coverage** insuring against loss resulting from liability imposed by law for bodily injury, death, and property damage sustained by any person arising out of the ownership, maintenance, operation or use  of a firearm carried in public wherein such coverage shall be at least  in an amount or limit of $300,000, exclusive of interest and costs, on account of injury to or death of more than one person and for  damage to property, in any one incident. [Emphasis added.]

Imagine requiring a person to purchase an insurance policy to go to church, post videos on the internet, publish a blog, or give a speech. This insurance requirement is just another way to discourage the exercise of a fundamental constitutional right that is disfavored by State of New Jersey.

16

Pursuant to A4769 Section 12, this provision take effect on the first day of the seventh month next following the date of enactment, which based on the enactment date of December 22, 2022, will be July 1, 2023.

### 3.    Fee Increases

Prior law imposed a $50 fee for obtaining a Handgun Carry Permit (*see* N.J. Ct. R. 1:43). Section 3 of A4769 increases the total fees required to obtain a permit by amending N.J.S. 2C:58-4(c) to require payment of to "a $200 application fee."  This four-fold increase of the associate permit fee is plainly calculated to discourage the exercise of the right to bear arms.  Notably, the Legislature does not even claim that this increase is linked to an increase in the legitimate cost of issuing permits.  While a portion of that fee "shall be used to defray the costs of investigation, administration, and processing of the permit to carry handgun applications," another portion—$50—"shall be deposited into the Victims of Crime Compensation Office account."  Compensating victims of crime is no doubt a worthy goal, but the State may not do so by effectively taxing the exercise of a constitutional right *See, e.g., Simmons v. United States*, 390 U.S. 377, 393–94 (1968).

Section 2 of A4679 also increases the fees *just to acquire and possess a firearm*. In addition to requiring a permit to carry a firearm, New Jersey also requires an individual to obtain a Firearms Purchaser Identification Card ("FID") to purchase and possess a rifle or a shotgun and a Permit to Purchase a Handgun ("Purchase Permit").  *See* N.J.S. 2C:58-3(f).  Under A4679, the fee for a rifle or shotgun FID has increased *tenfold* from $5 to

$50, and the fee for a handgun Purchase Permit has increased *more than tenfold* from $2 to $25.  As with the fee increases for a Carry Permit, the Legislature concedes these new fee scales are not necessarily based on increased expenses associated with legitimate costs of issuance:  "If the permit is issued by the superintendent," then "[a]ll fees, shall be paid to the State Treasury for deposit into the Victims of Crime Compensation Office account."  Pursuant to A4769 Section 12, these massive fee increases took effect immediately upon A4769 being signed into law.

### 4.    Onerous New Application Requirements

Section 2 and 3 of A4769 also add onerous new provisions to the process of obtaining an FID or Purchase Permit and a Handgun Carry Permit.  And because N.J.S. 2C:58-4(c) requires that an applicant for a Handgun Carry Permit not be "subject to any of the disabilities set forth in subsection c. of N.J.S.2C:58-3," all of the onerous new provision applicable to FIDs and Purchase Permits also apply to Handgun Carry Permits.

Section 2 of A4769 amends N.J.S. 2C:58-3 to add additional disqualifications for obtaining an FID, a Purchase Permit, and a Handgun Carry Permit.  Whereas prior law disqualified an applicant if issuance would "not be in the interest of the public health, safety or welfare," the new provision also disqualifies an applicant "found to be lacking the essential character of temperament necessary to be entrusted with a firearm."  It also provides a basis for denial where a person is:

> known in the community in which the person lives as someone who has engaged in acts or made statements suggesting the person is likely to

engage in conduct, other than justified self-defense, that would pose a danger to self or others,

A4769 made similar additions to N.J.S. 2C:58-4 to provide:

The chief police officer, or the superintendent, as the case may be, shall interview the applicant and the persons endorsing the application under subsection b. of this section, and shall make inquiry concerning, and investigate to the extent warranted, whether the applicant is likely to engage in conduct that would result in harm to the applicant or others*, including, but not limited to, whether the applicant has any history of threats or acts of violence by the applicant directed toward self or others or any history of use, attempted use, or threatened use of physical force by the applicant against another person, or other incidents implicating the disqualifying criteria set forth in subsection c. of N.J.S.2C:58-3, including but not limited to determining whether the applicant has been subject to any recent arrests or criminal charges for disqualifying crimes or has been experiencing any mental health issues such as suicidal ideation or violent impulses, and the applicant's use of drugs or alcohol. [Emphasis added.]*

The foregoing additions are already impermissibly subjective. But to make matters worse, the law creates a new onerous interview process not merely for the applicant herself but also four of her references.  Section 3, which amended N.J.S.2C:58-4(b), does much the same thing, imposing substantial *affirmative* obligations on an applicant's references:

The application shall be signed by the applicant under oath, and shall be endorsed by not less than four reputable persons who are not related by blood or by law to the applicant and have known the applicant for at least three years preceding the date of application, and who shall certify thereon that the applicant has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others.  The reputable persons also shall provide relevant information supporting the certification, including the nature and extent of their relationship with the applicant and information concerning their knowledge of the applicant's use of drugs or alcohol.

These amended provisions, increasing the number of required references from three to four, requiring them to sit for a character interview, and essentially demanding that they provide an *essay* to investigating authorities, are hard to fathom in a different scenario—like requiring the submission of essays as a condition for being allowed to operate a church or publish a newspaper or put on a parade.  Taken together, they are obviously designed to make an already cumbersome process so burdensome on the rightsholder and her family and friends so that they might become too discouraged to even make the effort to exercise a fundamental constitutional right.

The law also invites the permitting authority to engage in a fishing expedition:

> The chief police officer or the superintendent may require such other information from the applicant or any other person, including but not limited to publicly available statements posted or published online by the applicant, as the chief police officer or superintendent deems reasonably necessary to conduct the review of the application.

This invites the exercise of unbridled discretion for the investigating official to compel a limitless production of information, including private social media postings protected by the First Amendment and an entire lifetime of information, as well as to exercise uneven and disparate treatment of applicants merely because the officer deems it "reasonably necessary"—all to exercise a fundamental constitutional right.

If all of that were not bad enough, N.J.S. 2C:58-4 requires that Handgun Carry Permits be renewed every two years, thus requiring all applicant to submit to this inquisition every other year.  Pursuant to A4769 Section 12, these onerous new permit

requirements took effect immediately upon A4769 being signed into law.

### 5.    Novel and Undefined Offense of "Unjustifiable Display"

Section 5(a)(5) of A4769 creates a new, unconstitutionally vague, fourth degree crime called "unjustified display of a handgun."  Other parts of A4769 indicate what a person is required to do and not do when in possession of a handgun pursuant to a Handgun Carry Permit issued pursuant to N.J.S. 2C:58-4, but nothing in the statute gives a person any idea what constitutes the wholly independent and novel statutory crime. Pursuant to A4769 Section 12, the provisions of A4769 Section 5 take effect on the first day of the seventh month next following the date of enactment, which based on the enactment date of December 22, 2022 will be July 1, 2023.

### 6.    Discriminatory Treatment Among Rights Holders

Finally, as if to add insult to injury, in blatant violation of the Equal Protection Clause of the Fourteenth Amendment, A4769 creates a special gold-plated category of individuals who warrant special treatment under the law: *judges, prosecutors, and attorneys general*.  Section 8 of A4769 creates a whole new exemption under N.J.S .2C:39-6, exempting judges and prosecutors from not only the so-called "sensitive place" restrictions in A4769 section 7 but from all of the firearm restrictions in N.J.S 2C:39-5.

Accordingly, not only can judges, prosecutors, and attorneys general carry handguns into schools, museums, zoos, and casinos, but they can carry machine guns into all of those places now as well (*see* N.J.S. 2C:39-5(a)).  Perhaps New Jersey thinks that,

to the extent these officials are gun owners, they are likely to be law-abiding ones.  One can certainly hope that is true.  But New Jersey has no license to *assume* that the remainder of the law-abiding population as a whole is unlikely to bear arms lawfully as well. Pursuant to A4769 Section 12, the provisions of A4769 Section 8 take effect on the first day of the seventh month next following the date of enactment, which based on the enactment date of December 22, 2022 will be July 1, 2023.

Taken as a whole, A4769 can be seen exactly for what it is. Having lost the ability to prevent ordinary individuals from exercising their fundamental constitutional right to carry handguns in public for self-defense by forcing them to show to the arbitrary satisfaction of a public official that they really "need" to do so, Governor Murphy and the New Jersey Legislature have thrown together the worst, most onerous, and most prejudicial new provisions to effectively resurrect the "justifiable need" regime.

## D.  A4769 Will Predictably Burden Plaintiffs' Ability to Exercise Their Second Amendment Rights.

The individual Plaintiffs are seven law abiding New Jerseyans who simply wish to exercise their fundamental constitutional right to keep and bear arms for their safety, the safety of their loved ones, and the safety of their communities.[5]

Plaintiffs are law abiding New Jerseyans who believe that possession and carry of

---

[5] Plaintiffs' facts are fully set forth in the Declarations of Aaron Siegel, Jason Cook, Joseph DeLuca, Nicole Cuozzo, Timothy Varga, Christopher Stamos, Kim Henry, and Scott Bach.

firearms is an important aspect of protecting themselves and their families from the risk of violent crime. Plaintiffs have obtained or are applying for Handgun Carry Permits because they recognize that violent crime can take place anywhere, including when they are outside the home.

For example, Plaintiff Siegel is a member of the volunteer New Jersey Medical Reserve Corps, which is a disaster response unit. He received a Certificate of Recognition and Letter of Appreciation from the Sussex County Freeholders for his volunteer service during Super Storm Sandy. Plaintiff Siegel previously served as an Emergency Medical Technician in Paterson New Jersey. As a result, he understands that emergency personnel, including police, are sometimes delayed, through no fault of their own, in their ability to timely respond to emergencies. Thus, he understands that individuals experiencing criminal violence are often required to provide for their own personal defense against such attacks.

Plaintiff Nicole Cuozzo is a member of the Bible Baptist Church in New Egypt, New Jersey. Plaintiff Timothy Varga is a Deacon of the Grace Bible Church in Wall Township, New Jersey and is a member of the church's security team.

Plaintiffs Cuozzo and Varga are both aware of mass shooting incidents which took place at houses of worship around the United States, including the First Baptist Church in Sutherland Springs, Texas, the Emanuel African Methodist Episcopal Church in Charleston, South Carolina, and the Tree of Life Synagogue in Pittsburgh, Pennsylvania.

In particular, however, they are aware of the Freeway Church of Christ in Texas where, in 2019, a volunteer parishioner armed with a concealed handgun successfully ended an attack by an active shooter within six seconds after it began.

Plaintiff Kim Henry is a part time substitute teacher and cancer survivor who currently lives on social security disability in Pemberton, New Jersey with her two children. She has received numerous death threats from her ex-boyfriend and currently fears for her life and the lives of her children. Plaintiff Henry does not currently own any firearms, but she wishes to acquire firearms to protect her family.

### 1. Section 7(a)(6) – Prohibition on Carry Within 100 Feet of a Public Gathering Requiring a Government Permit.

Plaintiffs Siegel, Cook, and DeLuca each sometimes attend or pass within 100 feet of public gatherings and events, even if they are not actual attendees. But, none of them knows which ones require a government permit as none of them organize any such gatherings or events.

### 2. Section 7(a)(7),(8), (9), N.J.S. 2C:39-5(e) – Prohibition on Carry at a Schools and Daycares.

Plaintiffs do not challenge the prohibition on schools, etc. per se. Plaintiff Siegel take his son to Tae Kwan Do classes at a martial arts school near his home and also bagpipe classes. The Tae Kwan Do school is in a strip mall which also contains other stores and business that Plaintiff Siegel frequents. From time to time, he also takes continuing education classes for work hosted at various places, including but not limited to

24

hospitals, training centers, restaurants with a license to serve alcohol, and catering halls.

From time to time, both Plaintiff Cook and Plaintiff DeLuca take professional education classes for work. Plaintiff Cook also takes firearm training classes, and motorcycle classes from time to time.

Plaintiffs Cuozzo and Varga welcomed the *Bruen* decision because neither of their churches can afford full time professional security to protect the members of the church against the possibility of attack by an active shooter.

Cuozzo's church conducts services and other events most days of the week in addition to Sundays, and holds special events for the church members and the community at large on holidays and other special days throughout the year.

But in addition to services and other religious events, the church also conducts Sunday school classes, adult bible classes, and a homeschool co-op in which parents who homeschool their children bring their children together at the church for certain joint events and learning programs.

Varga's church sits on a campus consisting of 14 acres of land with three buildings (church sanctuary, school building, and gymnasium) totaling 47,000 square feet. The school building and gymnasium building are leased to the Ambassador Christian Academy. The church holds formal prayer services in the sanctuary building on Sundays and Wednesdays with less formal prayer meetings on Tuesdays. Several days during the week the church also holds bible study groups for adults and children of all ages.

Throughout the year the church holds sports leagues and clinics, as well as special seasonal or holiday events with hundreds or in some instances several thousand attendees. Overall, the church is busy with events most days of the year. The church's meager security budget barely covers a handful of such events, and even those are inadequately manned. Further, the funds used for the bare bones security budget could instead be used for desperately needed additional administrative staff, clergy, or technology staff.

Unfortunately, none of these key terms: school, educational institution, childcare facility, day care, or pre-school are defined in A4769. While Plaintiff Varga knows that a tradition school such as Ambassador Christian Academy on the campus of Grace Bible Church is a prohibited place, Plaintiffs have no way of knowing whether other locations such as the Tae Kwan Do classes, bagpipe classes, professional skills classes, motorcycle classes, Sunday school/religious study groups, sports clinics, etc. fall within the criminal prohibitions of the law.

Further, the activities of the Tae Kwan Do school and the various activities which take place on these church properties take place on multi-use properties. A4769 Section 7 prohibits carry on "any part of the buildings, grounds, or parking area" of any of the prohibited locations. Therefore, if any of the foregoing activities qualifies as a school, etc., under this law, carry would be prohibited in *all* parts of the church campuses and buildings, and in *every* store or business in the same strip mall as the Tae Kwan Do school, bagpipe school, or any other such potentially prohibited place.

26

Thus, many places not actually on the list of prohibited places, such as churches, synagogue, mosques, tailor shops, pizza shops, card stores, etc. are now all places where Plaintiffs and all other like them cannot carry. A4769 paints with an incredibly vast and broad brush.

### 3.     Section 7(a)(9) – Prohibition on Carry at a Zoo.

Plaintiff Siegel frequently takes his son to the Turtle Back Zoo in West Orange, New Jersey and the Van Saun Zoo in Paramus, New Jersey. Plaintiff Cook enjoys the Popcorn Park Zoo in Forked River, New Jersey, the Adventure Aquarium in Camden, New Jersey, and Jenkinson's Aquarium in Point Pleasant Beach, New Jersey. From time to time, Plaintiff DeLuca enjoys the Cape May Zoo. Under A4769, none of these plaintiffs can defend themselves (including any children they may have with them) while enjoying a family outing to learn about wild animals.

### 4.     Section 7(a)(10); N.J.A.C. 7:2–2.17(b) – Prohibition on Carry at Parks and Recreational Facilities.

Plaintiff Siegel frequently hikes and walks his dog in public parks near his home and goes to publicly owned beaches, including in Wildwood, New Jersey.

Plaintiff Cook enjoys walking trails in State parks, and during the summer enjoys walks or fishing at public beaches in Seaside, Avon, Belmar, Point Pleasant, and Manasquan. Because his grandparents lived in Union County, he has spent a great deal of time in Union County over the years.  He still enjoys spending time at Galloping Hill Park in Kenilworth several times per year. He has a one year-old-nephew that he will take his

27

nephew to public playgrounds near his home when he is older.

Plaintiff DeLuca regularly enjoys walking his dog in State parks such as Wharton State Forest and Black Run Preserve, and regularly enjoys public beaches in New Jersey.

Plaintiff Stamos annually accompanies his wife when she participates in the "Paddle the Peninsula" kayak event at Bayonne's 16th Street Park and otherwise enjoys the park several times per year, including when the park hosts its Renaissance Festival and Irish Festival. Several years ago, Bayonne converted the park's kayak launch area into a beachfront by constructing a sandy beach area for public recreation. He also, from time to time, takes his young nephews to Bayonne's Cottage Street Park.

Under A4769, none of these Plaintiffs can defend themselves or their family while spending time together enjoying surrounding nature.

### 5.       Section 7(a)(11) – Prohibition on Carry at Youth Sports Events.

Plaintiff Siegel takes his son to participate in youth Tae Kwan Do competitions.

### 6.       Section 7(a)(12) – Prohibition on Carry at Public Library or Museum.

Plaintiff Siegel frequently takes his son to public museums and the public library.

### 7.       Section 7(a)(15) – Prohibition on Carry at Bar or Restaurant Where Alcohol is Served.

Plaintiff's Siegel, Cook, and DeLuca enjoy dining out at restaurants that serve alcohol but do not and would not consume alcohol if they were carrying their handguns.

### 8.       Section 7(a)(17) – Prohibition on Carry at Entertainment Facility.

Plaintiff Siegel goes to movie theatres with his family approximately one or two

time per month. They also attend concerts at the Izod Center at the Meadowlands and at the PNC Bank Arts Center in Holmdel, New Jersey. Plaintiff Siegel sometimes attends New Jersey Devils Hockey games at the Prudential Center in Newark, New Jersey.

Plaintiff Cook enjoys movie theatres and the Medieval Times theatre, as well as theaters in Atlantic City. He also attends concerts at the Prudential Center, the PNC Bank Arts Center, and the BB&T Pavilion in Camden, New Jersey and attends races several times per year at Atco Dragway racetrack in Waterford Township, New Jersey.

Plaintiff DeLuca regularly goes to movie theatres and theatres in Atlantic City and also attend races at Atco Dragway.

9.   **Section 7(a)(18); N.J.A.C. 13:69D–1.13 – Prohibition on Carry at Casinos.**

Plaintiffs Siegel, Cook, and DeLuca regularly enjoy trips to the casinos in Atlantic City, New Jersey. When they do so they enjoy gambling on the casino floors, dining in the casino restaurants, attending shows in the casino theatres, and staying in the casino hotels. Plaintiff DeLuca also visits a friend who lives on a boat in Farley State Marina. In order to access the Marina he must traverse the property of the Golden Nugget Casino.

10.  **Section 7(a)(20) – Prohibition on Carry at Airport or Transportation Hub.**

When Plaintiff Siegel attend Devils games in Newark, he sometimes takes the bus or train to Newark. If he takes the train, his trip terminates at Newark Penn Station. From time to time Plaintiff Siegel drives his friends and family and drops them off or picks

them up from Newark Airport.

At least once per month, Plaintiff Cook drives family members and drops them off or picks them up at Newark or Atlantic City Airport. Plaintiff Cook enjoys snowboarding and skiing. Every few years, he travels to New Hampshire and is planning a trip to Utah next year. He is licensed to carry a handgun in both New Hampshire and Utah, and on some of these trips he will fly and wishes to bring his handgun with him to carry for protection. If he brought his handgun with him during air travel, he would declare his handgun unloaded and properly cased and packed at the airline ticket counter as required by federal law (49 C.F.R. § 1540.111), but A4769 prevents him from doing so.

On occasion Plaintiff DeLuca takes a PATCO train from Ashland Station in Voorhees, New Jersey to Philadelphia, Pennsylvania. Plaintiff DeLuca is licensed to carry a handgun in Pennsylvania.

## 11.    Section 7(a)(21), (22) – Prohibition on Carry at Health Care and Treatment Facilities.

In the course of his employment as a nurse practitioner, Plaintiff Siegel works variously at medical offices and medical boarding homes, including, but not limited to, Skylands Urgent Care in Lake Hopatcong and Free Clinic Newton, in Newton, New Jersey, where he works as a volunteer. Further, some of his continuing education classes take place at hospitals.

Prior to the passage of A4769, on several occasions, Plaintiff Cook lawfully carried his handgun at medical appointments, but only those medical appointments that did not

require that he disrobe, so that he could maintain safe possession and control of his hand-gun at all times.

**12.    Section 7(a)(23) – Prohibition on Carry at Public Filming Location.**

Anyone can encounter a place where motion picture or television images are being made while out in public, including television news coverage. Plaintiffs Siegel and Cook have done so multiple times in the past. In each instance, Plaintiff Cook approached the location to inquire about the production and to determine if he recognized any of the actors or personalities involved. Plaintiff Siegel did so on some of those occasions. Both would again in the future approach such locations in the same manner if he encountered them to see what film or television show was being filmed.

**13.    N.J.A.C. 7:25–5.23(m); N.J.A.C. 7:25–5.23(i); N.J.A.C. 7:25–5.23(a), (c), and (f); N.J.A.C. 7:25–5.23(f)(5) – Prohibition on Carry Under Fish and Game Regulations.**

Plaintiff Siegel takes his son hunting in the woods and fields of New Jersey.

**14.    Section 7(a)(24) – Prohibition on Carry on Private Property without Express Consent or Signage.**

Some of the foregoing places frequented by Plaintiffs are private property. Further, Plaintiff Siegel is divorced, and his son is from his first marriage. He shares custody of his son with his ex-wife, and picks his son up and drops him off at his ex-wife's condominium property. In doing so, he must drive and walk on condominium common elements. Plaintiffs all regularly frequent other private property, and none of the owners of the foregoing or other private property on which they would otherwise carry has

provided express consent or has posted the required sign granting permission. Notably, it is the *owner* that must provide consent, not the tenant. Thus a business owner cannot even consent to their customers carrying.

Further, Plaintiffs Cook and DeLuca are private homeowners. They would allow the carry of handguns on their property, but they do not want to have to post a sign on their property explicitly saying so.

### 15.    Section 7(b) – Prohibition on Carry in a Vehicle.

Plaintiffs Siegel, Cook, and DeLuca drive their cars nearly every day for both work and personal reasons. The prohibition on carry in a vehicle would force them to remain unarmed while in their cars and also force them to actively load and unload a handgun in view of the public in a parking lot or in an on-street parking space.

Plaintiff Siegel sometimes takes the bus or train to Newark to attend Devils games in Newark. Plaintiff DeLuca takes a PATCO train from Ashland Station in Voorhees, New Jersey to Philadelphia, Pennsylvania where he is licensed to carry a handgun.

Plaintiffs Cook and DeLuca also regularly ride motorcycles, but have no means to secure their handguns unloaded and locked away while riding or while parked in a parking lot at a prohibited location, both as required by Section 7(b).

Plaintiff DeLuca also rides a bicycle but has no means to secure his handgun unloaded and locked away while riding or while parked in a lot at a prohibited location, both as required by Section 7(b). He also owns a boat which he sometimes uses.

32

16.    **Section 4 – Insurance Requirement.**

All Plaintiffs will be required to carry insurance in order to carry their handguns pursuant to their Handgun Carry Permits.

17.    **Sections 2 and 3 – Fees and Onerous Permitting Requirements.**

Plaintiffs Siegel, Cook, and Henry intend to apply for Purchase Permits and will therefore be subject to the all of the new requirements of N.J.S. 2C:58-3, including the vastly increased fee.

Plaintiff Henry intends to apply for an FID and will therefore be subject to the all of the new requirements of N.J.S. 2C:58-3, including the vastly increased fee.

All of the Plaintiffs will be required to renew their Handgun Carry Permits every two years and will therefore be subject to the all of the new requirements of N.J.S. 2C:58-4, including the increased fee and the substantive standards of N.J.S 2C:58-3.

18.    **Sections 8 – Special Elite Status for Judges, Prosecutors, and Attorneys General.**

None of the Plaintiffs are judges, prosecutors, or attorneys general and therefore none will enjoy the special elite exemptions available to those categories of individuals.

ANJRPC has members, including all of the Plaintiffs, who engage or wish to engage in all of the foregoing activities.

As a result of the foregoing prohibitions, Plaintiffs and members of ANJRPC can carry their handgun virtually nowhere outside of their homes and are subject to onerous and unlawful requirements merely exercise their fundamental right to keep

and bear arms. A4769 is so comprehensive in where it bans the carry of handguns, primary bill sponsor Assemblyman Joe Danielsen was asked by his colleague Assemblywoman Victoria Flynn where *could* a person carry her handgun. Danielsen's answer: "My job is not to tell you where guns can go."   https://njleg.state.nj.us/archived-media/2022/AJU-meeting-list/media-player?committee=AJU&agendaDate=2022-10-17-10:00:00&agendaType=M&av=A at marker 50:25 to 51:33.

And, in fact, the sponsors of A4679 have repeatedly been asked where a person could actually lawfully carry a handgun under this law. The sponsors have steadfastly refused to answer.

## ARGUMENT

A plaintiff seeking a temporary retaining order or a preliminary injunction must demonstrate (1) a likelihood of success on the merits and (2) a prospect of irreparable injury if the injunction is not granted. *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017). In addition, "the district court . . . should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest." *Id.* Here, all four factors favor issuing a preliminary injunction.

First and foremost, plaintiffs are very likely to succeed on the merits, as A4769 is a direct affront to the Second Amendment in multiple respects.  It imposes crushing financial penalties on the exercise of Second Amendment rights, including forcing law-

abiding citizens to pay massive fees and even purchase liability insurance—insurance that does not even presently exist—just to exercise those rights. The act creates onerous new hurdles in the permit process, requiring personal interviews of the applicant and her references, as well as demanding that references prepare what amounts to an essay in support of the application. And on top of all that, the law defines "sensitive places" in a way that is utterly divorced from historical traditional and effectively makes it impossible to carry firearms in New Jersey.

None of that can be reconciled with the Supreme Court's recent and unambiguous teachings in *Bruen*. And all of it threatens plaintiffs with obvious irreparable harm. This Court should grant immediate relief and stop New Jersey's latest effort to prevent Plaintiffs and other law-abiding citizens from exercising the fundamental rights that the Supreme Court has repeatedly made clear the Second Amendment protects.

## I.     Plaintiffs Are Likely To Succeed on the Merits of Their Second Amendment, First Amendment, Due Process, and Equal Protection Claims.

Establishing likelihood of success on the merits "requires a showing significantly better than negligible but not necessarily more likely than not." *Id.* at 179. Although Plaintiffs bear the burden of demonstrating their entitlement to preliminary equitable relief, where the State bears the burden of proof on the "ultimate question," plaintiffs "must be deemed likely to prevail unless the Government has shown" that it can carry that burden. *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004).

A.     **Plaintiffs Are Likely To Succeed on the Merits of Their Second Amendment Claims.**

The Second Amendment to the U.S. Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

In *Bruen*, the Supreme Court clarified the test to be applied under the Second Amendment: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." 142 S. Ct. at 2129–30. "The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*. at 2130.

Carrying handguns in public—the very activity at issue in *Bruen*— plainly falls within the text of the Second Amendment. Id. at 2134-35. Therefore, Defendants bear the burden to demonstrate that A4769 and the challenged pre-existing prohibitions on carry are consistent with the historical tradition of firearm regulation. *Id*. at 2130.

Consistency with historical tradition requires comparing the challenged regulation with regulations that existed at the time of the Founding. "[W]hen a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id*. at 2131.

Here, the societal problem sought to be addressed by A4769 and New Jersey's prohibitions on handgun carry is the same as it was in *Bruen* and in *Heller*: "handgun violence," primarily in "urban area[s]." *Id*. Similarly, the nature of the prohibitions and rules challenged here are exactly the same as in *Bruen*: to restrict the ability of individuals to carry handguns in public for self-defense. Defendants thus are not entitled to resort to reasoning by historical analogy, as *Bruen* leaves that path only only for "unprecedented societal concerns," "dramatic technological changes," or "modern regulations that were unimaginable at the founding." *Id*. at 2132.  Restricting possession and carry of handguns in the various public places New Jersey has identified involves none of those things.

To the contrary, all the restricted places its vast sweep encompasses existed or had clear parallels in the 18th Century. Just as the Second Amendment applies equally to modern arms as 18th Century arms, see *Heller*, 554 U.S. at 582; *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016), so, too, it applies equally to modern parks and 18th Century parks, to modern theatres and 18th Century theatres, to modern vehicles and 18th Century vehicles.  There is no constitutional difference between the Boston Common of the 18th Century and today's 16th Street Park in Bayonne. There is no constitutional difference between the John Street Theatre of colonial New York and the PNC Bank Arts Center. There is no constitutional difference between a horse, a carriage, a train, a car, a bus, or a motorcycle.

Therefore, Defendants cannot resort to historical consistency by analogy. Rather, they must show that these same types of restrictions and requirements were part of the

historical tradition in or about 1791. They will not be able to do so, as several federal courts in New York have already found. *See Hardaway v. Nigrelli*, 2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022); *Antonyuk v. Hochul*, 2022 WL 16744700 (W.D.N.Y. November 7, 2022); *Christian v. Nigrelli*, 2022 WL 17100631 (W.D.N.Y.).

As the Supreme Court explained in *Bruen*, "the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses . . . ." 142 S.Ct. at 2133. As those limited examples reflect, the only restrictions on being armed in public found in the historical tradition related to places where the function of governing takes place, so as to prevent "Violence or Force being used at the [] Elections" or "violent intimidation of the courts of justice." D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 233-34, 244-45 (2018).

Accordingly, Defendants will be unable to show any historical tradition for the challenged prohibited places: public gathering – 7(a)(6); zoo – 7(a)(9); recreational facility – 7(a)(10); youth sports event – 7(a) (11); public library or museum – 7(a)(12); place where alcohol is served without regard to consumption – 7(a)(15); entertainment facility – 7(a)(17); casino – 7(a)(18); airport or transportation hub (non-secure areas) – 7(a)(20); health care or treatment facility – 7(a)(21), (22); public filming location – 7(a)(23); hunting and fishing areas; private property – 7(a)(24); vehicles – 7(b).

Defendants will also be unable to show any historical tradition for a breadth of prohibition that makes the entirety of a multi-use property prohibited, such as a church

with a school or even just Bible studies on the same campus, or an entire strip mall with a single prohibited location on it.

Defendants cannot show any historical tradition for imposing an insurance requirement, nor the subjective permit qualifiers and multiple interviews, reference essays, and open-ended discovery in N.J.S. 2C:58-3 and 4 as a condition to exercising the right to keep and bear arms. To the contrary, the Court was clear in *Bruen* that licensing may only involve "narrow, objective, and definite standards." 142 S. Ct. at 2138 n.9.

Finally, Defendants will be unable to support the exorbitant increase in fees. First, because some of the fees go to the Victims of Crime Compensation Office, they are plainly unconstitutional under *Cox v. New Hampshire*, 312 U.S. 569, 577 (1941). Any fee imposed on the exercise of a constitutional right must be designed solely "to meet the expense incident to the administration of the act and to the maintenance of public order in the matter licensed." *Id. See also Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943).  Forcing law-abiding citizens to shoulder the burden of compensating victims of gun crimes just because they choose to exercise their Second Amendment rights manifestly does not meet that standard.

Further, however, for Defendants to even avail themselves of the *Cox* rule, the underlying administration cost must *itself* be constitutional. If this were not so, a State could easily suppress political rallies by mandating 10,000 police officers at every rally

and then charging the organizer the associated astronomical fee.

In the context of the Second Amendment, that means that the costs of administration sought to be offset (i.e. licensing costs) must be consistent with the historical tradition of firearm regulation. 142 S. Ct. at 2129-30. Defendants will not be able to show that the excessive administrative cost of New Jersey's idiosyncratically costly licensing process meets that standard.

**B.      Plaintiffs Are Likely To Succeed on the Merits of Their First Amendment Claims.**

Several provisions of A4769 plainly violate the First Amendment. First, the interview requirement compels the contents of an applicant's protected speech, demanding information from the applicant or any other person, including but not limited to publicly available statements posted or published online by the applicant, as the chief police officer or superintendent deems reasonably necessary.  The law also compels the disclosure of the names and contact information of no less than four character references, who in turn must be willing attest that such applicant has not engaged in any acts or made any statements that suggest the applicant is likely to engage in conduct, other than lawful self-defense, that would pose a danger to the applicant or others *and* provide relevant information supporting the certification, including the nature and extent of their relationship with the applicant and information concerning their knowledge of the applicant's use of drugs or alcohol.

This chills the applicant's ability and willingness to speak on the internet, speak

privately and/or anonymously, or enter into intimate or private relationships. Thus, A4769 conditions the right to carry a firearm upon a person engaging in only government-approved speech and association. The exercise of one constitutional right cannot be conditioned on the forfeiture or violation of another. *See, e.g., Simmons*, 390 U.S. at 393–94 (It is "intolerable that one constitutional right should have to be surrendered in order to assert another.").

Second, the private property reverse presumption in Section 7(a)(24) impermissibly compels the speech of property owners and lessees. It requires property owners and lessees to espouse a belief one way or the other on the carriage of firearms outside the home by requiring them to expressly consent or post a sign. Plaintiffs are each homeowners and they each wish to allow the carry of handguns in their homes without posting a sign or engaging in express speech.

The First Amendment prohibits the State from telling people what they must say. *See Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018).

Finally, the ban in Section 7(a)(12) on carry in libraries violates the First Amendment right to access libraries, *Kreimer v. Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 2015), because it forces individuals to chose between foregoing their First Amendment rights and foregoing their Second Amendment rights. *Simmons*, 390 U.S. at 393–94.

### C.     Plaintiffs Are Likely To Succeed on the Merits of Their Due Process and Vagueness Claims.

"[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement" *Kolender v Lawson*, 461 U.S. 352, 357 (1983); *id*. at 358 (The arbitrary enforcement is "the more important aspect of the vagueness doctrine."); *Connally v. Gen. Constr. Co*., 269 U.S. 385, 391 (1926). A law that burdens constitutional rights or that imposes criminal penalties must meet a higher standard of specificity than a law that merely regulates economic concerns. *Hoffinan Estates v. Flipside, Hoffman Estates, Inc*., 455 U.S. 489, 498-99 (1982). This higher standard applies here because the laws at issue are criminal. In addition, a higher standard also applies because the subject matter of the regulated conduct implicates the fundamental constitutional right to keep and bear arms.

As set forth above, several of A4769's provisions are either too vague for a reasonable person to ascertain what is prohibited, require the discernment of facts not at a person's disposal, or encourage arbitrary discretion by public officials. For example, subjective criteria in N.J.S. 2C:58-3 deny permits "To any person":

known in the community in which the person lives as someone who has engaged in acts or made statements suggesting the person is likely to engage in conduct, other than justified self-defense, that would pose a danger to self or others,

[or] where the issuance would not be in the interest of the public health, safety or welfare because the person is found to be lacking the essential character of temperament necessary to be entrusted with a firearm.

These criteria are standardless and vague and therefore they invite arbitrary application.

Just as problematic, key terms for some sensitive places—like "school" and "educational institution"—are undefined, rendering it impossible to know whether those terms include karate lessons, bagpipe lessons, continuing professional education, Sunday school, Bible studies, motorcycle classes, or a parents' home schooling co-op.

Likewise, the term "vehicle" in Section 7(b)(1) is undefined. Therefore a person cannot know whether the vehicle restrictions apply only to cars or also to buses, trains, motorcycles, bicycles, boats, scooters, skateboards, etc.

And Section 7(a)(6) prohibits carrying a firearm:

> (6) within 100 feet of a place where a public gathering, demonstration or event is held for which a government permit is required, during the conduct of such gathering, demonstration or event;

A typical person cannot know which events require a permit and therefore cannot know how to avoid liability. In addition to being vague, Section 7(a)(6) fails to provide notice. Because a typical person cannot know which events require a permit, Plaintiffs cannot ascertain the facts necessary to avoid criminal liability.

Section 5(a)(5) of A4769 creates a new, unconstitutionally vague, fourth degree crime called "unjustified display of a handgun."[6]

---

[6] Brandishing a firearm is already a crime under N.J.S. 2C:12-1(b)(4). Therefore, it is difficult to imagine what act this vague new crime covers.

### D.    Plaintiffs are Likely to Succeed on the Merits of Their Equal Protection Claims.

The Equal Protection Clause is "essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Thus, a state can violate equal protection by drawing impermissible distinctions among citizens even if, absent the impermissible distinction, the state would have the power to enact the statute in question.

"Classifications affecting fundamental rights are given the most exacting scrutiny." *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (citation omitted). "[T]he right to keep and bear arms [is] among those fundamental rights necessary to our system of ordered liberty," *McDonald*, 561 U.S. at 778. Because A4769 "establishes . . . classification[s] that implicate[ ] fundamental rights[,] . . . [it] must meet strict scrutiny analysis," *Tolchin v. Supreme Court of N.J.*, 111 F.3d 1099, 1114 (3d Cir. 1997), and it must be "narrowly tailored to serve a compelling state interest," *Pemberthy v. Beyer*, 19 F.3d 857, 870 n.18 (3d Cir. 1994) (quotation marks omitted).

A4769 exempts judges, prosecutors, and attorney general from sensitive place restrictions. For purposes of the sensitive place restrictions there are no relevant distinctions between judges, prosecutors, and attorneys general and the people *except* for the statute's special exemption. Thus, both classifications involve groups similarly situated in all relevant respects other than the distinction at issue. *See Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 394 (3d Cir. 2010); *Garcia v. Harris*, 2016 WL 9453999, at *4

(C.D. Cal. Aug. 5, 2016); *see also Kolbe v. Hogan*, 813 F.3d 160, 201 (4th Cir. 2016) (Traxler, J., dissenting).

That distinction cannot survive review because it is not narrowly tailored to achievement of the State's interest in public safety. After all, to the extent carrying a firearm in a zoo ever poses a threat to public safety, the state offers no basis whatsoever to believe that any risk of gun violence—whether intentional or accidental—dissipates when the person carrying while strolling through the Tiger exhibit is a judge as opposed to a law-abiding permit holder.

The presumptive prohibition on private property also violates the Equal Protection Clause. A4769 treats individuals differently solely based on whether or not they are choosing to exercise their Second Amendment right to bear arms. If they do not so choose, they are subject to ordinary New Jersey trespass law. If they *do* so choose, they are subject to a special heightened legal standard that makes them a felon unless the property owner has specially pre-approved their presence at the property.

That distinction cannot survive strict scrutiny because it is not narrowly tailored to achievement of the State's interest in public safety.

## II.   Plaintiffs Are *Currently* Suffering Irreparable Harm and Will Continue to Suffer Irreparable Harm if the Court Denies Relief.

The conclusion that Plaintiffs have a reasonable probability of success on their constitutional claims compels the conclusion that Plaintiffs face irreparable injury in the absence of injunctive relief. It is well-accepted that the deprivation of a constitutional

right constitutes irreparable harm. *See, e.g.*, *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99, 113 (3d Cir. 2013). The Third Circuit has recognized this rule in the context of a variety of constitutional rights. *See, e.g.*, *id.* (First Amendment); *Lewis v. Kugler*, 446 F.2d 1343, 1350 (3d Cir. 1971) (Fourth Amendment). Rights under the Second Amendment are treated no differently. *See Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011); *see also McDonald*, 561 U.S. at 780.

## III.   The Remaining Factors Favor Injunctive Relief.

The public interest and balance of equities likewise favor Plaintiffs because Plaintiffs are likely to succeed on their constitutional claims. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), for "the enforcement of an unconstitutional law vindicates no public interest," *K.A. ex rel. Ayers*, 710 F.3d at 114; *Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017).

On the other side of the scale, Defendants suffer little harm, as they have no valid interest in enforcing New Jersey's unconstitutional law and, as explained above, New Jersey has never in its history chosen to impose these onerous restrictions. New Jersey cannot claim that suddenly there is urgency in enforcing them now, for the first time in the State's history. Moreover, any potential harm resulting from an *erroneous* injunction is "not extensive" in the context of an as-yet unenforced criminal law that threatens constitutional rights. *Ashcroft v. ACLU*, 542 U.S. 656, 671 (2004). No prosecutions are disrupted, and the Government remains free to enforce other, related laws. *Id.*

Finally, the balance of the equities generally favors parties seeking to preserve the status quo. *E.g.*, *Hereas Materials Tech. LLC v. Pham*, 2011 WL 13227724, *1 (E.D. Pa. May 5, 2011); *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 813 (3d Cir. 1989) (the "preservation of the status quo represents the goal of preliminary injunctive relief in any litigation"). Granting Plaintiffs relief will merely maintain the status quo—or minimize the change to the status quo—until the Court can fully adjudicate their claims.

## CONCLUSION

This Court should issue a temporary restraining order and a preliminary injunction prohibiting enforcement of the foregoing provisions of law.

Dated: December 23, 2022

Respectfully submitted,

s/ Daniel L. Schmutter
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com
