UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

AARON SIEGEL, JASON COOK,
JOSEPH DELUCA, NICOLE
CUOZZO, TIMOTHY VARGA,
CHRISTOPHER STAMOS, KIM
HENRY, AND ASSOCIATION OF
NEW JERSEY RIFLE AND PISTOL
CLUBS, INC.,

    Plaintiffs,

v.

MATTHEW J. PLATKIN, in his
official capacity as Attorney General
of the State of New Jersey; and
PATRICK CALLAHAN, in his
official capacity as Superintendent of
the New Jersey State Police,

    Defendants.

Hon. Karen M. Williams,  U.S.D.J.
Hon. Ann Marie Donio, U.S.M.J.

Docket No. 22-CV-7463

*CIVIL ACTION*
**(ELECTRONICALLY FILED)**

 Motion Return Date: January 9, 2023

---

### DEFENDANTS' BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

---

**MATTHEW J. PLATKIN**
ATTORNEY GENERAL
OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 080
Trenton, New Jersey 08625
*Attorney for Defendants*

Angela Cai (NJ Bar 121692014)
  *Deputy Solicitor General*
Jean Reilly
  *Assistant Attorney General*
David Chen
Amy Chung
Viviana Hanley
Chandini Jha
Samuel L. Rubinstein
  *Deputy Attorneys General*
  Of Counsel And On The Brief

# **TABLE OF CONTENTS**

TABLE OF CONTENTS...........................................................................i

TABLE OF AUTHORITIES..................................................................ii

PRELIMINARY STATEMENT ............................................................1

COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY ...........2

    A.    The *Bruen* Decision And New Jersey's Public-Carry Laws...................2

    B.    New Jersey Updates Its Firearm Laws After *Bruen*.............................4

    C.    The Instant Challenge And TRO Request.........................................8

LEGAL STANDARD ...........................................................................9

ARGUMENT....................................................................................11

  I.  JURISDICTIONAL DEFECTS PREVENT FINDING A LIKELIHOOD OF SUCCESS ON THE MERITS AND IRREPARABLE HARM ON PLAINTIFFS' SECOND AMENDMENT CLAIMS.....................................11

  II.    PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING IRREPARABLE HARM FOR ANY OF  THEIR CLAIMS...........................21

  III.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS, AS FURTHER BRIEFING WILL CONFIRM. .................................................25

    A.    Plaintiffs Are Unlikely To Succeed On Their Second  Amendment Claims.........................................................................................26

    B.    Plaintiffs Are Unlikely To Succeed On Their  Void-For-Vagueness Claims.........................................................................................41

    C.    Plaintiffs Are Unlikely To Succeed On Their Other  Constitutional Claims.........................................................................................44

  IV.    AN INJUNCTION WILL RESULT IN EVEN GREATER HARM TO THE STATE AND THE PUBLIC...........................................................47

CONCLUSION.................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018) ............................................................................ 48

*Acierno v. New Castle Cnty.*,
    40 F.3d 645 (3d Cir. 1994) ..................................................................... 11

*Adams v. Freedom Forge Corp.*,
    204 F.3d 475 (3d Cir. 2000) .................................................................... 21

*Am. Postal Workers Union v. U.S. Postal Serv.*,
    766 F.2d 715 (2d Cir. 1985) .................................................................... 23

*Amalgamated Transit Union Local 85 v. Port. Auth.*
    *of Allegheny Cnty*,
    39 F.4th 95 (3d Cir. 2022) ................................................................ 10, 21

*Anderson v. Davila*,
    125 F.3d 148 (3d Cir. 1997) .................................................................... 23

*Angelo v. District of Columbia*,
    No. 1:22-cv-1878, Minute Order (D.D.C. July 15, 2022) ........................ 26

*Angelo v. District of Columbia*,
    No. 22-cv-1878, __ F. Supp. 3d __, 2022 WL 17974434
    (D.D.C. Dec. 28, 2022) ....................................................................... 2, 16

*Antonyuk v. Hochul*,
    No. 22-2908, D.E. 75 (2d Cir. Dec. 7, 2022) ............................................ 2

*K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*,
    710 F.3d 99 (3d Cir. 2013) ..................................................................... 22

*Benisek v. Lamone*,
    138 S. Ct. 1942 (2018) ............................................................................ 25

*Bonidy v. U.S. Postal Serv.*,
    790 F.3d 1121 (10th Cir. 2015) .............................................................. 30

*Cameron v. EMW Women's Surgical Ctr., P.S.C.*,
    142 S. Ct. 1002 (2022) ..................................................................48

*Carr v. State*,
    34 Ark. 448 (1879) ......................................................................40

*Cedar Point Nursery v. Hassid*,
    141 S. Ct. 2063 (2021) ................................................................28

*Christian v. Nigrelli*,
    1:22-cv-695, D.E. 26 (W.D.N.Y. Oct. 3, 2022) ..........................40

*Christian v. Nigrelli*,
    No. 22-2987, D.E. 41 (2d Cir. Dec. 12, 2022) ..............................2

*Christian v. Nigrelli*,
    No. 22-cv-771 (N.D.N.Y. Oct. 3, 2022) ......................................16

*City of Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ......................................................................14

*City of Philadelphia v. Att'y Gen. of United States*,
    916 F.3d 276 (3d Cir. 2019) .......................................................50

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013). ...................................................................17

*Coates v. City of Cincinnati*,
    402 U.S. 611 (1971) ....................................................................41

*Conchatta, Inc. v. Evanko*,
    83 F. App'x 437 (3d Cir. 2003) ...................................................23

*Conestoga Wood Specialties Corp. v. Sec. of U.S. Dep't of*
    *Health & Human Servs.*,
    No. 13-1144, 2013 WL 1277419 (3d Cir. Feb. 8, 2013) .............10

*Constr. Ass'n of W. Pa. v. Kreps*,
    573 F.2d 811 (3d Cir. 1978) ........................................................23

*Corbett v. Hochul*,
    No. 1:22-cv-5867, Hr'g. Tr. (S.D.N.Y. Nov. 29, 2022) ..........2, 32

*D.T. v. Sumner Cnty. Sch.*,
942 F.3d 324 (6th Cir. 2019)......................................................................21

*Delta Const. Co. v. EPA*,
783 F.3d 1291 (D.C. Cir. 2015)..................................................................20

*District of Columbia v. Heller*,
554 U.S. 570 (2008) .................................................................. 27, 29, 42

*Doe v. Nat'l Bd. of Med. Examiners*,
199 F.3d 146 (3d Cir. 1999)........................................................................11

*Donahue v. N.J. Tpk. Auth.*,
No. A-0648-20, 2022 WL 1039690
(N.J. Super. Ct. App. Div. Apr. 7, 2022)....................................................30

*Ellison v. Am. Bd. of Orthopaedic Surgery*,
11 F.4th 200 (3d Cir. 2021) ..............................................................12, 13

*Elrod v. Burns*,
427 U.S. 347 (1976) .............................................................................22, 23

*English v. State*,
35 Tex. 473 (1872)......................................................................................34

*Eslava v. State*,
49 Ala. 355 (1873) .....................................................................................40

*Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*,
141 F.3d 71 (3d Cir. 1998) .........................................................................12

*Fischer v. Governor of N.J.*,
842 F. App'x 741 (3d Cir. 2021) .........................................................16, 18

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905 (D.C. Cir. 2015)....................................................................11

*GeorgiaCarry.Org, Inc. v. Georgia*,
687 F.3d 1244 (11th Cir. 2012)..................................................................28

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ...................................................................................41

iv

*Greater Phila. Chamber of Commerce v. City of Phila.*,
   949 F.3d 116 (3d Cir. 2020) .......................................................................... 9

*Greco v. Grewal*,
   No. 3:19-cv-19145, Op., D.E. 57 (D.N.J. Feb. 21, 2020) ............................. 23

*Hardaway v. Nigrelli*,
   No. 22-2933 D.E. 53 (2d Cir. Dec. 7, 2022) .................................................. 2

*Hill v. State*,
   53 Ga. 472 (1874) ........................................................................................ 34

*Hohe v. Casey*,
   868 F.2d 69 (3d Cir. 1989) ..................................................................... 22, 24

*Hope v. Warden York Cnty. Prison*,
   956 F.3d 156 (3d Cir. 2020) ...................................................................... 50

*Hope v. Warden York Cnty. Prison*,
   972 F.3d 310 (3d Cir. 2020) ...................................................................... 11

*Interactive Media Ent. & Gaming Ass'n Inc. v. Att'y Gen.*,
   580 F.3d 113 (3d Cir. 2009) ...................................................................... 42

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
   909 F.3d 446 (D.C. Cir. 2018) ................................................................... 20

*Kendrick v. Bruck*,
   586 F. Supp. 3d 300 (D.N.J. 2022) ........................................................... 16

*Kreimer v. Bureau of Police for Town of Morristown*,
   958 F.2d 1242 (3d Cir. 1992) ................................................................ 44, 45

*L.A. Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*,
   506 F. Supp. 3d 1018 (C.D. Cal. 2020) ..................................................... 50

*Lanin v. Borough of Tenafly*,
   515 Fed. App'x. 114 (3d Cir. 2013) ........................................................... 25

*LaSpina v. SEIU Pa. State Council*,
   985 F.3d 278 (3d Cir. 2021) ...................................................................... 18

*Lewis v. Kugler*,
446 F.2d 1343 (3d Cir. 1971).................................................................. 24

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) ......................................................... *passim*

*Mallet & Co. v. Lacayo*,
16 F.4th 364 (3d Cir. 2021) ..................................................... 10

*Marxe v. Jackson*,
833 F.2d 1121 (3d Cir. 1987)................................................... 21

*Maryland v. King*,
133 S. Ct. 1 (2012) (Roberts, C.J., in chambers) ......................................... 49

*McKay v. Federspiel*,
823 F.3d 862 (6th Cir. 2016)................................................... 16

*McTernan v. City of York*,
577 F.3d 521 (3d Cir. 2009)................................................... 22

*Messina v. Coll. of New Jersey*,
566 F. Supp. 3d 236 (D.N.J. 2021) ......................................... 25

*Mielo v. Steak 'n Shake Ops., Inc.*,
897 F.3d 467, 480 (3d Cir. 2018)............................................. 18

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ................................................................. 9

*Muscarello v. United States*,
524 U.S. 125 (1998) ............................................................. 42

*N.J. Bankers Ass'n v. Att'y Gen. N.J.*,
49 F.4th 849 (3d Cir. 2022) ................................................... 15

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
138 S. Ct. 2361 (2018)........................................................... 45

*Nat'l Treasury Emp. Union v. United States*,
927 F.2d 1253 (D.C. Cir. 1991)............................................... 23

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
142 S. Ct. 2111 (2022) ............................................................................ *passim*

*Nken v. Holder*,
556 U.S. 418 (2009) .................................................................................. 48

*Nordyke v. King*,
563 F.3d 439 (9th Cir. 2009),
*vacated*, 611 F.3d 1015 (9th Cir. 2010) .................................................... 36

*Pharmacia Corp. v. Alcon Labs.*,
201 F. Supp. 2d 335 (D.N.J. 2002) ........................................................... 24

*Pub. Serv. Co. of N.H. v. Town of W. Newbury*,
835 F.2d 380 (1st Cir. 1987) .................................................................... 23

*Range v. Att'y Gen. U.S.*,
53 F.4th 262 (3d Cir. 2022) ............................................................... 11, 32

*Reilly v. Ceridian Corp.*,
664 F.3d 38 (3d Cir. 2011) ....................................................................... 13

*Reilly v. City of Harrisburg*,
858 F.3d 173 (3d Cir. 2017) .......................................................... 10, 25, 32

*Robinson v. Ardoin*,
37 F.4th 208 (5th Cir. 2022) ..................................................................... 48

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006) .................................................................................. 46

*Siegel v. LePore*,
234 F.3d 1163 (11th Cir. 2000) ................................................................. 23

*Simmons v. United States*,
390 U.S. 377 (1968) ................................................................................. 45

*Smith v. State*,
50 Tenn. 511 (1872) ................................................................................. 40

*Steffel v. Thompson*,
415 U.S. 452 (1974) ................................................................................. 15

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ...............................................................15, 16

*Tolchin v. Supreme Ct. of State of N.J.*,
    111 F.3d 1099 (3d Cir. 1997).........................................................47

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021).................................................................12

*Turner v. Epps*,
    842 F. Supp. 2d 1023 (S.D. Miss. 2012)........................................49

*United States v. Class*,
    930 F.3d 460 (D.C. Cir. 2019).......................................................30

*United States v. Fullmer*,
    584 F.3d 132 (3d Cir. 2009).........................................................41

*United States v. Marcavage*,
    609 F.3d 264 (3d Cir. 2010).........................................................26

*United States v. Moyer*,
    674 F.3d 192 (3d Cir. 2012).........................................................43

*United States v. Portanova*,
    961 F.3d 252 (3d Cir. 2020).........................................................41

*Wash. State Grange v. Wash. State Republican Party*,
    552 U.S. 442 (2008) ..................................................................26

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*,
    900 F.3d 250 (6th Cir. 2018)........................................................11

*Whitmore v. Arkansas*,
    495 U.S. 149 (1990) ..................................................................12

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).......................................................................9

*Wreal, LLC v. Amazon.com, Inc.*,
    840 F.3d 1244 (11th Cir. 2016).....................................................25

## Statutes and Rules

P.L. 2022 Chapter 131................................................................ *passim*

1786 Va. Laws 25................................................................35, 38

1821 Tenn. Acts ch. 13, § 1, p. 15 ........................................ 39

1859 Conn. Acts 62, ch. 82, § 5 ........................................... 36

1865 La. Extra Acts 14, No. 10 § 1 ....................................... 37

1839 Ala. Acts no. 77 ........................................................... 39

Ala. Code § 13A-11-61.2....................................................... 5

Alaska Stat. Ann. § 11.61.220 ............................................... 7

Ark. Rev. Stat. § 13, p. 280 (1838)........................................ 9

Bayonne Ordinance O-22-36,
   https://tinyurl.com/6mp52eym (Nov. 9, 2022)............................ 10

Code of the State of Georgia 818 (1873) (§ 4528)..................... 34

D.C. Code Ann. § 7-2509.07................................................. 5, 7

*Fourth Annual Report of the Board of Commissioners of the Central
   Park* 106 (1861)................................................................... 35

Ga. Code Ann. § 16-11-127(b)(4) .......................................... 7

General Digest of the Ordinances and Resolutions of the Corporation
   of New Orleans 371 (1831) (art. 1)......................................... 34

1876 Iowa Acts 142, ch. 148, § 1 .......................................... 38

1929 Iowa Acts 90, § 30 ....................................................... 39

La. Rev. Stat. § 40:1397.3(O)................................................. 7

1919 Me. Laws 193............................................................... 39

1771 N.J. Laws 346, §1 ........................................................ 36

N.J.S.A. § 2C:1-14(n)........................................................................44

N.J.S.A. § 2C:39-5(e)...........................................................8, 17, 35

N.J.S.A. § 2C:58-4(c)......................................................................12

N.J.S.A. § 39:1-1.......................................................................43, 44

N.J.S.A. § 52:16A-122(a) ..............................................................44

N.J.A.C. § 7:25–5.23...................................................................20, 31

N.J.A.C. § 13:69D–1.13...................................................................8

N.J.A.C. § 7:2–2.17........................................................................8, 20

Nev. Rev. Stat. Ann. § 202.3673.......................................................5

Ohio Rev. Code Ann. § 2923.126(B)(6)...........................................7

Revised Statutes of the State of Missouri 1879, at 224 (§ 1274).......................35

S.C. Code Ann. § 23-31-225...........................................................7

1869-70 Tenn. Pub. Acts 23.......................................................34, 37

Tex. Act of April 12, 1871 Art. 320..............................................35

1870 Tex. Gen. Laws 63.................................................34, 35, 36, 37

Tex. Parks & Wildlife Code Ann. § 62.012.......................................7

Tex. Penal Code § 46.03................................................................5

## PRELIMINARY STATEMENT

Plaintiffs make the extraordinary demand that this Court should invalidate on a TRO posture portions of a state law that protects the safety of New Jersey residents and is consistent with the text and longstanding history of the Second Amendment. That law, P.L. 2022 Chapter 131, was enacted in response to *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), to protect New Jerseyans from gun violence. Plaintiffs cannot meet the high bar for emergency relief.

Plaintiffs' TRO application suffers from multiple defects that require denial. First, Plaintiffs' rushed application for emergency relief fails to establish that they imminently will suffer Article III injury caused by Chapter 131 and redressable by a TRO. Second, because they lack standing and because they fail to adduce a record to meet their burden, Plaintiffs cannot show irreparable harm. Third, on the merits, Plaintiffs fare no better. *Bruen* confirmed that the Second Amendment allows states to enact a host of gun regulations that expressly includes protecting sensitive places and requiring background checks. Chapter 131 does exactly that. Many of the provisions Plaintiffs challenge fall outside the scope of the Second Amendment entirely, and all are supported by a longstanding historical tradition of regulation. Fourth and finally, the equities overwhelmingly favor denying a TRO; injunctive relief would immediately authorize individuals to bring guns to places where they would pose serious risks: crowded stadiums, bars, casinos, emergency rooms, rush

1

hour traffic, children's basketball games, somebody else's home when that person does not consent—even while more fulsome briefing in this case is underway.

The State will offer ample evidence that Chapter 131 is constitutional. A hasty injunction would short-circuit the democratic process while the litigation process is underway. Tellingly, the Second Circuit has stayed injunctions in cases challenging a similar firearm statute in New York, confirming that the laws should remain in place while courts review the merits.[1] And other courts addressing similar challenges have refused to issue preliminary relief.[2] This Court should follow that lead.

## COUNTERSTATEMENT OF FACTS AND PROCEDURAL HISTORY

### A. The *Bruen* Decision And New Jersey's Public-Carry Laws.

New Jersey has long required permitting and background checks for those wishing to purchase and publicly carry a handgun. Previously, carry permit applicants were required to demonstrate that they had a "justifiable need" to publicly carry a handgun beyond a generic interest in self-defense. N.J.S.A. 2C:58-4(c).

In *Bruen*, the U.S. Supreme Court struck down a New York law analogous to New Jersey's "justifiable need" requirement. Holding that such a requirement

---

[1] *See* Order, D.E. 41, *Christian v. Nigrelli*, No. 22-2987 (2d Cir. Dec. 12, 2022); Order, D.E. 75, *Antonyuk v. Hochul*, No. 22-2908 (2d Cir. Dec. 7, 2022); Order, D.E. 53, *Hardaway v. Nigrelli*, No. 22-2933 (2d Cir. Dec. 7, 2022) (collected in Ex. 2). Tellingly, Plaintiffs did not note that these injunctions were stayed. *See* Br. 9-10 n.3.

[2] *See Angelo v. District of Columbia*, No. 22-cv-1878, __ F. Supp. 3d __, 2022 WL 17974434 (D.D.C. Dec. 28, 2022); Order, D.E. 74, *Corbett v. Hochul*, No. 1:22-cv-5867 (S.D.N.Y. Nov. 29, 2022); Tr. of Hr'g. (Ex. 3).

infringes the right of "ordinary, law-abiding citizens" to carry handguns in public for self-defense, 142 S. Ct. at 2122, the *Bruen* Court rejected the use of means-end scrutiny that prior courts had adopted in Second Amendment cases. Instead, *Bruen* instructed courts first to ask whether "the Second Amendment's plain text covers an individual's conduct," and, only if it does, then to ask whether the challenged regulation of that conduct is "consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129-30. The Court explained that there need not be "a historical twin" for the challenged law. *Id.* at 2133.

Consistent with that test, the *Bruen* Court recognized that the right to publicly carry a firearm "has traditionally"—and constitutionally—"been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms." *Id.* at 2138. The Court specifically identified that historical tradition as including (1) licensing requirements and (2) prohibitions on carrying firearms in "sensitive places." *Id.* at 2133, 2138 n.9. The Court specified that "nothing in [its] analysis should be interpreted to suggest the unconstitutionality" of provisions "designed to ensure only that those bearing arms … are, in fact, 'law-abiding, responsible citizens.'" *Id.* at 2138 n.9 (quotation omitted). And the Court "assume[d] it settled" that prohibiting firearms in certain locations (*e.g.*, "schools and government

3

buildings," "legislative assemblies, polling places, and courthouses") and analogous "new" sensitive locations is constitutional. *Id.* at 2133.

      B. New Jersey Updates Its Firearm Laws After *Bruen*.

After *Bruen* effectively invalidated the justifiable need requirement for public carry, the New Jersey Legislature passed P.L. 2022 Chapter 131, A4769/S3124 (Ex. 1), on December 19, 2022. The Governor signed the bill into law on December 22, 2022. In passing the bill, the Legislature noted that *Bruen* "makes clear … that the Legislature can enact laws to protect our communities" by respecting "the Supreme Court's … ruling while continuing to promote and enhance public safety." Ch. 131 § 1(b). The law "mitigate[s] the impact of having more people carrying guns in public places," and "better ensure[s] that those who exercise the right to carry are responsible, law-abiding, and appropriately trained individuals." *Id.* § 1(c). Chapter 131 amends and augments the State's firearm regulations in the following respects.

    1. *Enhanced Permitting And Carry Requirements.*

Mindful of *Bruen*'s guideposts for permissible firearm regulation, Chapter 131 repeals the "justifiable need" requirement and strengthens the criteria used to determine whether an applicant is qualified to purchase or carry firearms. *Id.* § 2. It enhances requirements for character references, requiring one additional reference and requiring that the references and the applicant be interviewed as part of the review process. *Id.* §§ 2, 3. It also increased the fees associated with both permits to

purchase and to carry. *Id.* Additional changes take effect in seven months: Section 3 institutes a firearms safety course requirement, Section 4 requires that anyone carrying a handgun in public obtain liability insurance, and Sections 5 and 6 set out requirements for the safe carry of handguns. *Id.* §§ 3, 4, 5, 6, 12.

### 2. *Sensitive Places Restrictions.*

Section 7 of Chapter 131 "designates places in which the carrying of a firearm or destructive device is prohibited." *Id.* § 1(e). The Legislature found that the elimination of the "justifiable need" requirement resulted in "the likelihood that a much greater number of individuals will now qualify to carry handguns in public," necessitating identifying "sensitive places where, due to heightened public safety concerns, carrying a dangerous, potentially lethal device or weapon, including a handgun, is not permissible." *Id.*[3] These locations fall into the following categories:

First, several locations are "vital to the functioning of democracy and our system of government." *Id.* § 1(g)(1). Chapter 131 thus prohibits firearms in a number of government buildings and in the vicinity of public assemblies that require permits. *See id.* §§ 7(a)(1) (government administrative buildings); (a)(2) (courts);

---

[3] Sensitive places restrictions are common. *See, e.g.*, Ala. Code § 13A-11-61.2 (school or professional athletic events); D.C. Code Ann. § 7-2509.07 (schools, hospitals, public transportation vehicles, places that sell alcohol, stadiums); Tex. Penal Code §§ 46.03; 46.035 (schools, racetracks, some businesses with liquor licenses, hospitals, airports, amusement parks); Nev. Rev. Stat. Ann. § 202.3673 (airports, schools, and childcare facilities).

(a)(3) (correctional facilities); (a)(5) (polling locations); (a)(6) (within 100 feet of a public assembly that requires a permit); (a)(12) (public libraries and museums).

Second, several locations are places where vulnerable or incapacitated populations gather. *Id.* §§ 1(g)(2)-(4). That includes locations with large concentrations of children. *See id.* § 7(a)(7) (schools); (a)(8) (child care facilities); (a)(9) (nursery schools); (a)(10) (parks and playgrounds); (a)(11) (youth sport events); (a)(12) (libraries and museums). It also includes places where there is a concentration of the physically or mentally compromised individuals. *Id.* § 7(a)(13) (shelters); (a)(14) (community residences for the disabled); (a)(21) (hospitals); (a)(22) (centers for addiction and mental health treatment). The same rationales apply to restricting alcohol in "[p]laces where intoxicating substances are sold," *id.* § 1(g)(5), which includes facilities where alcohol is sold for consumption on the premises, *id.* § 7(a)(15), and cannabis retailers or dispensaries, *id.* § 7(a)(16).

Third, several locations are places where large crowds gather and "where volatile conditions may pose a threat to public safety." *Id.* § 1(g)(5). That includes entertainment facilities, *id.* § 7(a)(17), casino complexes, *id.* § 7(a)(18), public transportation hubs, *id.* § 7(a)(20), and movie sets, *id.* § 7(a)(23). Since some places fall into multiple categories, this category also includes several aforementioned locations, *see id.* §§ 7(a)(6) (within 100 feet of a public assembly that requires a

permit); (a)(10) (parks and playgrounds); (a)(11) (youth sport events); (a)(15) (locations where alcohol is sold for consumption on the premises).[4]

### 3. Default Rule For Communicating Property Preferences.

The Legislature also found that "[t]he historical record . . . supports restriction of firearm possession on private property when the owner has not given their consent." *Id.* § 1(h). It observed that "[m]any states require a property owner's permission before another may enter private dwellings and private lands with a firearm or other weapons." *Id.*[5] And it found that "[r]equiring consent from the property owner before carrying weapons onto private property is . . . in line with both . . . reasonable expectations and property rights." *Id.* Thus, Section 7(a)(24) prohibits bringing firearms onto another's "private property . . . unless the owner has provided express consent or posted a sign indicating" consent.

### 4. Vehicle Restrictions.

The Legislature also recognized the unique dangers of having loaded firearms in vehicles. Effective immediately, Section 7(b)(1) requires individuals carrying a gun in a vehicle to keep the gun "unloaded and contained in a closed and securely

---

[4] Chapter 131 also provides a number of exemptions to the sensitive place restrictions, including brief and incidental entries and traveling along public rights-of-way. *Id.* §§ 7(a), (c), (e), (f), (g).

[5] Other states have similar rules regarding certain private property. *See, e.g.*, Alaska Stat. Ann. § 11.61.220; D.C. Code § 7-2509.07; Ga. Code Ann. § 16-11-127(b)(4); La. Rev. Stat. § 40:1397.3(O); Ohio Rev. Code Ann. § 2923.126(B)(6); S.C. Code Ann. § 23-31-225; Tex. Parks & Wildlife Code Ann. § 62.012.

fastened case, gunbox, or locked unloaded in the trunk of the vehicle." And when storing a gun in a vehicle, individuals must keep it unloaded in a securely fastened storage area not visible from outside the vehicle. *Id*. § 7(b)(2).

5. *Exempted Persons.*

Section 7 of Chapter 131 exempts law enforcement officers employed as security guards, employees of armored car companies, and others whose firearm carriage is otherwise expressly authorized by law. *Id*. §§ 7(a), (e), (f), (g). Section 8 expands the types of prosecutors and attorneys general who can carry firearms without first obtaining a permit and adds judges to this list. *Id*. §§ 8(a)(4), (12).

C. The Instant Challenge And TRO Request.

Plaintiffs filed the instant suit on the same day Chapter 131 was signed into law. Count 1 of their Complaint brings Second Amendment claims against most of the sensitive-places provisions in Section 7 and against certain permitting provisions in Sections 2 and 3. Compl., D.E. 1, ¶¶ 253-77, 279-87. Plaintiffs also seek to invalidate New Jersey laws that predate Chapter 131, including statutes and regulations limiting firearms at parks, schools, casinos, and gaming property: N.J.S.A. § 2C:39-5(e); N.J.A.C. § 7:2–2.17(b), N.J.A.C. § 13:69D–1.13; N.J.A.C. §§ 7:25–5.23 (a), (c), (f), (i), and (m). *Id*. ¶¶ 51-52, 261-62, 269, 278. Count 2 brings equal protection claims against Section 8's exemptions for judges, prosecutors, and attorneys general and Section 7(a)(24)'s private property default rule. *Id*. ¶¶ 289-95.

Count 3 brings void-for-vagueness claims against certain provisions of Sections 2, 5, and 7. *Id.* ¶¶ 297-311. Count 4 brings a First Amendment challenge against Section 7(a)(24)'s private property rule. *Id.* ¶¶ 313-16. Count 5 brings a First Amendment challenge against certain permitting provisions in Section 3. *Id.* ¶¶ 318-24. Count 6 brings a First Amendment challenge against Section 7(a)(12)'s prohibitions on firearms at libraries. *Id.* ¶¶ 326-28.

At midnight on December 23, Plaintiffs brought the instant application for a TRO and a preliminary injunction. In their TRO application, Plaintiffs only challenge location-based restrictions in Chapter 131 and preexisting law, and defer their request for relief on the following provisions of Chapter 131 to the PI stage: Section 4 (insurance); Sections 2 and 3 (permitting provisions); Section 5(a)(5) (unjustified display of a handgun provision); and Section 8(12) (exemptions for judges, prosecutors, and attorneys general). *See* D.E. 8-10, Ex. B.

The State files this response to the TRO application only, and requests an opportunity to fully brief all of Plaintiffs' challenges in its opposition to PI.

## **LEGAL STANDARD**

Injunctive relief "is a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), which is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only in limited circumstances," *Greater Phila. Chamber of Commerce v.*

*City of Phila.*, 949 F.3d 116, 133 (3d Cir. 2020) (quotation omitted); *see also, e.g.*, *Mallet & Co. v. Lacayo*, 16 F.4th 364, 389 (3d Cir. 2021) ("The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently existing actual threat." (quotation omitted)). Injunctions "are rarely granted" in the Third Circuit because "the bar is set particularly high." *Conestoga Wood Specialties Corp. v. Sec. of U.S. Dep't of Health & Human Servs.*, No. 13-1144, 2013 WL 1277419, at *1 (3d Cir. Feb. 8, 2013).

A court entertaining preliminary relief "must consider (1) whether the movant has a reasonable probability of success on the merits; (2) whether irreparable harm would result if the relief sought is not granted; (3) whether the relief would result in greater harm to the non-moving party; and (4) whether the relief is in the public interest." *Amalgamated Transit Union Local 85 v. Port. Auth. of Allegheny Cnty,* 39 F.4th 95, 102-03 (3d Cir. 2022) (quotation omitted). "The first two factors are prerequisites that the moving party must establish." *Id.* at 103. But even if those two factors are met, courts must still determine "in [their] sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

Moreover, because Plaintiffs demand a mandatory injunction that would alter the status quo by enjoining preexisting statutory provisions and regulations, a heightened standard applies: they must show "a substantial likelihood of success on

10

the merits and that their 'right to relief [is] indisputably clear,'" *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020) (quoting *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013)) (emphasis added); *see also Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) ("A party seeking a mandatory preliminary injunction that will alter the status quo bears a particularly heavy burden in demonstrating its necessity.

## **ARGUMENT**

## I. **JURISDICTIONAL DEFECTS PREVENT FINDING A LIKELIHOOD OF SUCCESS ON THE MERITS AND IRREPARABLE HARM ON PLAINTIFFS' SECOND AMENDMENT CLAIMS.**

As "[t]he party invoking federal jurisdiction," Plaintiffs have the burden of establishing standing to litigate *each* claim. *Range v. Att'y Gen. U.S.*, 53 F.4th 262, 269 n.7 (3d Cir. 2022). Because jurisdiction is not a "mere pleading requirement but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because Plaintiffs seek an emergency injunction, courts evaluate standing under the "heightened standard for evaluating a motion for summary judgment." *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 255 n.3 (6th Cir. 2018); *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 912 (D.C. Cir. 2015)); *Doe v. Nat'l Bd. of Med. Examiners*, 199 F.3d 146, 152 (3d Cir. 1999) ("Because [Article III] requirements are

not pleading requirements, but are necessary elements of a plaintiff's case, mere allegations will not support standing at the preliminary injunction stage.").

Thus, Plaintiffs must affirmatively demonstrate that they have suffered "an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief" for each of their claims. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Lujan*, 504 U.S. at 560–61). They have not carried this burden.

***First***, Plaintiffs fail to substantiate—or even allege—concrete plans imminently to visit the places for which they challenge Chapter 131's provisions, and otherwise fail to state a sufficiently concrete injury in fact. For "a statement of intent to take future action" to support injury in fact, that statement "must reflect a concrete intent to do so imminently." *Ellison v. Am. Bd. of Orthopaedic Surgery*, 11 F.4th 200, 207 (3d Cir. 2021). "'[S]ome day intentions'—without any description of concrete plans, or indeed even any specification of *when* the some day will be— do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564; *see also Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 77 (3d Cir. 1998) ("[I]nchoate plans for future [actions] are insufficient to demonstrate injury for purposes of Article III"); *Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990) ("A threatened injury must be

'certainly impending' to constitute injury in fact." (citation omitted)). In *Lujan*, for example, the Supreme Court deemed insufficient the plaintiff's averments that she "intend[ed] to go back to Sri Lanka," given that she had no concrete plans to do so. 504 U.S. at 564. Plaintiffs here fare no better, as they fail to establish a sufficiently imminent injury to have standing to litigate these types of claims.

For example, for their challenge to Section 7(a)(9), three Plaintiffs mention zoos in their declarations, but they allege only that they go "frequently," "[f]rom time to time," or "[s]everal times per year." D.E. 8-2 ¶ 13 (Siegel); D.E. 8-3 ¶ 11 (Cook); D.E. 8-4 ¶ 8 (DeLuca). These are precisely the sort of "inchoate plans" that the Third Circuit has deemed "insufficient to demonstrate injury for purposes of Article III." *Fair Hous. Council*, 141 F.3d at 77.

Plaintiffs also fall short of establishing concrete, imminent injury regarding Section 7(a)(15)'s regulation of places that serve alcohol. Three Plaintiffs aver that they "enjoy" dining at restaurants and that "[s]ome" of these restaurants have a license to serve alcohol, D.E. 8-2 ¶ 19 (Siegel); D.E. 8-3 ¶ 17 (Cook); D.E. 8-4 ¶ 12 (DeLuca), but they do not indicate that any of them imminently intends to visit a restaurant licensed to serve alcohol while carrying a firearm. These declarations lack the specificity required to establish an imminent Article III injury: they fail to explain when Plaintiffs will next visit these restaurants or even to identify a particular restaurant they will visit. *See Ellison*, 11 F.4th at 207; *Reilly v. Ceridian Corp.*, 664

F.3d 38, 42 (3d Cir. 2011) ("[F]uture harm at some indefinite time cannot be an 'actual or imminent injury'" (quoting *Lujan*, 504 U.S. at 564 n.2)).

The same standing deficiencies defeat Plaintiffs' challenges to the prohibitions on handgun carriage in numerous other sensitive places under Section 7(a). For example, as to the designation of public movie sets as a sensitive place, ch. 131, § 7(a)(23), two Plaintiffs declare only that they have previously encountered a movie being filmed out in public, and that, *if* they encountered such a scene again, they would want to approach but would be deterred from doing so while carrying a firearm. D.E. 8-2 ¶ 24 (Siegel); D.E. 8-3 ¶ 24 (Cook). But a past visit or encounter, without more, does not establish that a revisit or reencounter is imminent. *See Lujan*, 504 U.S. at 564 ("That the women 'had visited' the areas of the projects before the projects commenced proves nothing."); *cf. City of L.A. v. Lyons*, 461 U.S. 95, 103-106 (1983) (injunctive relief available only for imminent future harm to plaintiff). This same problem plagues Plaintiffs' challenge to the designation of the area surrounding a permitted public gathering as a sensitive place. Ch. 131, § 7(a)(6). The only relevant evidence is that "[f]rom time to time" three Plaintiffs have passed near public gatherings that might have required permits. D.E. 8-2 ¶ 23 (Siegel); D.E. 8-3 ¶ 23 (Cook); D.E. 8-4 ¶ 15 (DeLuca). This says nothing of when or if they will do so in the future. *See Lujan*, 504 U.S. at 564. Lacking in every one of these descriptions are any concrete and particularized details that would show that injury

to a particular Plaintiff is actual and imminent. These "some day" intentions are insufficient to establish standing under *Lujan*.

Finally, as to Plaintiffs' challenge to Section 7(b)(1), they fail to meet their burden to demonstrate concrete injury. Plaintiffs Siegel, Cook, and DeLuca mention that they regularly drive and would carry their handguns loaded while in the car but do not out of fear of prosecution. D.E. 8-2 ¶¶ 26-27 (Siegel); D.E. 8-3 ¶¶ 21, 26 (Cook); D.E. 8-4 ¶¶ 13, 17 (DeLuca). But that does not demonstrate that Section 7(b)(1)'s requirement that they keep the firearm unloaded in a container while in a vehicle poses a concrete and imminent injury to their Second Amendment right to self-defense. *Lujan*, 504 U.S. at 560.

**Second**, Plaintiffs fail to establish any credible threat of enforcement of Chapter 131 against them. Pre-enforcement challenges like this are justiciable only if "enforcement [is] sufficiently imminent." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) ("*SBA List*"); *see N.J. Bankers Ass'n v. Att'y Gen. N.J.*, 49 F.4th 849, 855 (3d Cir. 2022). Although a plaintiff need not "first expose himself to actual arrest or prosecution" to have standing "to challenge a statute," *Steffel v. Thompson*, 415 U.S. 452, 459 (1974), he otherwise must establish "an intention to engage in a course of conduct … proscribed by a statute," and identify "a credible threat of prosecution thereunder," *SBA List*, 573 U.S. at 159 (quotation omitted). A plaintiff can establish a credible threat of enforcement by presenting evidence of, for

example, a statute's "history of past enforcement" or the mechanisms for its enforcement. *See SBA List*, 573 U.S. at 164. None of that exists here.

Plaintiffs assume that the existence of the law is sufficient for standing. But "[t]he mere presence of a statute on the law books, standing alone, is insufficient to show a 'credible threat' that the statute will be enforced against a particular plaintiff." *Fischer v. Governor of N.J.*, 842 F. App'x 741, 749 (3d Cir. 2021); *see also McKay v. Federspiel*, 823 F.3d 862, 868–69 (6th Cir. 2016) (holding allegation of "subjective chill," without additional factors showing credible threat of imminent enforcement—like a history of past enforcement or enforcement warnings—is insufficient to establish standing); *Angelo*, 2022 WL 17974434, at *6 ("[A] plaintiff bringing a preenforcement challenge must do more than show that the government enforces its laws as written."); *Kendrick v. Bruck*, 586 F. Supp. 3d 300, 309 (D.N.J. 2022) (noting a "state's general interest in enforcing its gun laws was insufficient to confer standing on plaintiffs" (citing *Seegars v. Gonzales*, 396 F.3d 1248, 1255 (D.C. Cir. 2005)). Because Plaintiffs bear the burden of showing that Chapter 131 imminently will be enforced against them, but present nothing to meet that burden, a TRO should be denied.

The problem of imminent enforcement is especially acute for Plaintiffs' claims that they are unconstitutionally "chilled" from carrying handguns in various locations because they are "unsure" if those locations fall within the ambit of the

law. For example, Plaintiff Siegel says he is unsure if Section 7(a)(7) and N.J.S.A. 2C:39-5(e)'s regulations regarding schools reach the locations of his son's Tae Kwan Do or bagpipe classes, or his own continuing education classes. D.E. 8-2 ¶¶ 12, 14, 22, 39-40 (Siegel). Two Plaintiffs are similarly concerned that their respective churches might fall within the ambit of these same restrictions because parts of the church property are used for educational purposes. D.E. 8-5 ¶¶ 9-12 (Cuozzo); D.E. 8-6 ¶¶ 18-19 (Varga). But Plaintiffs' own uncertainty that these restrictions could be enforced against Plaintiffs for carrying handguns in these putative grey areas undermines any claim that such enforcement is "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Plaintiffs evince no evidence that officials will enforce these provisions in the manner Plaintiffs allege they fear.

Relatedly, Plaintiffs speculate that they may be prosecuted for running afoul of the provision that prohibits firearms within 100 feet of a public gathering for which a permit is required, because they do "not know" which gatherings require a permit and therefore might accidentally pass near one in violation of the law. D.E. 8-2 ¶¶ 23, 28 (Siegel); D.E. 8-3 ¶¶ 23, 27 (Cook); D.E. 8-4 ¶¶ 15, 18 (DeLuca). But Chapter 131 only prohibits a person from "*knowingly* carry a firearm" into a sensitive location. *See id.* § 7(a) (emphasis added). Plaintiffs fail to establish a credible threat

17

that they would be prosecuted for *unknowingly* passing within 100 feet of a public gathering that required a permit while carrying a handgun.

**Third**, Plaintiffs have not demonstrated traceability or redressability as to several of their claims. They adduce no evidence that the proprietors of entertainment venues, restaurants, and numerous other establishments would have allowed Plaintiffs to bring firearms into those locations were it not for Section 7(a). Consequently, they have not shown that enjoining enforcement of this provision would result in their ability to carry handguns lawfully on these properties.

Plaintiffs bear the burden of establishing that any injury is "fairly traceable" to the enactment of the legislation, *Mielo v. Steak 'n Shake Ops., Inc.*, 897 F.3d 467, 480 (3d Cir. 2018) (citation omitted), which requires something "akin to but for causation in tort," *LaSpina v. SEIU Pa. State Council*, 985 F.3d 278, 284 (3d Cir. 2021) (citation omitted). An injury is not fairly traceable to newly enacted legislation "if the alleged injury is merely the result of the independent action of some third party not before the court." *Mielo*, 897 F.3d at 481 (quotation omitted). Plaintiffs also bear the burden of establishing that any injury is "likely to be redressed by a favorable judicial decision." *Id.* (citation omitted). "[T]he redressability element . . . is not satisfied if a favorable result would eliminate one of multiple causes of an injury without actually decreasing the injury at all." *Fischer*, 842 F. App'x at 750-51 (citation omitted).

Plaintiffs failure to demonstrate traceability or redressability in claiming that Chapter 131 unconstitutionally deters them from carrying a handgun into a number of private establishments is fatal to their claims. Many of the commercial or recreational venues Plaintiffs wish to visit while armed are not owned by the State, and Plaintiffs neither allege nor demonstrate that, Chapter 131 aside, handgun carriage on these properties is consistent with the policies or preferences of the proprietors of these venues. [6] For example, Plaintiffs present no evidence that the operators of Plaintiff Siegel's son's Tae Kwan Do competitions, D.E. 8-2 ¶ 12 (Siegel), or of the medical offices and clinics where Plaintiff Siegel works, *id.* ¶ 8 (Siegel), consent (implicitly or explicitly) to the carriage of handguns on those properties. The same problem defeats Plaintiffs' standing to challenge Section 7(a)(24). Plaintiffs present no evidence that the owners of private properties upon which they wish to carry handguns actually consent to the carriage of handguns on their properties but will not affirmatively communicate that consent. For example, Plaintiff Siegel's declaration is silent as to whether his ex-wife's condominium association permits handgun carry on common areas of the condominium property.

_____

[6] To the contrary, many establishments prohibit firearms independent of state law. *See, e.g.*, MetLife Stadium Guest Policies, https://tinyurl.com/8mdkjvdh; Adventure Aquarium Code of Conduct, https://tinyurl.com/2p9xjebv; Camden County Library Customer Behavior Policy, https://tinyurl.com/ytvnfk62.

*See* D.E. 8-2 ¶ 21 (Siegel).  Thus, they have not shown that Section 7(a)(24) is the cause of their inability to carry handguns on any private property.

Plaintiffs run into a similar problem with locations that are independently designated as sensitive places by a different authority. For example, both Bayonne and Union County have designated local parks as firearms-free areas.[7] *See* D.E. 8-3 ¶¶ 9, 29 (Plaintiff Cook averring that he "enjoy[s] spending time" at a park in Union County); D.E. 8-7 ¶¶ 6-8 (Plaintiff Stamos averring that he sometimes visits parks in Bayonne). The same problem applies to their challenge to the Fish and Wildlife regulations, which are not enforced by Defendants.[8] Thus, Plaintiffs lack standing to bring suit against the State to enjoin these relevant provisions of Chapter 131, since any injury from their inability to bring firearms to those locations are not fairly traceable to the state statute, and an injunction against the statute would not redress their alleged injury. *See Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 465 (D.C. Cir. 2018) (no traceability where separate, unchallenged law "prohibit[ed] all the same conduct" challenged by plaintiff); *Delta Const. Co. v. EPA*, 783 F.3d 1291, 1296 (D.C. Cir. 2015) (same).

---

[7] *See* Bayonne Ordinance O-22-36, https://tinyurl.com/6mp52eym (Nov. 9, 2022); Union County Commissioners Uphold Gun Safety on County Property, https://tinyurl.com/mrxvhst7 (Nov. 14, 2022).

[8] N.J.A.C. § 7:2-2.17 is enforced by the Superintendent of the State Parks Service. *See* Compl. ¶ 51. N.J.A.C. § 7:25–5.23 is enforced by the Division of Fish and Wildlife. *See* Compl. ¶¶ 53-54.

For each of these reasons—the lack of imminent action, the speculative nature of any enforcement, and the presence of independent obstacles to carrying firearms in the proposed locations—Plaintiffs lack Article III standing on many of their claims.[9] Because lack of standing prevents Plaintiffs from establishing irreparable harm and likelihood of success, the TRO should be denied.

## II.   PLAINTIFFS CANNOT MEET THEIR BURDEN OF ESTABLISHING IRREPARABLE HARM FOR ANY OF THEIR CLAIMS.

Even if Plaintiffs have standing, they nonetheless fail on the required factor of irreparable harm. *Amalgamated Transit*, 29 F. 4th at 103; *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) ("[E]ven the strongest showing on the other three factors cannot eliminate the irreparable harm requirement," the absence of which is "dispositive" (quotation omitted)). Courts cannot grant relief "unless the moving party shows that it specifically and personally risks irreparable harm." *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 487 (3d Cir. 2000); *see Marxe v. Jackson*, 833 F.2d 1121, 1127 (3d Cir. 1987) ("Courts have long required that a party seeking preliminary relief produce affirmative evidence indicating that he or she will be irreparably harmed should that relief be denied."). Plaintiffs have not met that burden as to any of the provisions that they challenge.

---

[9] Plaintiffs do not claim organizational standing distinct from the standing of individuals who are both named Plaintiffs and members of the Association of New Jersey Rifle and Pistol Clubs, Inc. *See* D.E. 8-9 ¶¶ 7-8 (Bach).

21

***First***, as discussed extensively above with regard to standing, Plaintiffs have not established any Article III harm that they have or imminently will suffer because of Chapter 131. As a result, they cannot demonstrate that they would be irreparably harmed absent an injunction. *See McTernan v. City of York*, 577 F.3d 521, 528 (3d Cir. 2009) (there can be "no irreparable harm" when there is "no harm of any type"). And even if Plaintiffs could meet the Article III threshold, they nevertheless have not demonstrated an "'immediate,' 'irreparable' injury that warrants the 'extraordinary remedy' of a preliminary injunction." *D.T.*, 942 F.3d at 327 (citation omitted). In fact, they have not attempted to do so. *See* Br. 45-46.

***Second***, Plaintiffs cannot rely on allegations of constitutional injury alone to make a required showing of irreparable harm. Yet that is precisely what they do.

As the Third Circuit has unequivocally stated: "Constitutional harm is not necessarily synonymous with the irreparable harm necessary for issuance of a preliminary injunction." *Hohe v. Casey*, 868 F.2d 69, 73 (3d Cir. 1989) (citation omitted)). Plaintiffs cannot seek solace in *K.A. ex rel. Ayers v. Pocono Mountain Sch. Dist.*, 710 F.3d 99 (3d Cir. 2013), which merely cited without explanation *Elrod v. Burns*, 427 U.S. 347 (1976), for the proposition that losing "*First Amendment* freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *K.A.*, 710 at 113 (emphasis added). Significantly, the Third Circuit has made it clear that "[n]othing" in *Elrod* "suggests that the Court meant to do away with the

traditional prerequisites for injunctive relief simply because First Amendment freedoms were implicated." *Anderson v. Davila*, 125 F.3d 148, 164 (3d Cir. 1997); *Conchatta, Inc. v. Evanko*, 83 F. App'x 437, 442 (3d Cir. 2003) (same).[10] That is because to do so would mean collapsing the irreparable harm element of the PI burden into the likelihood of success element, contrary to established precedent confirming each is a separate requirement.

More fundamentally, neither the Supreme Court nor the Third Circuit has ever expanded *Elrod* to cover *all* alleged violations of constitutional rights. Indeed, courts have refused to extend even a presumption of irreparable harm to non-First Amendment challenges. *See, e.g.*, *Constr. Ass'n of W. Pa. v. Kreps*, 573 F.2d 811, 820 n.33 (3d Cir. 1978) (declining to extend *Elrod* to equal protection claims); *Greco v. Grewal*, No. 3:19-cv-19145, Op. at 15-16, D.E. 57 (D.N.J. Feb. 21, 2020) (declining to extend the *Elrod* to the Fourth Amendment); *see also Siegel v. LePore*, 234 F.3d 1163, 1177 (11th Cir. 2000) (rejecting contention "that a violation of constitutional rights always constitutes irreparable harm"); *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987) ("[A]lleged denial of

---

[10] Indeed, then-Judge Clarence Thomas clarified in *Nat'l Treasury Emp. Union v. United States*, 927 F.2d 1253 (D.C. Cir. 1991), that even in the First Amendment context, the mere claim of a constitutional violation is insufficient to establish irreparable harm, notwithstanding *Elrod*. *Id.* at 1255-56; *see also Am. Postal Workers Union v. U.S. Postal Serv.*, 766 F.2d 715, 722 (2d Cir. 1985) (same).

procedural due process, without more, does not automatically trigger . . . a finding" of irreparable harm).[11] Thus, Plaintiffs' mere allegations of Second Amendment injury are insufficient to demonstrate the irreparable harm that they must affirmatively establish to justify the extraordinary relief of a TRO.

*Third*, the fact that Plaintiffs chose not to challenge existing sensitive-place regulations that had already been in place for years shows there is no "immediate irreparable injury" from denying an emergency injunction. *Hohe*, 868 F.2d at 72 (internal citation omitted). Plaintiffs acknowledge that other longstanding laws and regulations barred them from bringing firearms to schools, casinos, parks, and game reserves. Br. 14-15. But they declined to challenge them at any point in the past. To now allege that they will suffer immediate irreparable injury from not being able to carry firearms in those and similar locations—like libraries, daycares, and zoos— without an emergency injunction rings hollow.

It is blackletter law that delay can "knock[] the bottom out of any claim of immediate and irreparable harm," and that it offers a "dispositive basis" for rejecting a request for a preliminary injunction. *Pharmacia Corp. v. Alcon Labs.*, 201 F. Supp.

---

[11] Plaintiffs' reliance on *Lewis v. Kugler*, 446 F.2d 1343 (3d Cir. 1971), *see* Br. 46, is mistaken, because nothing in that case suggests mere allegation of Fourth Amendment injury constitutes irreparable harm. Instead, the *Lewis* Court simply discussed whether monetary damages were adequate relief for an unconstitutional search or seizure. *Id.* at 1350. That does not suggest all constitutional violations constitute irreparable harm, let alone Second Amendment violations.

2d 335, 382 (D.N.J. 2002); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1945 (2018) (affirming denial of preliminary injunctive relief where there was an "unnecessary, years-long delay"); *Lanin v. Borough of Tenafly*, 515 Fed. App'x. 114, 117-18 (3d Cir. 2013) ("[P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights ... tends to indicate at least a reduced need for such drastic, speedy action."); *Messina v. Coll. of New Jersey*, 566 F. Supp. 3d 236, 249 (D.N.J. 2021) (no irreparable harm where challenge delayed for four months); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) (collecting cases). Plaintiffs have been barred from carrying firearms into numerous locations, such as schools, parks, casinos, and game reserves, for years. Their long delay in seeking enforcement of the very rights on which they insist immediate vindication today indicates the opposite of irreparable harm.

## III.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS, AS FURTHER BRIEFING WILL CONFIRM.

Plaintiffs also have not demonstrated "a reasonable probability of eventual success in the litigation." *City of Harrisburg*, 858 F.3d at 176 (quotation marks and citation omitted). In asking the Court to declare the statutory provisions invalid and to enjoin their enforcement writ large, *see* Compl. at 58, this "facial attack," which "tests a law's constitutionality based on its text alone and does not consider the facts or circumstances of a particular case," must clear a high bar. *United States v.*

*Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010). Plaintiffs must prove that the law is "unconstitutional in all of its applications" or lacks a "plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008); *see id.* at 451 (noting facial challenges are disfavored because they "threaten to short circuit the democratic process"). Plaintiffs are not likely to clear this high bar.

A. Plaintiffs Are Unlikely To Succeed On Their Second
   Amendment Claims.

The Second Amendment analysis is a complex one, and it is unlikely that mere allegations in a Complaint will evince a likelihood of success on the merits. Under *Bruen*, this Court must assess whether "the Second Amendment's plain text covers an individual's conduct" and, if so, whether a state's restriction of that conduct accords with "the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2126. The latter historical inquiry often requires examination of judicial, legislative, executive, and academic materials, *id.* at 2138-56, and also requires "nuanced judgments about ... how to interpret" such evidence, *id.* at 2130.

The State will be able to further address why Plaintiffs cannot succeed on the merits when given adequate time to brief the PI motion. But even at this stage, several obvious problems make Plaintiffs' claims unlikely to succeed. The court should thus deny Plaintiffs' motion for a TRO.

***First***, Chapter 131 involves regulations on background checks and sensitive locations, which are precisely the sort of regulation that the Supreme Court already

described as "presumptively lawful regulatory measures." *District of Columbia v. Heller*, 554 U.S. 570, 627 n.26 (2008). The new statute's provisions "prohibiting the carry of firearms in *new* and analogous sensitive places," *Bruen*, 142 S. Ct. at 2133, and employing "objective licensing requirements," *id.* at 2162 (Kavanaugh, J., concurring), fall into what *Bruen* has likewise described as legitimate restrictions under the Second Amendment. *Id.*; *see also id.* at 2133.

The *Bruen* Court considered "it settled that [certain] locations were 'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." 142 S. Ct. at 2133. These include "schools and government buildings," "legislative assemblies, polling places, and courthouses," as well as "*new* and analogous sensitive places." *Id*. Accordingly, Plaintiffs are unlikely to succeed in their TRO challenge to Chapter 131's sensitive places restrictions.

**Second**, as to several challenged provisions, Plaintiffs cannot meet their threshold burden under *Bruen*: demonstrating that the relevant conduct is encompassed by the Second Amendment's plain text. 142 S. Ct. at 2126. This initial but dispositive inquiry is "focused on the 'normal and ordinary' meaning of the Second Amendment's language." *Id.* at 2127 (quoting *Heller*, 554 U.S. at 576-77). If the text does not cover the conduct, "the analysis can stop there; the regulated activity is categorically unprotected." *Id.* at 2126 (quotation marks omitted). Importantly, it is Plaintiffs who bear the burden at this stage of the inquiry. *Id.*

27

Take, for example, Plaintiffs' challenge to the private property default rule in Section 7(a)(24) of Chapter 131. For one, Plaintiffs do not even attempt to justify how the provision falls within the scope of the plain text of the Second Amendment. *See* Br. 36-40 (Second Amendment argument lacking any discussion of Section 7(a)(24)). For another, Plaintiffs would not succeed had they advanced such an argument, because Section 7(a)(24) is not a restriction on the right to bear arms. Nothing about Section 7(a)(24) alters substantive rights of property owners to exclude firearms from their property. And the property owner's substantive "right to exclude … is a fundamental element of the property right that cannot be balanced away." *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2077 (2021) (internal citation omitted). As the Eleventh Circuit explained in a case challenging an analogous Georgia law that prohibited firearms in places of worship if the authority for that place did not consent, the Second Amendment in no way "abrogated the well established property law, tort law, and criminal law that embodies a private property owner's exclusive right to be king of his own castle." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012) (collecting historical citations). Instead, "the pre-existing right codified in the Second Amendment does not include protection for a right to carry a firearm in a place . . . against the owner's wishes." *Id*. Nothing in *Bruen* suggests otherwise because the decision only concerned the right to carry firearms "in *public*," not on private land. 142 S. Ct. at 2135 (emphasis

added). And certainly nothing in *Heller* suggested that the Second Amendment took away states' ability to regulate *property rights*. 554 U.S. at 635.

Similarly, nothing about Section 7(a)(24) changes the scope of the right to carry on private property. The substantive right has always been the same: one cannot bear arms on someone else's home, business, or land if that person is unwilling. Section 7(a)(24) merely establishes what a visitor must presume about a property owner's preference regarding firearms on her property where the property owner has not affirmatively communicated her preference.[12] Like the Georgia law that was upheld by the Eleventh Circuit, Section 7(a)(24) protects property owners' right to exclude firearms from their property by removing their obligation to affirmatively tell every repairperson or customer that firearms are prohibited.[13] Changing default rules on how property owners communicate their preferences for

---

[12] Default rule-setting is commonplace. For example, employers set default rules for how employees receive paychecks. The default is often by mail, but employees can opt for direct-deposit instead by saying so and entering their account information. States set default intestacy procedures that individuals can alter through wills. Nothing about the setting of the default changes the substantive rights of the parties involved, who can simply choose to alter the default.

[13] Empirical evidence shows that this reflects the preferences of the vast majority of New Jerseyans who prefer not to have firearms on their property without express consent. *See* Ian Ayres & Spurthi Jonnalagadda, *Guests with Guns: Public Support for "No Carry" Defaults on Private Land*, 48 J. L. Medicine & Ethics 183, Table A4 (2020) (Ex. 21) (79% of New Jersey respondents preferring default rule requiring repairperson to obtain consent before carrying firearms onto private property); *id.* (67%, customers to carry at businesses).

conduct by visitors on their properties does not fall within the plain text of the Second Amendment.

A similar deficiency plagues Plaintiffs' challenge to provisions of the statute that bar carrying firearms in places where the government is proprietor of the property, such as Sections 7(a)(2) (airports and public transit hubs), (a)(12) (public libraries and museums), (a)(21) and (22) (government-operated healthcare facilities and rehab centers), and government-operated vehicles in Section 7(b)(1).[14] As numerous courts have found, when the government owns or operates the property, the government has a right to exclude persons who do not conform with conditions that define their license to enter that property. *See United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) (upholding ban on guns in parking lot near U.S. Capitol because "the government—like private property owners—has the power to regulate conduct on its property"); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015) ("[T]he fact that the government is acting in a proprietary capacity, analogous to that of a person managing a private business, is often relevant to constitutional analysis.").

---

[14] The same problem also applies to entertainment venues owned by the government, including PNC Bank Arts Center, which is owned by the New Jersey Turnpike Authority. *See Donahue v. N.J. Tpk. Auth.*, No. A-0648-20, 2022 WL 1039690, at *1 (N.J. Super. Ct. App. Div. Apr. 7, 2022).

When regulating conduct in government-owned or operated facilities, the government acts "as a proprietor rather than as a sovereign." *Id.* at 1126. And by prohibiting firearms in those facilities, it "affects private citizens only insofar as they are doing business" with the government as a provider of services. *Id.* at 1127. Thus, for the same reasons that private property rules do not implicate the text of the Second Amendment, neither do these provisions regulating firearms-carry in locations where the government is acting as a proprietor.[15]

**Third**, for any challenged provisions that do implicate the plain text of the Second Amendment, Plaintiffs are also unlikely to succeed on the merits because Chapter 131's provisions are amply supported by historical tradition. As *Bruen* noted, if the challenged activity falls within the scope of the Second Amendment's plain text, a state can "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation" by identifying a "well-established and representative historical analogue." 142 S. Ct. at 2126, 2130.

The Court expressly confirmed that the analogue need not be "a historical twin." *Id.* at 2133. In other words, "even if a modern-day regulation is not a dead

---

[15] Plaintiffs' challenge to preexisting Fish and Wildlife rules in N.J.A.C. § 7:25–5.23 fail because they cannot show these regulations fall within the plain text of the Second Amendment. For example, N.J.A.C. § 7:25–5.23(m) provides that "No person shall have *both* a firearm and a bow and arrow" while hunting. (emphasis added). But nothing about the provision impinges on a hunter's ability to bear a firearm.

ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* As the Third Circuit explained, courts assess whether the cited historical laws are "relevantly similar," not whether there is "an analogy specific to the crime charged." *Range*, 53 F.4th at 285. The central consideration is whether the modern regulation "impose[s] a comparable burden on the right of armed self-defense and whether that burden is comparably justified" as to the burden imposed by the historic regulation—that is, whether "how and why" the regulation is imposed is analogous. *Bruen*, 142 S. Ct. at 2133. To that end, because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," *id.* at 2132, if a modern regulation addresses an "unprecedented societal concern" spurred by "dramatic technological changes" unimaginable to the Founders or the Reconstruction generation, an analysis of historic analogues will not be "relatively simple to draw," calling instead for "a more nuanced approach." *Id.* at 2132.

Moreover, while *Bruen* held that the government bears the burden of adducing relevantly similar historical analogues for firearms restrictions that fall within the protection of the Second Amendment's text, Plaintiffs seeking emergency relief always bear the burden to establish a likelihood of success on the merits. *See City of Harrisburg*, 858 F.3d at 176; *Corbett* (Ex. 3) Tr. 9:13-23 (denying preliminary injunction of firearms statute and noting Plaintiffs fail to meet their burden on

likelihood of success if they cannot present "countervailing evidence" rebutting the government's evidence of historical analogues).

Below, the State highlights illustrative examples of historical analogues that support the constitutionality of challenged provisions of Chapter 131.

### 1. Locations For Government And Constitutionally-Protected Activity.[16]

As noted above, *Bruen* already confirmed the constitutionality of designating government buildings as sensitive places where firearms are not permitted. That the *Bruen* Court had little trouble so concluding is unsurprising because government buildings are locations where important democratic rights are at stake, such as the right to vote, the right to petition one's government, and the right to due process in the judicial system. Plaintiffs do not challenge most of Chapter 131's provisions regarding government buildings, but, puzzlingly, they challenge the public library and museum provision. But the same concerns regarding firearms-carry in places where the right to petition one's government—like courthouses—also animate restrictions on firearms-carry in places where the rights to speech and intellectual freedom are at their apex—public libraries and museums.

The relevant history confirms that firearms were regularly prohibited at places of government and other constitutionally-protected activity. For example:

---

[16] Plaintiffs challenge Sections 7(a)(6) (public demonstrations) and (a)(12) (libraries and museums). Compl. ¶¶ 257-60, 266, 306-08, 326-28.

- A 1773 Maryland law prohibited bringing any weapon into the House of Assembly. 63 Proceedings and Acts of the General Assembly 338, § 5 (June 15-July 3, 1773) (Ex. 4).

- An 1873 Georgia law prohibited carrying weapons "to any court of justice or any election ground or precinct, or any place of public worship, or any other public gathering in this state, except militia muster grounds." Code of the State of Georgia 818 (1873) (§ 4528) (Ex. 22).

- An 1869 Tennessee law prohibited deadly weapons in any "fair, race course, or public assembly of the people." 1869-70 Tenn. Pub. Acts 23 (Ex. 8).

- An 1870 Texas law prohibited carrying guns into any "place where persons are assembled for educational, literary or scientific purposes … or to any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly." 1870 Tex. Gen. Laws 63 (Ex. 5). [17]

### 2. *Locations Where Crowds Gather.* [18]

Historical restrictions on firearms-carry also applied to locations where large crowds gathered, where risk of violent upheaval and chaotic activity with firearms was heightened. This included examples like:

- A 1786 Virginia law prohibited "rid[ing] armed by night nor by day in fairs or markets." 1786 Va. Laws 25 (Ex. 6).

- An 1816 New Orleans law prohibited "any person to enter into a public ball-room with any cane, stick, sword or any other weapon." Jerome Bayon, General Digest of the Ordinances and Resolutions of the Corporation of New Orleans 371 (1831) (art. 1) (Ex. 7).

- The same 1869 Tennessee statute described above prohibited deadly weapons in any "fair [or] race course." 1869-70 Tenn. Pub. Acts 23 (Ex. 8).

---

[17] Courts swiftly affirmed the validity of such laws. See *English v. State*, 35 Tex. 473, 478–79 (1872); *Hill v. State*, 53 Ga. 472, 475 (1874).

[18] Plaintiffs challenge Sections 7(a)(10) (parks, beaches, playgrounds, and other recreational facilities); (a)(11) (youth sports events); (a)(17) (entertainment facilities), (a)(18) (casinos); (a)(20) (airports and transportation hubs); and (a)(23) (movie sets). Compl. ¶¶ 264-65, 268-70, 272.

- The same 1870 Texas statute described above prohibited firearms in any "ball room, social party or other social gathering composed of ladies and gentlemen." 1870 Tex. Gen. Laws 63 (Ex. 5). In 1871, Texas further prohibited firearms in any "place where persons are assembled for amusement or for educational or scientific purposes, or into any circus, show, or public exhibition of any kind." Art. 320, Tex. Act of April 12, 1871 (Ex. 9).

- By 1877, Missouri law prohibited carrying concealed weapons "into any school room or place where people are assembled for educational, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any lawful purpose." Revised Statutes of the State of Missouri 1879, at 224 (§ 1274) (Ex. 10).

Specific prohibitions of firearms in parks are also well-supported.

- Central Park in New York and Fairmount Park in Philadelphia both prohibited firearms. *See Fourth Annual Report of the Board of Commissioners of the Central Park* 106 (1861) ("All persons are forbidden … [t]o carry firearms or to throw stones or other missiles within [Central Park]."); *Acts of Assembly Relating to Fairmount Park* 18 (1870) ("No persons shall carry fire-arms, or shoot birds in the Park, or within fifty yards thereof, or throw stones or missiles therein.") (Exs. 23, 24).

- Firearms were also prohibited in parks in St. Louis (1881), Chicago (1881), St. Paul, MN (1888), Pittsburgh, PA (1893) (Exs. 25, 26, 27, 28). More jurisdictions followed in the early 20th century.

3. *Locations Where Vulnerable Or Incapacitated People Gather.*[19]

*Bruen* made equally clear that schools are paradigmatic sensitive locations where firearms can be banned. Such restrictions are paradigmatic precisely because

---

[19] Plaintiffs challenge Sections 7(a)(9) (zoos); (a)(10) (parks, beaches, playgrounds, and other recreational facilities designated by governing authorities); (a)(11) (youth sports events); (a)(12) (libraries and museums); (a)(15) (places that serve alcohol); (a)(21) (healthcare facilities); and (a)(22) (addiction and mental health services); as well as Section 7(a)(7) and N.J.S.A. § 2C:39-5(e)'s schools provision to the extent they share property with other facilities. Compl. ¶¶ 50, 261, 263-67; 271; 326-28.

schools are places where "great numbers of defenseless people (e.g., children)" gather. *Nordyke v. King*, 563 F.3d 439, 459 (9th Cir. 2009), *vacated*, 611 F.3d 1015 (9th Cir. 2010). Other locations designated as sensitive also protect vulnerable or otherwise incapacitated individuals, such as hospitals and treatment centers. The same applies to individuals who are incapacitated because of intoxication. Examples of historical restrictions on firearms in places where such vulnerable and incapacitated people can be found include:

- An 1859 Connecticut law provided that: "If any booth shed, tent, or other temporary erection, within one mile of any military parade-ground, muster-field or encampment, shall be used and occupied for the sale of spirituous or intoxicating liquor, or for the purpose of gambling," then "the owner or occupant" of such a structure must "vacate and close the same immediately." 1859 Conn. Acts 62, ch. 82, § 5 (Ex. 11).
- An 1867 Kansas law prohibited carrying of firearms by intoxicated persons. 1867 Kans. Sess. Laws 25 (Ex. 12).
- The same 1870 Texas statute described above prohibited firearms in "any school room or other place where persons are assembled for educational, literary or scientific purposes." 1870 Tex. Gen. Laws 63 (Ex. 5).

   *4.  Private Property Without Express Permission (Section 7(a)(24))*.

Given the sanctity of property rights throughout our Nation's history, it is unsurprising that there is a robust historical record of laws prohibiting firearms on another's private property without that property owner's express consent. Examples can be found in our own State's history and others':

- A 1771 New Jersey law prohibited "carry [of] any gun on any lands not his own . . . unless he hath license or permission in writing from the owner or owners, or legal possessor." 1771 N.J. Laws 346, §1 (Ex. 13).

36

- An 1865 Louisiana law prohibited "carry[ing] fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor." 1865 La. Extra Acts 14, No. 10 § 1 (Ex. 14).

   5. *Vehicle Restrictions (Section 7(b)(1)).*

Nor are Plaintiffs likely to succeed on the merits of their challenge to Chapter 131's vehicle carry restriction, which merely specifies *how* firearms are to be carried. Section 7(b)(1) requires individuals carrying a handgun "in a vehicle" to store their gun "unloaded and contained in a closed and securely fastened case, gunbox, or locked unloaded in the trunk of the vehicle." But it does not wholly prohibit licensed individuals from carrying firearms in a vehicle.

As applied to public transit vehicles, the provision does not fall within the scope of the Second Amendment's protections because the vehicles are government property or are under government contract, *see supra* at 30-31 (explaining government as proprietor can decide to prohibit firearms like private owner). In any event, it is consistent with historical regulations of firearms. The concerns that animate regulating firearms-carry on a crowded bus are not relevantly different from those supporting prohibitions on firearms-carry at:

- "[F]airs" or "markets," 1786 Va. Laws 25 (Ex. 6),
- A "race course," 1869-70 Tenn. Pub. Acts 23 (Ex. 8), and
- A "social gathering," 1870 Tex. Gen. Laws 63 (Ex. 5).

In each of these places, large numbers of people are congregated in confined spaces, rendering them vulnerable to firearm violence and making self-defense using

37

a gun impracticable given the risk of harming bystanders. In fact, these concerns are amplified on public transit where strangers crowd and jostle in spaces with limited egress, increasing the risk of accidental discharge of a gun. As a result, some states prohibited firearms in and around mass transport.[20] *See, e.g.*, 1876 Iowa Acts 142, ch. 148, § 1 (Ex. 15) (prohibiting "present[ing] or discharg[ing] any gun, pistol, or other fire arm at any railroad train, car, or locomotive engine"). Section 7(b)(1) does not go as far—it only requires storage in a particular way.

As to private vehicles, Section 7(b)(1)'s language on how one must carry also passes constitutional muster. Although private automobiles were not in use at the Founding or during the Reconstruction period, States began to restrict carrying firearms in motor vehicles contemporaneous with the popularization of automobiles. The mere fact that such restrictions in motor vehicles logically could not have existed prior to the popularization of automobiles is hardly a problem. Motor vehicles pose different problems than Founding-era modes of transport. The speed at and distance which modern motor vehicles can travel make them facilitators of escape in gun crimes. And their speed has created the need for police to enforce speed limits, exposing officers to danger whenever they approach a vehicle at a traffic stop. Thus

---

[20] Because it is not evident that publicly operated mass transportation existed at the Founding or Reconstruction, these provisions serve as the most analogously similar historical statutes for Section 7(b)(1).

"[t]he regulatory challenges posed by firearms [in vehicles] today are not … the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Bruen*, 142 S. Ct. at 2132.[21]

Indeed, the laws that did exist during the Founding and Reconstruction eras addressed relevantly similar problems by prohibiting concealed carry altogether. In the early to mid-19th century, States enacted laws broadly prohibiting concealed carry of pistols and other weapons "unless upon a journey." Ark. Rev. Stat. § 13, p. 280 (1838) (Ex. 18); *see also, e.g.*, 1839 Ala. Acts no. 77, § 1 (Ex. 19); 1821 Tenn. Acts ch. 13, § 1, p. 15 (Ex. 20).[22] But courts interpreting these statutes construed the journey exception narrowly, holding that the statutes still prohibited carry while individuals were engaged in day-to-day travel within their community as opposed to prolonged journeys. For example, in *Carr v. State*, 34 Ark. 448 (1879), the Arkansas

---

[21] Indeed, states began to restrict carrying firearms in vehicles contemporaneous with the popularization of automobiles, demonstrating that, since the technology has become available, states have "addressed the [same] societal problem … through materially [the same] means" as today. *Bruen*, 142 S. Ct. at 2131; 1929 Iowa Acts 90, § 30 (prohibiting carry of firearms "in or on a motor vehicle unless the same be unloaded in both barrels and magazine, and taken down or contained in a case"); 1919 Me. Laws 193 (prohibiting possession of rifle or shotgun "loaded or with a cartridge in the magazine thereof, in or on any motor vehicle").

[22] *Bruen* concluded that these statutes were not analogous to the modern New York law prohibiting public carry altogether because these historical statutes prohibited only concealed carry and allowed open carry. 142 S. Ct. at 2146. Here, Section 7(b)(1) does not ban handgun carry in a vehicle altogether; it only regulates the manner in which a handgun in a vehicle must be carried. It is therefore analogous to the 19th-century statutes as both restrict manner of carry.

Supreme Court held that the state's concealed carry ban applied to people "mixing with the people in ordinary intercourse, about the streets" and thus someone in transit through town should "have deposited his pistols with his baggage, and not carried them on his person." *Id.* at 449; *see also Eslava v. State*, 49 Ala. 355, 537 (1873) (holding concealed carry ban applied to someone "going to and from his residence and to his place of business" as well as to "[t]ravel … within the ordinary line of the person's duties, habits, or pleasure"); *Smith v. State*, 50 Tenn. 511, 513 (1872) (concealed carry prohibition applied to a "ramble in one's own neighborhood across the lines of contiguous counties"). Thus, like Section 7(b)(1), these statutes restricted the carry of firearms in transit and aimed to prevent individuals from being "about the streets armed in a manner which, upon a sudden fit of passion, might endanger the lives of others." *Carr*, 34 Ark. at 449.

*    *    *    *    *

To be clear, the above list is not the sum of the State's evidence, which will be supplemented at the PI posture[23] and to the extent necessary in the litigation process.[24] But at this early juncture, the State has amply shown that Plaintiffs cannot

---

[23] Courts reviewing less expansive firearms challenges post-*Bruen* have ordered at least a month for a PI response. *See, e.g.*, Order, D.E. 26, *Christian v. Nigrelli*, 1:22-cv-695 (W.D.N.Y. Oct. 3, 2022) (one month); Order, *Angelo v. District of Columbia*, No. 1:22-cv-1878 (D.D.C. July 15, 2022) (two months).

[24] To the extent that Plaintiffs insist that only historical analogues from 1791 can support modern regulations, *see* Br. 37-38, *Bruen* made no such determination. 142 S. Ct. at 2138 (expressly leaving open whether the Founding or states' adoption of

demonstrate a likelihood of success on the merits because the historical record is replete with relevantly similar sensitive locations regulations.

### B. Plaintiffs Are Unlikely To Succeed On Their Void-For-Vagueness Claims.

A law is not void for vagueness if "a person of ordinary intelligence would have fair warning" whether the contemplated conduct was unlawful. *United States v. Portanova*, 961 F.3d 252, 263 (3d Cir. 2020). "Simply because a criminal statute could have been written more precisely does not mean the statute as written is unconstitutionally vague." *United States v. Fullmer*, 584 F.3d 132, 152 (3d Cir. 2009) (quotation omitted). "[I]mprecise but comprehensible normative standard[s]" are enough. *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971). Nor is a statute vague because "enforcement requires the exercise of some degree of police judgment." *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). Moreover, because Plaintiffs challenge Chapter 131 on its face, they bear an even heavier burden. Plaintiffs can only prevail if they demonstrate that Chapter 131 "is

---

the Bill of Rights via the Fourteenth Amendment in 1868 is the relevant timeframe and citing scholarly articles endorsing the latter). Indeed, *Bruen* itself explicitly referred to 19th-century evidence in discussing sensitive places. *Id.* at 2133. The State's position is that historical evidence from 1868 and the post-ratification period is most faithful to originalism, because it reflects the public understanding of the right that states chose to adopt in ratifying the Fourteenth Amendment. But because the challenged provisions are supported by historical analogues even prior to 1868, the Court need not resolve this issue to deny a TRO.

impermissibly vague in all of its applications." *Interactive Media Ent. & Gaming Ass'n Inc. v. Att'y Gen.*, 580 F.3d 113, 116 (3d Cir. 2009).

Chapter 131 has a plainly legitimate sweep in each of the five areas Plaintiffs challenge. Because Plaintiffs do not seek a TRO on the permitting provisions or the "unjustified display of a firearm" provision, this response does not address them, and instead focuses on Plaintiffs' TRO demands.

1. *"Carry"*

Plaintiffs cannot seriously contend that the word "carry" in Chapter 131 is unconstitutionally vague. That word has been used to refer to the conveyance of an object throughout New Jersey's firearm laws prior to Chapter 131, which does not change the meaning of that word. Moreover, the Supreme Court has concluded that the term "carry a firearm" in federal firearm statutes was not ambiguous when interpreting it to encompass conveyance in a motor vehicle. *Muscarello v. United States*, 524 U.S. 125, 139 (1998). Indeed, *Heller* itself interpreted the Second Amendment's right to "bear" arms to mean the right to "carry" firearms, 554 U.S. at 584, and the Court used "carry" throughout its opinion in *Bruen*. It is hard to imagine that the word "carry" in Chapter 131 is unconstitutionally vague when the Court has used the same word in the same way to interpret the Second Amendment.

### 2. *Within 100 Feet of a Public Gathering*

Nor is Chapter 131's carry restriction near public gatherings requiring a government permit unconstitutionally vague. Ch. 131, § 7(a)(6). Plaintiffs allege that "a typical person cannot know which events require a permit," Compl. ¶ 307, but Chapter 131 only prohibits someone from "*knowingly* carry[ing] a firearm" near such gatherings. Ch. 131, § 7(a). "Scienter requirements in criminal statutes 'alleviate vagueness concerns' because a *mens rea* element makes it less likely that a defendant will be convicted for an action committed by mistake." *United States v. Moyer,* 674 F.3d 192, 211–12 (3d Cir. 2012) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 149 (2007)).[25]

### 3. *"Vehicle"*

Finally, Plaintiffs quibble that because Chapter 131 does not define "vehicle," the law's vehicle restrictions are void for vagueness. But "vehicle" is already defined under New Jersey law. *See* N.J.S.A. § 39:1-1. (defining vehicle as a "device … by which a person or property … may be transported upon a highway, excepting devices moved by human power or used exclusively upon stationary rails or tracks or low-speed electric bicycles, low-speed electric scooters, or motorized bicycles"); *id.*

---

[25] Nor are Plaintiffs correct to claim that they have no way of knowing whether an event is permitted. New Jersey has a designated "Major Event Coordinator," who "shall provide a consolidated one-stop centralized location of information" on major events and assists with permitting. N.J.S.A. § 52:16A-122(a).

(defining "motor vehicle" similarly) Nothing in Chapter 131 suggests that its use of "vehicle" is any different. *See* N.J.S.A. § 2C:1-14(n) (noting I "motor vehicle" in the criminal code "shall have the meaning provided in N.J.S.A. 39:1-1.").

      C. <u>Plaintiffs Are Unlikely To Succeed On Their Other Constitutional Claims.</u>[26]

    1. *Section 7(a)(1) Does Not Violate The First Amendment*

Plaintiffs' claim that Section 7(a)(12) violates the First Amendment right to access libraries is baseless. Plaintiffs' own cited authority[27] undercuts their claims. In *Kreimer*, a homeless man brought a challenge to library rules that prohibited, among other things, "staring at another person with an intent to annoy that person . . . [or] by behaving in a manner which reasonably can be expected to disturb other patrons." *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1262 (3d Cir. 1992). The Third Circuit upheld the challenged regulations, finding that exercise of certain "oral and interactive First Amendment activities is antithetical to the nature of the Library" and that the library is "obligated only to permit the public to exercise rights that are consistent with [its] nature." *Id.* at 1261-62. Bringing a

---

[26] Because the TRO only seeks relief as to Sections 7(a)(10) and (24), this response does not focus on First and Fourteenth Amendment challenges to Sections 3 and 8.

[27] Although Plaintiffs cite *Kreimer* as a 2015 decision, their listed reporter citation is to the 1992 decision.

loaded weapon into a space for quiet study is reasonably likely to disturb other patrons and similarly "need not be tolerated." *Id*. at 1262.[28]

### 2. Section 7(a)(24) Does Not Violate The First Amendment Or The Equal Protection Clause.

Plaintiffs' argument that Section 7(a)(24) violates the First Amendment is ill-conceived. *See* Compl. ¶¶ 313-16 (Count 4). While they press a compelled speech theory, it is inapplicable. The compelled speech doctrine applies where the government action "compel[s] individuals to speak a *particular* message" and in so doing, alters the message that the person wishes to send. *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 138 S. Ct. 2361, 2371 (2018) (emphasis added). Specifically, that includes "situation[s] in which an individual must personally speak the government's message," as well as when the government "force[s] one speaker to host or accommodate another speaker's message." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 63 (2006).

Neither is true here. Nothing about Section 7(a)(24) compels property owners to send a message on behalf of the government or any other entity. Instead, property owners are free to express their own message about what they prefer regarding firearms on their property. Those who wish to allow firearms on their property

---

[28] Nor does *Simmons* save Plaintiffs' argument. That case cabined its findings to certain Fourth and Fifth Amendment rights and said nothing about the First and Second Amendments. *See Simmons v. United States*, 390 U.S. 377, 394 (1968).

simply must indicate consent, but the State does not control the manner of speech. A property owner may express consent by posting a sign without any limitation as to format, or may simply indicate consent to each visitor via communication of any variety. Establishing a default rule does not compel speech. After all, it would be absurd to claim that it is compelled speech to require that anyone wishing to depart form default intestacy rules write a will. Section 7(a)(24) is no different.

Accepting Plaintiffs' theory would also lead to absurd results, since the TRO Plaintiffs seek would pose the very compelled speech problem they advance. After all, if "espous[ing] a belief one way or the other" as to whether one consents to firearms on their property is compelled speech, Br. 41, then requiring property owners who wish to exclude firearms to speak also compels speech. And given that empirical evidence suggests the vast majority of New Jerseyans prefer not to have firearms on their properties, *see supra* at 29 n.13, Section 7(a)(24) in fact *reduces* the need for property owners to speak to express their preference. Under Plaintiffs' own theory, the State's approach compels less speech than any alternative.

Plaintiffs' Equal Protection claim regarding Section 7(a)(24) is also meritless. While they insist that the provision "treats individuals differently solely based on whether or not they are choosing to exercise their Second Amendment right to bear arms," Br. 45, that is inaccurate. Nothing about Chapter 131 alters the substantive limitation that there is no right to carry on private property against the consent of the

property owner. *See supra* at 28-30. Instead, the only change that Section 7(a)(24) makes is to confirm that property owners who permit firearms need to make their preferences explicit. While that means property owners who *do not* consent to firearms on their property need not speak, that is not a classification that involves suspect classes or fundamental rights. *Tolchin v. Supreme Ct. of State of N.J.*, 111 F.3d 1099, 1113-14 (3d Cir. 1997) (legislation that establishes classifications that do not involve suspect classes or fundamental rights subject merely to rational basis review). Instead, it is a simple rule about preference-communication that is amply supported by rational basis. *See, e.g.*, Ch. 131 § 1(h) ("Requiring consent from the property owner before carrying weapons onto private property is also in line with both the reasonable expectations and property rights of New Jersey property owners."); *see also supra* at 29, n.13.

## IV. AN INJUNCTION WILL RESULT IN EVEN GREATER HARM TO THE STATE AND THE PUBLIC.

Even if Plaintiffs meet their burden on the likelihood of success on the merits and irreparable harm, emergency relief is still not warranted. That is because the court must "then determine[] in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Almagamated Transit*, 39 F.4th at 102-03. When "the Government is the opposing party," the final two factors—"assessing the harm to the opposing party and weighing the public interest"

merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs have not shown that these merged factors favor relief.

The State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm on the State." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 n.17 (2018); *see also Robinson v. Ardoin*, 37 F.4th 208, 227 (5th Cir. 2022) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." (quotation omitted)). The State, as sovereign, "has a legitimate interest in the continued enforceability of its own statutes." *Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 142 S. Ct. 1002, 1011 (2022) (quotation omitted). That harm is especially pronounced where, as here, there is "an ongoing and concrete harm to [the State's] law enforcement and public safety interests." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers).

Here, the harm at issue is more than affront to state sovereignty; an emergency injunction would prevent the State from protecting the public from threats to "health, safety, and welfare posed by gun violence." Ch. 131 § 1(b). "[E]xpanding handgun carrying creates safety risks," including "serious dangers of misuse and accidental use" and "can translate into more acts of gun violence." *Id.* §§ 1(c), (e). There are especially "heightened public safety concerns" for "sensitive places." *Id.* § 1(e).

The risk of dangerous and often fatal situations looms large if the sensitive places provisions are enjoined. For example, a crowded entertainment venue (such

as sporting events) could become deadly if fan rivalries are aggravated by a volatile mix of alcohol and firearms. The same rings true for establishments that serve alcohol, should disagreements amongst intoxicated people turn deadly. Studies have shown that road rage incidents are likely to be more frequent and violent when firearms are easily accessible to motorists.[29] And needless to say, firearms in locations where children gather to read and learn pose grave risks of accidental shootings or worse for some of the State's most vulnerable population.[30] The risks to public safety greatly outweigh by any individual harms alleged by Plaintiffs.

A shooting death or injury cannot be undone. Chapter 131 protects the public from "the single most irreparable harm of all"—"death itself." *Turner v. Epps*, 842 F. Supp. 2d 1023, 1028 (S.D. Miss. 2012); *see also L.A. Unified Sch. Dist. v. S&W Atlas Iron & Metal Co.*, 506 F. Supp. 3d 1018, 1036 (C.D. Cal. 2020) ("There can be no dispute that serious injury or death constitutes irreparable harm."). And

---

[29] *See* Road Rage, Harvard Injury Control Research Center, https://tinyurl.com/mydabab7; Harry Hoenig, *Road Rage Shootings Soar as New Laws Put More Guns in Cars*, https://tinyurl.com/4mbprc5m (Nov. 28, 2022); Sarah Burds-Sharps, Everytown for Gun Safety, *Reports of Road Rage Shootings are on the Rise*, https://tinyurl.com/52t82waa (Apr. 4, 2022).

[30] *See, e.g.*, Dustin Jones, *Firearms overtook auto accidents as the leading cause of death in children*, https://tinyurl.com/mwu6y9cs (Apr. 22, 2022); Jaclyn Diaz, *High Gun Sales And More Time At Home Have Led To More Accidental Shootings By Kids*, https://tinyurl.com/3k5472sv (Aug. 31, 2021); Michael A. Fletcher, *"A quiet phenomenon": The rise of gun violence at school sports*, https://tinyurl.com/3a6dcv3c (Sept. 30, 2022).

while the State's interest in protecting public safety is obvious, it should be permitted

to submit additional evidence at the PI stage.

## **CONCLUSION**

This Court should deny a TRO.[31]

 

Respectfully submitted,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:   */s/Angela Cai*
       Angela Cai
       Deputy Solicitor General

Dated:  December 30, 2022

---

[31] If the Court disagrees, any TRO should limit its relief to the Plaintiffs in this suit. *See City of Philadelphia v. Att'y Gen. of United States*, 916 F.3d 276, 292 (3d Cir. 2019) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to plaintiffs." (citation omitted)). Moreover, the State would request a five-business-day stay of a TRO so that the State can appeal to the Third Circuit if appropriate. *See Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 160 (3d Cir. 2020) ("[If] a purported TRO goes beyond preservation of the status quo and mandates affirmative relief, the order may be immediately appealable under § 1292(a)(1).").

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 30, 2022, I electronically filed the foregoing Opposition To Plaintiffs' Motion for a Temporary Restraining Order with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

By:   <u>*/s/Angela Cai*</u>
Angela Cai
Deputy Solicitor General

Dated: December 30, 2022