MBT7CORC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    JONATHAN CORBETT,

4                    Plaintiff,

5          v.                          22 Civ. 5867 (LGS)

6    KATHLEEN HOCHUL, LETITIA
     JAMES, KEVIN BRUEN, ERIC
7    ADAMS, KEECHANT SEWELL, and
     INSPECTOR HUGH BOGLE,
8
                    Defendants.
9                                      Remote Conference
     ------------------------------x
10
                                       New York, N.Y.
11                                     November 29, 2022
                                       2:30 p.m.
12
     Before:
13
                     HON. LORNA G. SCHOFIELD,
14                                     District Judge

15                         APPEARANCES

16

17   JONATHAN CORBETT
          Attorney for Plaintiff (pro se)
18
     NEW YORK STATE OFFICE OF THE ATTORNEY GENERAL
19        Attorney for Defendants Hochul, James, and Brown
     BY:  TODD A. SPIEGELMAN
20
     NEW YORK CITY LAW DEPARTMENT
21        Attorney for Defendants Adams, Sewell, and Bogle
     BY:  NICHOLAS R. CIAPPETTA
22

23

24

25
```

MBT7CORC

```
 1              (Case called)

 2              THE COURT:  Hello, and thank you for convening.

 3         We're here to discuss primarily one matter, which is

 4    the plaintiff's motion for a preliminary injunction.  We also

 5    have the defendants' proposed motions to dismiss, and I will

 6    discuss that after we talk about the plaintiff's motion for

 7    injunctive relief.

 8         I should start out by saying that I have reviewed your

 9    papers, and it's my hope to issue an oral ruling at the

10    conclusion of our conference, but I did want to give both sides

11    an opportunity to speak particularly to some of the more

12    difficult issues.

13         So, Mr. Corbett, it's your motion.  There are issues

14    I'm particularly interested in, but if you would like to say a

15    few words by way of introduction, I'll let you do that first.

16              MR. CORBETT:  Good morning, your Honor.

17         I don't think I have too much to say as far as an

18    introduction.  I'm sure the Court has thoroughly reviewed the

19    papers and understands my position, so I'll just be available

20    for questions.

21              THE COURT:  Okay.  Well, let me start with a question,

22    then.

23         So with respect to the social media and references

24    requirements, I'm really focused on the standing issue.  I am

25    pretty persuaded that you don't have standing to raise those
```

MBT7CORC

1    issues, but I did want to give you a chance to address that if

2    there's anything you would like to say.  And I have read your

3    papers on the subject, but that's my question and that's my

4    first concern.

5         MR. CORBETT:  Yes.  I think it does make it tougher

6    with the timing thing, candidly.  I hear the government's

7    arguments.  The issue will certainly arise eventually whether

8    it is on this application or on renewal.  It's something that

9    licensing officers may take into consideration on their own,

10   even if state law doesn't require them to quite yet.  I think

11   it's a real issue.  And whether it's going to be next month or

12   two years from now, it's going to come up, it's going to be

13   something that directly injures my interests.  Immediacy is

14   certainly much harder in this case, especially when they're not

15   even processing applications at the moment.

16        THE COURT:  I'm glad you have a realistic view of that

17   issue.  And I don't doubt that it might come up some time, but

18   perhaps not in your case because a renewal application, of

19   course, only follows an original license that you're seeking to

20   renew, and we don't even have that yet.

21        So why don't we move on, then, if you don't mind, to

22   the training requirement, which I think is much more of a

23   question.  I'd like to start with the standing issue, but let

24   me ask the city defendants—so that's Mr. Spiegelman, I think.

25   It's your position that the plaintiff doesn't have standing to

MBT7CORC

```
 1    raise that issue.  It seems to me that perhaps he does.  So if
 2    you'd like to say anything on that subject, I'd be pleased to
 3    hear it.  And again, I have read the papers.
 4         MR. SPIEGELMAN:  Judge, I should say I represent the
 5    state defendants, but we did argue that the plaintiff doesn't
 6    have standing on this issue.  I just reiterate under binding
 7    law, including the Second Circuit's decision in Libertarian
 8    Party, the cognizable legal injury doesn't arise until the
 9    application has been denied, and Mr. Corbett's application has
10    not been denied.  So he may obtain standing at some point, but
11    he doesn't have it yet.  I think the point that there is --
12         THE COURT:  If I could just interrupt for a second,
13    what about futility?  I take your point that the application
14    hasn't been denied, but futility is a separate basis for
15    standing.
16         MR. SPIEGELMAN:  Well, yes.  In the same case, the
17    Second Circuit was clear that objection or antipathy to the law
18    is not futility, and that is what we have here.  Plaintiff
19    Corbett thinks the laws unconstitutionally won't submit -- they
20    won't participate in the training, but that's simply not
21    enough.  He still has to go through the training and be denied
22    to have standing.  In Libertarian Party there was no training
23    requirement then, but there were other requirements that
24    applicants had to pay fees and they had to submit affidavits
25    for good moral character and proper cause.  Even with all that,
```

MBT7CORC

 1    they didn't have standing.  Just the filling out of the

 2    application, the affidavit, the fees, that wasn't the injury;

 3    the injury was when there are denied, and so too here.

 4            THE COURT:  I understand your argument.

 5            Mr. Ciappetta, apologies for my confusing who your

 6    clients were.  Would you like to be heard on that issue?

 7            MR. CIAPPETTA:  Yes, just briefly.

 8            I think we argued along the same lines.  I will just

 9    add that the plaintiffs in his papers and his complaint

10    explicitly said that the training is a waste of his time.  And,

11    to me, that doesn't establish futility.  Whether or not he

12    feels that the course is going to be beneficial to him or not,

13    standing can't be based upon that.  And I would submit that the

14    training is useful.  It's 16 hours, plus two as a practical

15    component, and there's New York relevant laws.  So even though

16    he may be a licensee elsewhere, the training would be relevant,

17    but that's going on to different issue for now.

18            THE COURT:  Right.  I mean, I think the point is not

19    so much whether the training would be helpful, but the real

20    question is whether it's futile and whether futility confers

21    standing here.  It's not just that he has antipathy towards the

22    training requirement, but he refuses to do it.  And it's not

23    something that is in the control of some other person or that

24    may change as circumstances in the world change, it's something

25    he refuses to do.

MBT7CORC

```
1          So I guess my question is:  Why doesn't that make the

2    whole application process futile?  I mean, why do I have to

3    insist that his application be denied because he has refused to

4    take the training before I hear this?

5          MR. CIAPPETTA:  I think even if you look at the

6    recently decided Bruen case, your Honor, in that case, you have

7    an application and a denial.  That denial, as Mr. Spiegelman

8    said, is the quintessential hook for the standing.  And in

9    those cases, under that theory in the Bruen case, the person

10   said, Well, I can't establish proper cause so I'm not even

11   going to bother applying.  And that wasn't -- I think the Court

12   there would have said that there was a standing issue as well.

13         So we saw in that Bruen case you had an application,

14   you had a denial, and that was the basis for the federal

15   lawsuit.  Here, we don't even have that.  His application

16   remains pending; there's no decision on it yet.  And you could

17   have that situation --

18         THE COURT:  So here's a question.

19         MR. CIAPPETTA:  Yes.

20         THE COURT:  Is there any reason to think that he would

21   be granted the license that the requirement for training can be

22   waived or would be waived?

23         MR. CIAPPETTA:  Not as of this moment.

24         And, your Honor, as you reviewed my papers, I did

25   mention the fact that local licensing officers do have
```

MBT7CORC

1    discretion with respect to the training.  They can evaluate

2    going back five years to see whether other experience may have

3    substituted for it.  In reply, the plaintiff did say that he

4    hasn't taken any training in the last five years, so I do

5    acknowledge that that probably would mean that it couldn't be

6    established elsewhere.  Though, I do think that the department

7    deserves a chance to look at the application.

8            But, certainly, there's a lot of situations with

9    respect to training where people may have established that

10   otherwise.  So we wouldn't want them to say, Oh, it's futile, I

11   don't think that I have the five years, the five-year look-back

12   wouldn't help me.  I think that's a decision for the department

13   to make.  The department should be able to review it and it

14   shouldn't be based on whether the license applicant says, I

15   can't meet it or not.

16           Here, it might be a clearer question based on his

17   statement in his affidavit.  But in a lot of circumstances, it

18   might not be so clear.  Also, if "I won't be able to be

19   licensed" was the standard, I think there would be a whole host

20   of other situations where people would be running to court

21   without letting the NYPD process their applications.  For

22   example, they could say, Oh, I have a criminal conviction in my

23   background, that means they'll deny me, I'm not going to even

24   bother applying; or, I have an order of protection against me

25   that most likely means I'll be denied, I won't apply.  So I

MBT7CORC

```
 1    think in those situations we'll have an efficiency of court

 2    issue.

 3              THE COURT:  A big difference is that the application

 4    has been filed here.  I guess it depends on what the

 5    circumstances are, but if an application has been filed and in

 6    one of those other examples you gave and it's clear from the

 7    statute that the applicant hasn't met a requirement or

 8    condition for licensing, I think there's a fair question -- and

 9    maybe not even question, a fair conclusion about futility.  But

10    let's go on to the merits of the training requirement.

11              Mr. Corbett, I know that you're pro se here, but you

12    are an attorney, but it's your license for a firearm that is at

13    issue here.  So with regard to the constitutionality of the

14    training requirement, it's your position that it's not

15    Constitutional and after the Bruen case it's clear that the

16    inquiry here, the proper inquiry, is a historical one.  And the

17    question is whether historically comparable regulations or

18    burdens were or have been imposed, and I didn't see any

19    evidence attached to your motion on that issue, and so I was

20    wondering what you have to say about that.

21              MR. CORBETT:  Yes, your Honor.

22              On that issue, the burden is on the government to

23    demonstrate that there is a historical analogue, not on the

24    challenger.  I think that we can easily see what the current

25    state of the law is in all 50 states.  I think that we can look
```

MBT7CORC

```
 1    back over the last century——and this is not something that

 2    requires a ton of research——an 18-hour training course has

 3    never been required.  The historical analogue that the

 4    government attempts to make is that of military service, trying

 5    to, again, bring back the word militia in the Second Amendment

 6    that has been resounding made a nullity by the Supreme Court at

 7    this point.  One could own a firearm and not be eligible for

 8    the militia in the 1800s.  There simply is no historical

 9    analogue that the government has pointed to.  Given that it's

10    not my burden, I think that the government clearly has not

11    carried theirs.

12              THE COURT:  Let me interrupt.

13              I agree with you that ultimately the government has

14    the burden here of showing that there is a historical analogue,

15    but on your motion for preliminary injunction you have the

16    burden of showing a likelihood of success on the merits.  So

17    that means that if they present me with evidence, which they

18    have, and you don't then you haven't carried your burden.  And,

19    frankly, even if I simply viewed it as their having the burden

20    even on your motion, if they put in evidence and you don't put

21    in evidence then they have carried their burden, unless I

22    discredit all of their evidence.  And I don't have any

23    countervailing evidence to do that with.

24              MR. CORBETT:  I think it's not so much discrediting

25    their evidence as finding that it's not legally relevant.  The
```

MBT7CORC

1    evidence that they submitted simply is not analogous to the

2    current rules.  Unless they've submitted evidence that is

3    actually on point, they haven't submitted any evidence that is

4    competent to carry their burden.

5         THE COURT:  Well, I mean, by the terms itself in the

6    Second Amendment, and even the discussion in the *Heller* case,

7    isn't the right to bear arms sort of intimately related and

8    derived from the whole concept of a militia, but broadly

9    defined, as *Heller* does?

10        MR. CORBETT:  There are many people who do believe

11   that there is a connection between their right and militia

12   membership.  However, the Supreme Court has been clear that

13   these are individual rights that we have that are unconnected

14   with militia membership.  So I don't think at this point, based

15   on current Supreme Court law, that that argument can save the

16   government's rule here.

17        THE COURT:  Okay.  Let me hear from one of the

18   defendants.  Why don't we start with Mr. Spiegelman again.

19        MR. SPIEGELMAN:  I'd be happy to.

20        Your Honor cited *Heller* and the text in the Second

21   Amendment itself, and *Heller* is clear that part of the Second

22   Amendment right is the proper use of handguns.  And even before

23   we get to this historical analysis, the Supreme Court found

24   "shall issue" licensing regimes would have training

25   requirements to be presumptively Constitutional.  And the

MBT7CORC

```
 1    Concealed Carry Improvement Act transforms New York into a
 2    "shall issue" regime, especially on the training requirement.
 3    If the plaintiff -- if the applicant completes the 18 hours,
 4    the licensing officer will issue them a license and so this is
 5    now -- New York is now like 31 other states.
 6              And I think if you look at the plaintiff's papers
 7    carefully, it doesn't actually contend that a training
 8    requirement in and of itself is unconstitutional, it's just the
 9    fees he speculates might be incurred or the 18 hours, but
10    that's kind of a slender read to stand on.  I mean, New York
11    may be the highest, but it's not the highest by much, right?
12    Illinois is at 16.  New Mexico is at 15.  Do the extra two
13    hours make the whole requirement unconstitutional?  No.  If you
14    take plaintiff's arguments to its natural conclusion, the
15    highest state is always unconstitutional you just keep knocking
16    down the hours, which doesn't make a whole lot of sense.
17              And the historical analogues are on point.  I won't
18    belabor what we say in our papers, but the militia training was
19    much more extensive than 18 hours.  This was training every
20    year, six times a year, in some states, six hours a day until
21    you were 45, not once every three years for 18 hours.  And the
22    overarching purpose was firearms safety, even for the militia.
23    They don't want you shooting yourself with the gun.  And, of
24    course, the burden is much less here.
25              I think we're on firm ground with the training
```

MBT7CORC

1    requirement.  Even the *Antonyuk* court, which looked at the law

2    pretty skeptically, upheld the training requirement, didn't

3    really say anything about the hours, just put that down as

4    fine.  And plaintiff's argument on the fees is based on

5    speculation.

6            I guess the last thing I'd say about that is,

7    historically, militia members incurred a lot of costs.  They

8    paid for their own equipment.  They didn't get reimbursed for

9    travel time and so on.  So the fees, whatever they are, are not

10   out of step, historically.

11           I think I'll leave it at that.

12           THE COURT:  Okay.  Thank you.

13           Mr. Ciappetta, would you like to be heard?  And I'm

14   particularly interested in the exorbitant fees argument that

15   Mr. Corbett makes.

16           MR. CIAPPETTA:  I'm sorry, your Honor.  I had to

17   unmute myself.

18           THE COURT:  Okay.

19           MR. CIAPPETTA:  Yes, I will address the fees.

20           First, I do want to talk about the *Bruen* test itself

21   for a moment.  I won't reiterate what the State said, but our

22   analysis was slightly different, and it goes to your question

23   on the burden.

24           While eventually the burden is to justify the

25   regulation based on a tradition and establishing a tradition in

MBT7CORC

1    regulation, there's a first step in *Bruen*, and that shouldn't

2    get lost here, and that's very important.  The Court made very

3    clear that there's a step-one analysis that needs to take

4    place.  And at that step one, you first have to determine

5    whether the proposed conduct is even covered by the Second

6    Amendment.  That's significant.  That's not something to just

7    speed through as the plaintiff does.

8           In *Bruen*, I think the question is fairly easy so they

9    didn't spend need to spend a ton of time and make decision on

10   it, but it is analysis that needs to occur in every single

11   case.  And here, we argue that the proposed conduct is owning

12   or possessing a firearm without obtaining training.

13          THE COURT:  Well, wait.  I mean, I understand that

14   that's your argument.  And the reason I didn't pursue it is

15   because it seems to me that it begs the argument and it

16   conflates the right to bear arms with any regulatory

17   requirements that might be imposed on it.  And so, I guess I

18   have trouble accepting your argument.

19          MR. CIAPPETTA:  Okay.  But I would say then -- I mean,

20   I assume the plaintiff is trying to propose that the proposed

21   conduct is a right to carry.  But I would suggest, your Honor,

22   then, if that's the case, that would make the first step of the

23   *Bruen* analysis virtually irrelevant, because at every single

24   regulation that would be challenged in any regard somebody

25   would say, Oh, my proposed conduct is the right to carry.

MBT7CORC

1          So, for example, if they challenge the NYPD licensing

2     scheme in its entirety, you could say, Oh, that's my right to

3     carry.  I would suggest that there, it's the right to carry

4     without a license; and here, it's the right to carry without

5     undergoing any training.  And we say that conduct isn't

6     protected.

7          THE COURT:  Is there any binding case law?  I know

8     it's hard since *Bruen* is so recent, but is there any binding

9     case law or even persuasive case law that adopts your approach

10    for defining step one?

11         MR. CIAPPETTA:  Not in the Second Circuit, but there

12    have been decisions in district courts elsewhere.  I believe

13    there's a couple decisions in Texas that spend a great deal of

14    time.  Even the decision that came out of Texas, your Honor,

15    dealing with whether individuals 18 to 21 years of age have a

16    right to carry.  And in that case, and in also some of the

17    cases challenging sections of United States Code as to whether

18    a felon can carry or not, there's substantial analysis in those

19    cases.  In fact, I have one in front of me.  I believe it's

20    *United States v. Antonio Perez-Gallan*.  And there, was

21    whether -- if you were subject to a court order, whether that

22    violates *Bruen*.  And eat each of these levels, they're

23    conducting quite a bit of analysis at that first step.  So I

24    don't think it's just something that is always going to be the

25    cause, or even in certainly this case, it's just the right to

1   possess gets you through the *Bruen* step one.  I think it's much

2   more complicated than that.

3          THE COURT:  Okay.  Did you want to say anything else

4   about the constitutionality of the training requirement?

5          MR. CIAPPETTA:  Yes.

6          Likewise, with respect to the training, whether you

7   look at it in step one or in step two, I think the Supreme

8   Court has already tacitly approved training.  They mentioned in

9   Footnote 9 of the *Bruen* decision that there are long-standing,

10  presumptively lawful regulatory measures, and this seems to be

11  one of them.  They specifically talk about a training course.

12         THE COURT:  I had a question about that because,

13  frankly, it wasn't entirely clear to me from the *Bruen*

14  decision.  Where does that leave us with the historical

15  analysis?  I mean, they tell us the test is a historical

16  analysis, but does that mean that they've implicitly done this

17  historical analysis around training and come to that conclusion

18  or what?

19         MR. CIAPPETTA:  Yes, that's what I believe, your

20  Honor.  I believe that over the course of *Bruen* and over the

21  course of *Heller* that the Supreme Court identified these

22  long-standing, presumptively lawful regulatory measures, and

23  they've already done that analysis for us.  For example, also

24  in the category of dangerous arms they did that analysis

25  already and they already determined how, going forward, you

MBT7CORC

```
 1    would look at a dangerous weapon; it would be whether -- you

 2    wouldn't need to do that historical analysis, they've already

 3    done it.  For example, with respect to felons, with respect to

 4    the sensitive locations that they've identified——schools,

 5    courthouses——you wouldn't need to do those again.  So if

 6    somebody challenges them, the Supreme Court has already done

 7    that analysis, correct.

 8             So, for example, and as applicable to this case, these

 9    long-standing presumptively lawful regulatory measures, one of

10    those is where there are narrow definite and objective

11    standards.  And this is certainly a narrow, definite, and

12    objective standard.  All you need to do, as Mr. Spiegelman

13    said, is look and see whether the person has a certificate of

14    completion for the training.

15             THE COURT:  Again, I'm trying to understand this.

16             So narrow -- I don't remember the language -- certain

17    and objective standards that -- not any narrow and objective

18    standards I presume would survive, it also has to have a

19    historical analogue, right?

20             MR. CIAPPETTA:  I would argue no.  If they're narrow

21    and objective, I believe the Supreme Court has already upheld

22    those presumptively.

23             THE COURT:  Okay.

24             MR. CIAPPETTA:  Particularly with respect to training

25    and course work.
```

MBT7CORC

1          THE COURT:  Okay.  I mean, it seems to me you're

2    suggesting an overly broad reading, but that is not relevant

3    here since we're talking about training requirements.  But,

4    okay, go ahead.

5          MR. CIAPPETTA:  So here, as I said, this is very

6    objective, right?  I mean, you either take the course and you

7    get your certificate of completion or you don't.

8          Going back to your point -- which is a broader point,

9    right?  It really involved whether there's the exercise of

10   discretion upon the licensing officer.  And with respect to a

11   training program, and this is a training requirement, there's

12   no discretion that needs to be exercised if he sees the

13   certificate, that's a checkmark, that application requirement

14   has been completed.

15         THE COURT:  So you're suggesting that any narrow

16   requirement imposed on an applicant that is objective and not

17   discretionary would survive?

18         MR. CIAPPETTA:  Potentially.  I mean, I don't think I

19   need to make that argument in this particular case.

20         THE COURT:  Right.  Okay.

21         MR. CIAPPETTA:  But in the appropriate case, I would

22   certainly be willing to make that argument, and I believe it

23   would be a colorable one.

24         THE COURT:  Okay.  You're right.  It's completely

25   academic here.  So why don't we talk about some aspect that

MBT7CORC

 1   isn't as academic.  And I'm still interested in the fees

 2   argument.

 3          MR. CIAPPETTA:  Yes.  I think that that's also

 4   speculative.  The Supreme Court had some language in a footnote

 5   that talked about cost.  I think that talks about numerical

 6   dollar cost, hard costs, not soft costs, which is the time

 7   involved to take a course, the number of hours in the course,

 8   because --

 9          THE COURT:  And what did we know about the standard of

10   how much is too much?

11          MR. CIAPPETTA:  That's a good question.  We don't know

12   that.  And I do think that that's something that that's going to

13   have to be developed in case law.  I do think that while

14   perhaps it's a different standard for the Second Amendment,

15   there is case law dealing with fees and other context, and

16   we've litigated this in different aspects where the fee has to

17   be proportionate to the amount of work done in connection with

18   the application.  So the administrative fee couldn't be

19   $10,000, for example, because there's not $10,000 worth of work

20   done to review the application.

21          Here, I think the fee is only $350.  I can tell you,

22   certainly, that there's a tremendous amount of work that goes

23   into the review of an application, and even more so since the

24   CCIA was passed on September 1., because now you have a lot of

25   different things to review that you didn't have to review

MBT7CORC

1    before.

2            THE COURT:  Okay.  Let me hear from Mr. Corbett.

3            Mr. Corbett, it's your motion, and I think you know

4    the issues that I'm interested in.  I'll let you have the last

5    word if there's anything else you'd like to add, or anything

6    that's been said that you want to address.

7            MR. CORBETT:  Thank you, your Honor.

8            There is ambiguity in the *Bruen* case as to whether

9    certain objective licensing measures need to pass a historical

10   analogue or not.  But to the extent that the Supreme Court

11   implied some kind of exception, the exception was not just for

12   any objective measures, but specifically for those that prevent

13   dangerous or non-law abiding people with having guns.  So

14   essentially there's some kind of tailoring there, there's some

15   kind of balancing test, if we're going to assume that there's

16   no historical analogue required for those things.

17           THE COURT:  I mean, but there is.  There's a very

18   strong historical analogue for dangerous or unsavory people

19   possessing guns.

20           MR. CORBETT:  Definitely.

21           The papers that I filed don't dispute that a training

22   requirement of some kind is Constitutional or that fees of some

23   kind are Constitutional; the question is whether or not they're

24   excessive.  And I think right now we have a few things that go

25   towards it being excessive.

MBT7CORC

1          Number one, the total cost of licensure is going to be

2     over $1,000.  The government can call that speculation, but

3     they haven't put forth any speculation of their own or any

4     evidence to disprove it.  It seems pretty clear from any

5     research that I've done and presented to the Court that it's

6     going to be over $1,000.  It's also going to be dozens of

7     hours.

8          THE COURT:  Wait.  Have you put any evidence that says

9     that?

10          MR. CORBETT:  Well, I put the actual costs that the

11     government charges for their licensure.  But the real issue is

12     that the training courses are going to be substantial.

13          If we look at training courses in other states that

14     are smaller in duration, you'll see that they run 5, 6, 7,

15     $800.  There's no way in New York, one of the most expensive

16     places in the country, we're going to escape anything like

17     that.  But even if it was just $500 for the licensing course,

18     that's in addition to the $350 for the application, in addition

19     to the $88, or whatever it is, for the fingerprints, in

20     addition to the time one has to take to complete all of these

21     steps.  So really, this does deny the ordinary citizen the

22     ability to get this license without trading extreme hardship.

23          On the other hand, the government really hasn't

24     demonstrated what good this course is going to do over shorter

25     courses that are common in other states.  It just doesn't seem

 1    that there's any kind of justification other than an attempt to

 2    just make it more difficult.

 3            THE COURT:  But that doesn't make it unconstitutional.

 4    I guess, at what point do you say it reaches the level where it

 5    is so excessive that it's unconstitutional?  What's the measure

 6    of that?

 7            MR. CORBETT:  It's going to be hard to put an exact

 8    number on that.  And the Supreme Court has always been very

 9    good at putting these kind of vague standards and letting the

10    district courts kind of figure it out.  And it's unfortunate we

11    have to do that now with very little guidance, however the

12    licensing costs now will be the highest in the country, there's

13    no doubt about that.  The training number of hours will be the

14    highest in the country, there's no doubt about that either.  So

15    if there is a training requirement that can be challenged in

16    this country, it is New York's new requirement.

17            I wanted to add one more thing, just as a general

18    outlook for this case.  The government makes a lot of arguments

19    that make sense.  They're logical and, in a vacuum, they are

20    persuasive.  I would urge the Court to consider whether the

21    Supreme Court, as it's currently made up, will consider them

22    the same way.

23            The government's, for example, arguing that the

24    burdened right is not just the right to bear arms, but the

25    right to bear arms without a license and so forth.  These are

MBT7CORC

1    questions that the Supreme Court would not even come close to

2    agreeing with the government on.  There is an argument that is

3    made there, it is a logical argument, but it is an argument

4    that is foreclosed by *Bruen*, and it is an argument that will go

5    nowhere.  The militia is not connected to this debate anymore.

6    Comparing training requirements to militia training

7    requirements is simply not a historical analogue that the

8    Supreme Court will accept.  And I would urge the Court to see

9    it as that.

10          THE COURT:  Okay.  I am prepared to rule, in that

11   case.  Let me begin with the legal standard, which I know was a

12   matter that the parties disputed.

13          I'm quoting now:  "A party seeking to stay government

14   action taken in the public interest pursuant to a statutory or

15   regulatory scheme must establish (1) a likelihood of success on

16   the merits, and (2) irreparable harm in the absence of an

17   injunction."  *Evergreen Association, Inc. v. City of New York*,

18   740 F.3d 233 at 245, Second Circuit 2014; *accord Citizens*

19   *United v. Schneiderman*, 115 F. Supp 3d 457 at 462, S.D.N.Y.

20   2015.  "A presumption of irreparable injury flows from a

21   violation of Constitutional rights."  *We The Patriots USA Inc.*

22   *V. Hochul* 17 F.4th 266 at 294, Second Circuit 2021.

23          I know that this is a less demanding standard than at

24   least what I believe the City advocated for, but I'm not sure

25   that the mandatory injunction standard has been applied in this

MBT7CORC

1   context.  And the quotation that I read from *Evergreen* is

2   explicitly addressed to a party seeking to stay government

3   action taken pursuant to a statutory or regulatory scheme.  So

4   for the purpose of my analysis here, I'm adopting the less

5   demanding standard, meaning less demanding standard imposed on

6   the plaintiff seeking relief.

7          So in terms of my analysis, just to cut to the chase,

8   I'm denying the request for preliminary injunction.  With

9   respect to the social media and reference requirements,

10  plaintiff has not established a likelihood of success on the

11  matters, and, specifically, that is on the standing issue.  In

12  order to have standing to sue, a litigant must have suffered an

13  injury in fact *Spokeo, Inc. v. Robins*, 578 U.S. 330 at 338,

14  2016.  "To establish injury in fact, a plaintiff must show that

15  he or she suffered an invasion of a legally protected interest

16  that is concrete and particularized in actual imminent, not

17  conjectural or hypothetical."  *Id*. at 339, *accord TransUnion,*

18  *LLC. v. Ramirez*, 141 Supreme Court 2190 at 2200, and the year

19  is 2021.  "A concrete injury must be *de facto*; that is, it must

20  actually exist; it must be real, and not abstract."  *Spokeo,*

21  578 U.S. at 340.

22          As I understand from our oral argument, I think

23  Mr. Corbett is realistic about this argument and understands

24  the impediment that the requirement of imminence imposes.

25  Here, I find, for the purposes of this motion, that the

MBT7CORC

1  plaintiff lacks standing to challenge the social media and

2  reference requirements because he applied for his license in

3  April 2022, and the two requirements we're talking about did

4  not apply to applications that were made before September 1,

5  2022.  So by the terms of the statute, those requirements don't

6  apply to plaintiff, so he cannot show injury in fact from these

7  requirements.

8      Plaintiff looks to the future and argues that these

9  requirements would apply to any renewal application.  I'm not

10  persuaded by this argument.  First, any renewal application is

11  at least three years away, and that is not actual or imminent.

12  Second, any renewal application is hypothetical because there

13  is not yet any license to renew.  So for that reason, I find

14  that plaintiff has not established a likelihood of success on

15  the two challenges, the social media requirement and the

16  references requirement, because he lacks standing.

17      Let me turn then to the training requirement.  I

18  conclude that the plaintiff has not shown a likelihood of

19  success on the merits of this challenge.  I'm assuming without

20  deciding that he is likely to be able to show that he has

21  standing to challenge the training requirement.  "In order to

22  challenge the New York firearm licensing laws, a person must

23  either have applied for and been denied a license or make a

24  showing that his or her application would have been futile."

25  *Libertarian Party of Erie County v. Cuomo*, 970 F.3d 106 at 116,

MBT7CORC

Second Circuit 2020, abrogated by *Bruen* on other grounds.

          Plaintiff here has filed an application and the training requirement by its terms applies to his application. He has not taken the required training.  He states that he has no intention of taking the required training and he hasn't had any training in the last five years.  Nothing in the statute suggests that the training requirement can be waived or that it's discretionary.  And so on these facts, it seems likely that the plaintiff can show that his application is futile and likely to be denied.  It is sufficient to establish injury in fact and, therefore, standing.

          Onto the merits of the training requirement, the plaintiff has not shown a likelihood of success in showing that the requirement is unconstitutional.  "The Second and Fourteenth Amendments protect an individual right to keep and bear arms for self-defense." *New York State Rifle and Pistol Association, Inc, v. Bruen*, 2111 at 2125, and the year is 2022. "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.* at 2129 and 30.

          "This historical inquiry will often involve reasoning by analogy."  Id. at 2132.  "Analogical reasoning requires only that the government identify a well-established and

MBT7CORC

1    representative historical analogue, not a historical twin."

2    *Id.* at 2133.  "Whether modern and historical regulations impose

3    a comparable burden on the right of armed self-defense and

4    whether that burden is comparably justified are central

5    considerations when engaging in an analogical inquiry.  Id."

6          So as a threshold matter, I find, for the purposes of

7    this motion, that the Second Amendment's plain text covers the

8    conduct in question, that is to own and carry a handgun in

9    public.  However, plaintiff has failed to show a likelihood of

10   success on the merits.  Defendants ultimately have the burden

11   of proof on this issue.  And here, they have made a sufficient

12   showing without any contrary evidence from plaintiff that the

13   training requirement is consistent with the Nation's historical

14   tradition of firearm regulation.

15         The State defendants attach and quote a New York law

16   called an Act for Regulating the Militia of the State of New

17   York, passed in 1780, which shows that the belonging to a

18   militia was something that was required basically of every

19   able-bodied man between the ages of 16 and 44, and that was the

20   State militia.  And those men were required to be enrolled and

21   to bear arms and at least four times a year——by the way, I

22   think it's four and not six——be "called out to be well and

23   sufficiently exercised trained and disciplined for their

24   instruction and improvement."  That is at Docket 16-8 at page

25   3.

MBT7CORC

1              State defendants also provided a similar New Jersey

2     law which states, "That the militia, on the days of exercise,

3     may be detained under arms on duty in the field any time not

4     exceeding six hours."  Based on these sources and evidence in

5     the record, the training requirement appears to be consistent

6     with, and even more lenient than, the training requirements of

7     the 18th and 19th centuries.  Although the plaintiff disputes

8     that the militia is an appropriate analogue, it is in that

9     context that the Second Amendment was adopted and, in that

10    context, that men were expected and did carry arms.

11             The plaintiff identifies several ways in which the

12    training requirement is different from its historical analogue.

13    As I said, I think that argument is unpersuasive because

14    defendants, as *Bruen* says, need not identify an historical

15    twin.  Plaintiff also argues that the training requirement is

16    unconstitutional because of exorbitant fees and also an

17    argument about excessive time, but the plaintiff has not

18    offered any evidence of what the fees actually will be.  And

19    the New York State militia statute makes clear that individuals

20    were required to soldier significant costs in connection with

21    their bearing arms.  So it seems to me there's ample historical

22    precedent not only for the training requirement but imposing

23    costs in connection with the bearing of arms and licensure on

24    the applicants.

25             So for these reasons, because the plaintiff has not

MBT7CORC

```
1    established a likelihood of success on the merits of

2    challenging the training requirement, I am denying the motion

3    for preliminary injunction.

4            Mr. Corbett, I understood from your letter to the

5    Court that you intend to appeal; is that right?

6            MR. CORBETT:  Your Honor, as to the Court's holding on

7    the training requirement, yes, that is a likely outcome.

8            THE COURT:  Okay.  So given that, I think your

9    suggestion to wait on any motions to dismiss makes sense.  And

10   so I'm going to grant the plaintiff's application to stay any

11   motions to dismiss pending appeal and resolution of the

12   preliminary injunction order.

13           My plan is to issue a very brief written order

14   basically referencing my reasoning here on the record.  We have

15   a court reporter.  There will be a transcript.  And I'm also

16   going to stay discovery and any other proceedings until after

17   the preliminary injunction motion or appeal is resolved.

18           Anything else we should be talking about, Mr. Corbett?

19           MR. CORBETT:  Your Honor, I just wanted to give notice

20   that there may be a motion to amend the complaint to include

21   the time that it has taken to process this application.  We're

22   approaching the eight-month mark now.  The City has shown no

23   intention of rapidly processing my or any other application

24   that's been submitted, which will become a new Constitutional

25   issue.  So I just wanted to put that out there.  There will be
```

1   an interlocutory appeal, the Court will retain jurisdiction,

2   and that motion for leave to amend may be pending.

3           THE COURT:  Okay.  Mr. Spiegelman, do you want to

4   comment?  Is there any opposition to the motion to amend or to

5   the proposed timing of the motion to amend, which I presume is

6   relatively soon?

7           MR. SPIEGELMAN:  I think I need to see the motion to

8   say what the -- and talk it over with my clients to say what

9   the State defendants' position on it would be.

10          As to timing, I guess it's when plaintiff wants to

11  file it.

12          THE COURT:  All right.  But do you agree that I would

13  have jurisdiction to consider it and rule on that motion?

14          MR. SPIEGELMAN:  I think you would.

15          THE COURT:  I think you would, too, but I just wanted

16  to make sure there's no objection that.

17          So, Mr. Ciappetta, what is the position of the City

18  defendants as to any motion to amend?  Or do you want to confer

19  with your clients?

20          MR. CIAPPETTA:  We would have to confer.

21          I guess I do have one question for the Court though.

22  Assuming he makes that motion and it's granted, then would I

23  assume our time to respond to that or move would likely be

24  stayed as well?

25          THE COURT:  Yes, that's true.  And if I don't

MBT7CORC

1   explicitly say so then, just ask me in a letter and I'll

2   endorse it to make that clear and on the record.

3          MR. CIAPPETTA:  We likely wouldn't have an objection.

4   I do need to speak with my client.  We're fairly permissive on

5   letting people amend their complaint, as long as it's not too

6   long into the litigation or it wouldn't involve discovery.  So

7   my inclination would be not to oppose it.

8          THE COURT:  Okay.  So, Mr. Corbett, I have a

9   requirement for premotion letters.  What I suggest you do is

10  make a premotion letter and just lay out your argument fully

11  and attach the proposed amended complaint to your letter.  And

12  what I suggest you do is do a compare so that we can see the

13  changes as compared to the original complaint, and then the

14  defendants can respond, likewise, in a letter and either say

15  that they don't oppose or put their arguments there.  Then I'll

16  just decide on the letters; I won't take full briefing.  So if

17  you would comply with my individual rules in that way, that

18  would be great.

19         MR. CORBETT:  Your Honor, if I may ask, you have

20  separate rules for *pro se* litigants and non.  I'm happy to

21  follow the non-*pro se* litigant rules; is that acceptable?

22         THE COURT:  That is preferable.  Thank you for raising

23  that.

24         Okay.  I assume there's nothing else.  So unless

25  anyone speaks up quickly, we're adjourned.

MBT7CORC

1                Thank you.  Have a good afternoon, gentlemen.

2                (Adjourned)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25