## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

AARON SIEGEL; JASON COOK; JOSEPH DELUCA; NICOLE CUOZZO; TIMOTHY VARGA; CHRISTOPHER STAMOS; KIM HENRY; *and* ASSOCIATION OF NEW JERSEY RIFLE & PISTOL CLUBS, INC.,

    *Plaintiffs*,

  v.

MATTHEW PLATKIN, in his official capacity as Attorney General of New Jersey,

PATRICK J. CALLAHAN, in his official capacity as Superintendent of the New Jersey Division of State Police,

  *Defendants*.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 1:22-cv-7463-KMW-AMD

Oral Argument Requested

Motion Date: January 9, 2023

**<u>CIVIL ACTION</u>**

**(ELECTRONICALLY FILED)**

## PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR A TEMPORARY RESTRAINING ORDER

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com
*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 2

    1. Standing .................................................................................................. 3

        a) "Some Day" Plans ............................................................................. 4

        b) Threat of Enforcement ....................................................................... 6

        c) Redressability/Traceability .............................................................. 8

    2. Irreparable Harm ................................................................................. 11

    3. Likelihood of Success on the Merits ................................................... 13

        a) Second Amendment ......................................................................... 13

            i) Private Property Default Rule – 7(a)(24) .................................... 15

            ii) Government as Proprietor ............................................................ 15

            iii) "Government and Constitutionally Protected Activity" ............. 17

            iv) "Locations Where Crowds Gather" ............................................ 19

            v) "Where Vulnerable or Incapacitated People Gather" .................. 20

            vi) Private Property without Express Permission ............................ 21

            vii) Vehicle Prohibition – Unloaded and Locked Away ................... 21

        b) Void for Vagueness .......................................................................... 24

i) "Carry" ................................................................................................ 25

ii) "Vehicle" ........................................................................................... 26

c) First Amendment ................................................................................ 26

i) Libraries ............................................................................................. 26

ii) Private Property - Compelled Speech ............................................... 27

d) Equal Protection – Private Property .................................................... 28

4. Balancing the Equities .......................................................................... 28

CONCLUSION ............................................................................................. 29

# TABLE OF AUTHORITIES

## Cases

*Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 792 F.3d 281 (3d Cir. 2015)................... 9,10

*AmSouth Bank v. Dale*, 386 F.3d 763, 786 (6th Cir. 2004)........................................ 11

*Antonyuk v. Hochul*, No. 1:22-cv-0986-GTS-CFH,
    2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022).................................................. 18, 27

*Board of Education of Independent School District No. 92*
    *of Pottawatomie County v. Earls*, 536 U.S. 822 (2002) ........................................... 3

*Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015).................................... 16

*Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983) ....................................................... 12

*Clark v. McDonald's Corp.*, 213 F.R.D. 198 (D.N.J. 2003)......................................... 5

*Connection Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998)................................ 29

*Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347 (3d Cir. 2014) ...................... 9

*Council of Alternative Pol. Parties v. Hooks,* 121 F.3d 876 (3d Cir. 1997) ............. 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .......................................... passim

*D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031 (9th Cir. 2008)................... 4

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011).............................................. 12

*Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016).......................................................... 12

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006)................................................................................................ 13

*Hereas Materials Tech. LLC v. Pham*,
    2011 WL 13227724 (E.D. Pa. May 5, 2011)......................................................... 29

*Hohe v. Casey*, 868 F.2d 69 (3d Cir. 1989) .................................................................... 12

*Houston v. Marod Supermarkets, Inc*, 733 F.3d 1323 ................................................... 5

*I.C.C. v. Hudson Transp. Co.*, 174 F. Supp. 373 (D.N.J. 1959) .................................... 3

*Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) .................... 16

*Johnson v. United States*, 135 S. Ct. 2551 (2015) ................................................ 24, 25

*K.A. ex rel. Ayers v. Pocono Mountain School District*,
  710 F.3d 99 (3d Cir. 2013) ....................................................................................... 29

*Khodara Env't, Inc. v. Blakey*, 376 F.3d 187 (3d Cir. 2004) ........................................ 9

*Kolbe v. Hogan*, 845 F.3d 114 (4th Cir. 2017) ............................................................ 25

*Kreimer v. Town of Morristown*, 958 F.2d 1242 (3d Cir. 1992) ................................. 26

*Libertarian Party of Va. v. Judd,* 718 F.3d 308 (4th Cir. 2013) ................................... 9

*Lujan v. Defs of Wildlife*, 504 U.S. 555 (1992) ................................................ 3, 4, 5, 6

*McCahon v. Pennsylvania Tpk. Comm'n*,
  491 F. Supp. 2d 522 (M.D. Pa. 2007) ..................................................................... 11

*McDonald v. Chicago*, 561 U.S. 742 (2010) ......................................................... 12, 22

*Nat'l Treasury Emp. Union v. United States*,
  927 F.2d 1253 (D.C. Cir. 1991) ............................................................................... 12

*Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229 (11th Cir.2003) ................ 5

*New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022) .... passim

*Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806 (3d Cir. 1989) ............................ 29

*Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294 (3d Cir. 1996) ........................................ 7

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988) ......................... 27

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006) ................................................................................... 27

*Sessions v. Dimaya*, 138 S. Ct. 1204 (2018) ........................................... 24, 25

*Silvertop Associates Inc. v. Kangaroo Manufacturing Inc.*,
    931 F.3d 215 (3d Cir. 2019) ..................................................................... 3

*Tandon v. Newsom*, 141 S. Ct. 1294 (2021) .............................................. 12

*Tinker v. Des Moines Independent Community School Dist.*,
    393 U.S. 503 (1969) ................................................................................. 16

*Toll Bros. v. Twp. of Readington*, 555 F.3d 131 (3d Cir. 2009) ............. 9, 10

*Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27 (2d Cir. 1995) ............. 3

*United States v. Bramer*, 832 F.3d 908 (8th Cir. 2016) ............................. 25

*United States v. Class*, 930 F.3d 460 (D.C. Cir. 2019) .............................. 16

*Warner Bros. Pictures, Inc. v. Gittone*, 110 F.2d 292 (3d Cir. 1940) ......... 3

*Wayne Land & Min. Grp. LLC v. Delaware River Basin Comm'n*,
    894 F.3d 509 (3d Cir. 2018) ............................................................ 7, 9, 11

*West Virginia State Board of Education v. Barnette*, 319 U.S. 624 (1943) .............. 27

*Wooley v. Maynard*, 430 U.S. 705 (1977) .................................................. 12

*Wrenn v. D.C.,* 864 F.3d 650 (D.C. Cir. 2017) ..................................... 12, 29

## Statutes

42 U.S.C. §1983 ......................................................................................... 11

N.J.S. 2C:39-5(b) ....................................................................................... 25

N.J.S. 13:13A-10 ........................................................................................ 11

N.J.S. 23:2A-10(a)(5) ............................................................ 10

N.J.S. 39:1-1 ....................................................................... 26

N.J.S. 52:17B-101-108 ........................................................ 10

**Rules**

N.J.A.C. 7:2-2.17 .................................................................. 8

N.J.A.C 7:25-5.23 ................................................................. 8

**Other Authorities**

David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*,
   13 Charleston L. Rev. 205 (2018) .......................................... 17

Mark W. Smith, *"Not All History Is Created Equal": In the Post-Bruen World,
   the Critical Period for Historical Analogues Is when the Second Amendment
   Was Ratified in 1791, and not 1868 (working draft)* (October 1, 2022), available
   at https://ssrn.com/abstract=4248297 or http://dx.doi.org/10.2139/ssrn.4248297.. 14

## <u>INTRODUCTION</u>

**"[T]oday's decision . . . holds that a State may not enforce a law . . . that effectively prevents its law-abiding residents from carrying a gun for [self-defense]."**

- *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2157 (2022) (Alito, J., concurring).

**"[B]lindly allowing concealed weapons into every corner of our communities does not make us safer."**

- New Jersey Governor Phil Murphy at the public signing of A4769. https://www.youtube.com/watch?v=xD-e_8M9AI0 at marker 8:40 (last visited January 4, 2023).

**"We're better as a state, we're better off when we don't have to worry about everyone carrying a gun . . . ."**

- New Jersey Assembly Speaker Craig J. Coughlin.

*Id*. at 31:47.

**"[P]eople that are waiting in line to get a carry permit in New Jersey - I don't think that they understand the responsibility that comes with carrying a firearm. . . . That's why we only let professional law enforcement officers carry them . . ."**

- New Jersey Senate President Nicholas P. Scutari.

*Id*. at 23:23.

Defendants oppose Plaintiffs' request for injunctive relief through misdirection and mischaracterization. A4769 effectively prohibits the exercise of the fundamental right of the people to carry arms outside the home for self-defense—in direct violation of *New*

*York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111, 2135 (2022).[1] Defendants repeatedly invoke interest balancing to try to justify this new grossly unconstitutional law, but that mode of analysis is squarely foreclosed by *Bruen* and *District of Columbia v. Heller*, 554 U.S. 570 (2008). Defendants nevertheless refer to "vulnerable" populations or "volatile" situations as a justification for these vast restrictions on handgun carry. But the entire point of the right to keep and bear arms under the Second Amendment is that *the people*—not the State—get to decide when and under what circumstances it is proper to arm themselves for self-defense. That balance was already struck in the Constitution. *Heller*, 554 U.S. at 634-35; *Bruen*, 142 S. Ct. at 2131.

The bottom line of *Bruen* is this: the people have a right to be armed when they leave their homes. The State can restrict that right only in *exceptional* circumstances defined by historical tradition, not how the State would balance the various interests at stake today. *Id*. at 2156. New Jersey's effort to prohibit the people from being armed *nearly everywhere* cannot be reconciled with the Supreme Court's clear teachings.

## ARGUMENT

As an initial matter, Defendants incorrectly claim that Plaintiffs seek a mandatory injunction. That is wrong. A mandatory injunction either (1) mandates that the defendant conduct a positive act or (2) provides the moving party with substantially all the relief

---

[1] Defendants refer to A4769 by its session law designation, Chapter 131. "A4769" and "Chapter 131" should considered interchangeable.

sought and that relief cannot be undone even if the defendant prevails at a trial on the merits. *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 33–34 (2d Cir. 1995); *Silvertop Associates Inc. v. Kangaroo Manufacturing Inc.*, 931 F.3d 215, 218 n.1 (3d Cir. 2019).

Plaintiffs do not seek to alter the status quo. The principal object of a TRO or preliminary injunction is to preserve the status quo until the case can be heard upon the merits, and the status quo is the last uncontested status that preceded the pending controversy. *Warner Bros. Pictures, Inc. v. Gittone*, 110 F.2d 292 (3d Cir. 1940); *I.C.C. v. Hudson Transp. Co*., 174 F. Supp. 373, 376 (D.N.J. 1959). The status quo is the state of affairs *prior* to the passage of A4769. That is the status quo to be preserved. And, at least after *Bruen*, the status quo before New Jersey enacted its restrictive regime is that New Jerseyans could actually exercise the constitutional right that *Bruen* recognized.

## 1.   Standing

Once a single plaintiff is found with standing as to a claim, the Court need not inquire as to the standing of any other plaintiff on that claim. *Board of Education of Independent School District No. 92 of Pottawatomie County v. Earls*, 536 U.S. 822, 826 n.1 (2002). Thus, in order to successfully assert lack of standing as a basis to avoid a temporary restraining order ("TRO") on a given claim, Defendants must show that no plaintiff has standing to assert that particular claim. Defendants have not done so.

The leading case on standing is *Lujan v. Defs of Wildlife*, 504 U.S. 555 (1992). Defendants make several erroneous standing arguments, none of which are valid.

3

a)     **"Some Day" Plans**

Defendants first take issue with how imminently various Plaintiffs intend to visit places where they would carry firearms but for New Jersey's new law. Defendants misunderstand *Lujan's* teaching on the degree of "concreteness" required to establish standing. The problem in *Lujan* was not that it was unclear precisely when the plaintiffs intended to take the actions that they claimed to frequently take. It was that the plaintiffs could not even represent whether they would *ever* actually do so:

> Skilbred was asked at a subsequent deposition if and when she had any plans to return to Sri Lanka, she reiterated that "I intend to go back to Sri Lanka," but confessed that she had no current plans: "I don't know [when]. There is a civil war going on right now. I don't know. Not next year, I will say. In the future.

*Id*. at 563-64. The problem in *Lujan* was the uncertainty as whether they ever really would go back at all.  "Some day" in *Lujan* meant "maybe, maybe not." "[A]ctual or imminent" does not mean that a plaintiff must articulate precisely "what day or time." "Actual or imminent" simply means *not speculative. Id*. Thus the requirement is not pinpoint timing but rather to ensure that he intention is not merely speculation or wishful thinking.

Consistent with that understanding, courts have routinely found sufficient allegations that plaintiff does something regularly. *See, e.g., D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1037–38 (9th Cir. 2008) (finding a real and immediate threat of future injury where the "plaintiff demonstrates an intent to return to the geographic area where the accommodation is located and a desire to visit if it were made

accessible" through the regularity of the plaintiff's visits to the area, a stated intent or plan to return to the accommodation, and an explanation of why the plaintiff preferred the accommodation at issue over others); *Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1242 (11th Cir.2003) (noting that the plaintiffs *frequently* visited the park); *Houston v. Marod Supermarkets, Inc*, 733 F.3d 1323, 1340 (noting that the plaintiff lived approximately 30 miles from the store and drove by the store on a regular basis); *cf. Clark v. McDonald's Corp.*, 213 F.R.D. 198, 229 (D.N.J. 2003) ("Plaintiff Clark, unlike the plaintiff in [*Lujan*], has at least offered a "specification of when the some day will be." It will be "upon remediation," i.e., the day that the architectural barriers alleged to exist at the restaurants Clark has visited are removed or cured.")

All of the Plaintiffs' claims easily pass that low bar. Plaintiffs Siegel, Cook, DeLuca, and Stamos use words like "frequently, "regularly," "every year," "one or two times per month," "sometimes," "enjoys," "from time to time," "nearly every day" "several times per month," "several times per year," "every few years," "regularly," and "annually." All of these words express regularity and continuity. In every instance it is clear that the Plaintiff will be engaging in the activity with a degree of certainty, which is all *Lujan* and Article III require.

Defendants' argument regarding filming locations also fails. Since filming locations are generally not known to the public in advance, requiring the definiteness Defendants insist on would make it impossible for any plaintiff to challenge that part of the law. Here, two plaintiffs have said unequivocally that they *do* approach such locations

and would approach such locations in the future while carrying if they could lawfully do so. Plaintiff Cook says that *every time* he encounters a filming location he approaches the location and would do so in the future. Compl. ¶158. Plaintiff Siegel says essentially the same thing only that he sometimes approaches these locations but not always. But he is clear that he would do so again. Compl. ¶114. Both allegations are sufficient under *Lujan*.

Importantly, Defendants do not challenge the standing of the church Plaintiffs, Cuozzo and Varga, who allege that they are prevented from carrying in their church because the breadth and vagueness of A4769 makes them fear prosecution as there is a school, Sunday school, bible classes, or other types of instruction given on the same property as the church prayer services. Cuozzo and Varga allege both: (1) that the breadth of A4769 in prohibiting carry in *all* parts of a multiuse property even if only one part is a prohibited location is unconstitutional and (2) that A4769 is unconstitutionally vague in that they cannot tell if "school, college, university or other educational institution" includes Sunday school, bible classes, sports instruction, or other learning of any kind.

**b)   Threat of Enforcement**

Defendants argue that Plaintiffs have not shown a "credible threat of prosecution." Given the publicity and rhetoric of the Governor, the Attorney General, the Senate President, the Speaker of the Assembly, and the bill sponsors, Defendants' position is hard to take seriously. A4769 is a brand new law and has been the subject of multiple press conferences and photo opportunities.

On June 24, 2022, the day after *Bruen* was decided, Governor Phil Murphy, along

with Defendants Platkin and Callahan, held a press conference criticizing *Bruen* and calling for new laws limiting where a person could carry a handgun. https://www.youtube.com/watch?v=EJ9ZJR-Sk24 at 2:47 (last visited January 3, 2023).

On December 22, 2023, Governor Murphy, again joined by Defendants Platkin and Callahan, held a live signing of A4769 on YouTube.com, hailing A4769 as a law that would keep guns "out of places where they simply do not belong" and that the State of New Jersey will "do everything [it] can to ensure the safety of our citizens." https://www.youtube.com/watch?v=xD-e_8M9AI0 (Governor speaks at 2:34; Defendant Platkin speaks at 16:04) (last visited January 4, 2023).

Further, on his official webpage, Defendant Platkin provides a list of only *four* priorities of his office. One of them is "gun violence." https://www.njoag.gov/programs/gun-violence/ (last visited January 3, 2023).  The idea that Plaintiffs cannot show that this law will be enforced is simply not credible—especially given that Defendants conspicuously decline to represent that they would not enforce the law against Plaintiffs were they to violate it.[2]

---

[2] Indeed, when evaluating pre-enforcement challenges for declaratory and injunctive relief, the Third Circuit has repeatedly held that there is a present case or controversy when the parties' interests are adverse, the plaintiffs are seeking a conclusive judgement, and that judgment would provide utility. *Wayne Land & Min. Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 522 (3d Cir. 2018) (citing *Marathon Petroleum Corp. v. Sec'y of Fin. for Delaware*, 876 F.3d 481, 496 (3d Cir. 2017)). The Third Circuit has also repeatedly held that the parties' interests are adverse when the government has not "disavowed [its] intent to prosecute" under the challenged statute. *Pic-A-State Pa., Inc. v. Reno*, 76 F.3d 1294, 1299 (3d Cir. 1996) (citing multiple Third Circuit precedents).

Defendants then erroneously to try to turn the void for vagueness claims into a lack of standing. They reason that since several of the Plaintiffs allege that they cannot tell how broad the scope of the undefined phrase "school, college, university or other education institution is (as it relates to such things as bible classes, karate lessons, music lessons, continuing professional classes, etc.) they cannot show a probability of enforcement. By that logic, no plaintiff would ever have standing to bring a vagueness claim because standing would be defeated in every instance by the uncertainty of the prohibition's scope. That is why is the standing inquiry focuses only on whether the plaintiff plausibly alleges that she would engage in the conduct but for the law. Whether the law actually prohibits the conduct is a merits question, not a standing question.

    c)    **Redressability/Traceability**

Defendants make several related argument on redressability/traceability. First, they argue that Plaintiffs must show that the proprietors of the locations where Plaintiffs wish to carry would allow them to do so absent the prohibitions of A4769. Second, they argue that Bayonne's and Union County's separate prohibitions on carry in parks make Cook's and Stamos's claims as to parks not traceable to A4769, and they claim that N.J.A.C. 7:2-2.17 and N.J.A.C 7:25-5.23 are also enforced by other agencies and therefore there is no standing as to State parks and the fish and game regulations.[3]

---

[3] If strictly necessary, it is a simple matter for Plaintiffs to amend the Complaint to join Bayonne, Union County, and the other State agencies, but as set forth below, Plaintiffs need not do so to validly assert these claims.

First, none of those arguments applies to the standing of the church Plaintiffs Cuozzo and Varga, as their churches not only would allow them to carry but in fact encourage them to carry to protect the church. Compl. ¶¶208-09, 213, 227-28.

Second, neither redressability nor traceability requires strict but-for causation. Because relief from this Court would eliminate the most severe sanction for carrying in these various locations, i.e., a state law criminal charge—Plaintiffs have standing to challenge all of these provisions.

Redressability and causation/traceability "often overlap." *Toll Bros. v. Twp. of Readington*, 555 F.3d 131, 142 (3d Cir. 2009) (citations omitted). The main difference between the two requirements is "that while traceability looks backwards … redressability looks forward." *Toll Bros.*, 555 F.3d at 142.

"Redressability is not a demand for mathematical certainty. It is sufficient for the plaintiff to establish a 'substantial likelihood that the requested relief will remedy the alleged injury in fact.'" *Id.* at 143 (citation omitted). If a favorable judgment "would substantially lighten [the plaintiff's] regulatory burden," then its injury has been redressed. *Am. Farm Bureau Fed'n v. U.S. E.P.A.*, 792 F.3d 281, 293 (3d Cir. 2015); *Wayne Land & Min. Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 525 (3d Cir. 2018) (A decision that would remove a fracking ban on the plaintiff's property was sufficient to confer standing.)

The Third Circuit has been clear that "there is room for concurrent causation in the analysis of standing." *Const. Party of Pennsylvania v. Aichele*, 757 F.3d 347, 366 (3d Cir.

2014) (citing *Libertarian Party of Va. v. Judd,* 718 F.3d 308, 316 (4th Cir. 2013));

*Khodara Env't, Inc. v. Blakey*, 376 F.3d 187, 195 (3d Cir. 2004) (Alito, J.) ("Article III

standing demands 'a causal relationship,' but neither the Supreme Court nor our Court

has ever held that but-for causation is always needed."). "[I]ndeed, 'an indirect causal

relationship will suffice, so long as there is a fairly traceable connection.'" *Id*. (quoting

*Toll Bros. Inc.,* 555 F.3d at 142).

Here, relief against enforcement of A4769 would lift the main criminal sanction

that would arise from carrying in the challenged locations and "substantially lighten

[Plaintiffs'] regulatory burden." *Am. Farm Bureau Fed'n*, 792 F.3d at 293.

Further, as the chief law enforcement officer of the State of New Jersey, all law

enforcement personnel and activities are subordinate to Defendant Attorney General

Platkin. *See* N.J.S. 52:17B-101-108. Thus, the Attorney General has ultimate jurisdiction

over all criminal matters throughout the State, regardless of under what statute they arise,

and which agency may have general administrative or civil enforcement authority. *See,*

*e.g*. N.J.S 23:2A-10(a)(5), (f) (Attorney General may bring criminal charges for violation

of Fish and Game regulations);   N.J.S. 13:13A-10 (enforcement of park rules and

regulations subject to supervision of Attorney General).[4]

Finally, Plaintiffs seek not only injunctive relief but also a declaratory judgment.

---

[4] In any event, Plaintiffs have sought all appropriate relief, and so the Court could always word its injunction broadly enough to make clear that the Attorney General is bound to ensure that no local jurisdiction acts inconsistent with the relief granted.

*See, e.g., Wayne Land & Min. Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 522–24 (3d Cir. 2018). Thus, even if an injunction would not strictly bind a party that is not joined as a defendant (such as, for example, Bayonne) a declaratory judgment would. As creations of the State, Bayonne, Union County, the State Parks Service, and the Division of Fish and Wildlife would all be bound by a declaratory judgment that the challenged prohibitions are unconstitutional. If Plaintiffs prevail, none of those agencies, entities, or subdivisions would get a second bite at the apple. The State of New Jersey gets one chance to defend the constitutionality of those laws. None of its agencies, statutory creations, or subdivisions is entitled to a second chance.

At worst, they would be on notice that their own prohibitions are unconstitutional, which itself would redress any injury independent of the State law. For example, if the Bayonne Police Department tried to arrest Plaintiff Stamos for carrying in a park after this Court held the State prohibition on carrying in parks unconstitutional, the police would be wide open to a claim for damages under 42 U.S.C. §1983. *AmSouth Bank v. Dale*, 386 F.3d 763, 786 (6th Cir. 2004) ("The 'useful purpose' served by the declaratory judgment action is the clarification of legal duties for the future, rather than the past harm a coercive tort action is aimed at redressing.").

## 2.    Irreparable Harm

Defendants argue that constitutional injury alone is not sufficient to constitute irreparable harm outside the First Amendment context. First, since Plaintiffs have alleged several First Amendment claims, this does not defeat a TRO as to those claims. Second,

the inability to carry a firearm to protect oneself is irreparable harm regardless of whether it is constitutionally protected, as the kind of injury one could suffer if unable to defend against an unanticipated violent encounter is irreparable in the most of obvious of senses.

And Defendants are simply wrong. The loss of a fundamental right is always irreparable. The Second Amendment is not a second class right subject to lesser protection that the fundamental rights protected by the First Amendment or other constitutional provisions. *McDonald v. Chicago*, 561 U.S. 742, 779; *Bruen* 142 S. Ct. at 2156. Thus, an infringement of a Second Amendment right is as irreparable as an infringement of a First Amendment right. *See, e.g.*, *Wrenn v. D.C.,* 864 F.3d 650, 667 (D.C. Cir. 2017) (Second Amendment); *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) (Second Amendment). To the extent *Hohe v. Casey* reasoned that "Constitutional harm is not necessarily synonymous with the irreparable harm" even in the *First* Amendment context, 868 F.2d 69, 73 (3d Cir. 1989), it is plainly no longer good law. *See, e.g.*, *Tandon v. Newsom*, 141 S. Ct. 1294, 1297 (2021) ("the loss of free exercise rights 'for even minimal periods of time'" constitutes irreparable injury). And *Nat'l Treasury Emp. Union v. United States*, 927 F.2d 1253, 1254-56 (D.C. Cir. 1991) involved plaintiffs who did not allege that the challenged law would actually stop them from exercising their constitutional rights.

Finally, Defendants argue that Plaintiffs cannot show irreparable harm because they did not previously challenge the pre-existing prohibitions. This ignores that prior to the 2022 *Bruen* decision, most New Jerseyans could not obtain a Handgun Carry Permit

because of the justifiable need requirement, including these Plaintiffs. In all events, a plaintiff does not forfeit the right to seek an end to an ongoing irreparable injury by failing to do so at the absolute earliest possible juncture.

**3.     Likelihood of Success on the Merits**

   **a) Second Amendment**

   Defendants fundamentally misunderstand the requirements of *Bruen,* and as a result have the TRO burden of proof on the Second Amendment claims backwards.

   As explained in Plaintiffs' moving brief, the test in *Bruen* is as follows:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen,* 142 S. Ct. at 2129-30. In *Bruen*, the Court already held that the right to carry handguns outside the home falls within the text of the Second Amendment. *Id.* at 2134-35. The burden for a TRO or preliminary injunction tracks the burden at trial. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429–30 (2006). Therefore, the burden in opposing a TRO on the Second Amendment claims rests with Defendants. To resist a TRO, Defendants must show that they are likely to be able to demonstrate that the challenged regulations are consistent with the Nation's historical tradition of firearm regulation. *Bruen,* 142 S. Ct. at 2129-30. They have not done this. Notably, Defendants do not dispute Plaintiffs' contention in their moving brief that

13

because all the restricted places the challenged laws' vast sweep encompasses existed or had clear parallels in the 18th Century, they may not establish historical consistency by analogy. Rather, they must show that these same types of restrictions and requirements were part of the historical tradition in or about 1791.

Importantly, Defendants may not carry their burden by reference to regulations around 1868, the time of the ratification of the Fourteenth Amendment. Although the Court in *Bruen* noted the existence of a scholarly debate as to whether 1791 or 1868 is more relevant to the historical analysis, the Court was clear that in prior instances of originalist analysis of the provisions of the Bill of Rights, the Court has looked to 1791 as the relevant time frame. *Id*. at 2137. ("[W]e have made clear that individual rights enumerated in the Bill of Rights and made applicable against the States through the Fourteenth Amendment have the same scope as against the Federal Government. [Citations omitted]. And we have generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791.") *See also* Mark W. Smith, *"Not All History Is Created Equal": In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868 (working draft)* (October 1, 2022), available at https://ssrn.com/abstract=4248297 or http://dx.doi.org/10.2139/ssrn.4248297. But in all events, Defendants fail either way, as there has never been any clear and established tradition of prohibiting the carrying of

firearms in the vast array of places covered by New Jersey's law.

### i) Private Property Default Rule – 7(a)(24)

Defendants' argument that they are merely choosing one of two default rules for private property does not work. Nowhere is there any historical basis for the idea that the State may select, *for the property owner*, a presumption about the carrying of firearms on private property. Defendants do not cite a single example of this from the Founding era or at any time. Property owners may exercise their property rights, but the State may not do it for them, especially where the only way for a property owner to override the State's choice is by engaging in state-mandated speech. *Bruen* makes it clear that the historical tradition weighs in favor of carry, not against carry. No state-imposed default rule against carry could possibly satisfy *Bruen*.

### ii) Government as Proprietor

Defendants seek to shortcut their burden under *Bruen* by claiming that the State may prohibit carry on government property as the owner, but nothing in *Bruen* allows that. The Court was very clear. The only thing that permits a state to prohibit the carry of handguns is historic tradition. *Id*. at 2129-30. Defendants have not shown any historical tradition of states prohibiting handgun carry on property owned by the state. Indeed, if that were the historical tradition, then *Bruen* would not need to have gone out of its way to single out "legislative assemblies" and "courthouses" as among "the relatively few" sensitive places where firearms may be prohibited, 142 S. Ct. at 2133, as those places are

virtually by definition owned by the government.

Notably, the only Second Amendment cases Defendants invoke in support of their government-as-proprietor argument predate *Bruen* and its recognition of a general right to carry, *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019) (abrogated by *Bruen,* 142 S. Ct. at 2127 n.4) and *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121 (10th Cir. 2015).

But even in the First Amendment context, the government-as-proprietor rule does not allow state to wholesale deny the exercise of a constitutional right. The government's treatment of speech must be consistent with the kind of forum it has provided. *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 677–79 (1992) ("These cases reflect . . . a "forum based" approach for assessing restrictions that the government seeks to place on the use of its property"). And even in the least protected First Amendment forum the restriction on speech cannot be "an effort to suppress the speaker's activity due to disagreement with the speaker's view." *Id*. at 679. *See also Tinker v. Des Moines Independent Community School Dist*., 393 U.S. 503, 509 (1969) (government can only regulate speech in public schools where it would "materially and substantially interfere with the requirements of appropriate discipline in the operation of the school").

Finally, even if the government-as-proprietor doctrine did apply to the Second Amendment, it could only apply to State owned property. The State of New Jersey could not reasonably be considered the "proprietor" of a local public library, museum, beach, park, etc., all of which are encompassed by A4769.

The government-as-proprietor doctrine cannot justify any of the prohibitions.

### iii) "Government and Constitutionally Protected Activity"

Defendants are well aware that *Bruen* does not permit a defendant to establish historical tradition with one or even a few examples: "we doubt that *three* colonial regulations could suffice to show a tradition of public-carry regulation." *Bruen,* 142 S. Ct. at 2142 (emphasis in original); *see also* i*d*. at 2149 ("a handful of other examples in Massachusetts and the District of Columbia . . . is surely too slender a reed on which to hang a historical tradition of restricting the right to public carry.")

Defendants must establish an *historical tradition*, not merely cite historical outliers. It is for this reason they have struggled to aggregate their meager examples and shoehorn them into larger artificial categories. "Government and Constitutionally Protected Activities" is one such artificial category.

As the Supreme Court explained in *Bruen*, "the historical record yields relatively few 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—e.g., legislative assemblies, polling places, and courthouses . . . ." 142 S. Ct. at 2133. As those limited examples reflect, the only restrictions on being armed in public found in the historical tradition related to places where the function of governing takes place, so as to prevent "Violence or Force being used at the [] Elections" or "violent intimidation of the courts of justice."  David Kopel & Joseph Greenlee, *The "Sensitive Places" Doctrine*, 13 Charleston L. Rev. 205, 233-34, 244-45 (2018).

The "function of governing" is not the same as places where "constitutionally protected activity" occurs, and the two may not be aggregated under a *Bruen* analysis just

so Defendants can try to satisfy a clear numerosity requirement. Defendants' examples do not establish any historical tradition:

- The 1773 Maryland law on its face plainly applies to the state legislature only and does not support any challenged prohibition.

- The 1873 Georgia law, 1869 Tennessee law, and the 1870 Texas law refer to either "any other public gathering," "public assembly of the people," or "any other place where people may be assembled to muster or to perform any other public duty, or any other public assembly."

First, as made clear in *Bruen*, these three alone cannot establish an historical tradition. In fact, if three out of 13 colonies was insufficient in *Bruen*, 142 S. Ct. at 2142, then certainly three out of 37 states (as of 1869-73) is insufficient to establish a tradition.

Second, as indicated above, 1868 is not the correct time frame. Defendants have not provided any example from around 1791. But even if 1868 could be used as *part* of the analysis, Defendants have provided literally nothing prior to 1869. These three late 19th Century laws cannot inform about the original meaning of the Second Amendment.

Third, it is not at all clear what "public gathering" or "public assembly" meant in 1869-73, and it is Defendants' burden to show such meaning.

In *Antonyuk v. Hochul*, No. 1:22-cv-0986-GTS-CFH, 2022 WL 16744700, at *76 (N.D.N.Y. Nov. 7, 2022), in enjoining the New York law at issue, the court noted the following:

The Court has not yet been able to find a definition of the term in 18th and 19th century dictionaries. . . . in four of the six historical laws cited, a "public assembly" (or "public gathering") appears to be likened to assemblies involving the deliberation or exercise of one's constitutional rights, or the

18

performance of a public duty pursuant to those rights (such as "vot[ing]," "muster[ing]," or "perform[ing] any other public duty").

The court also disregarded the same Georgia, Tennessee, and Texas laws as not sufficient to establish a tradition. *Id*.

None of the challenged restrictions can be justified under the artificial rubric of "government and constitutionally protected activity."

### iv) "Locations Where Crowds Gather"

This is another attempt to artificially aggregate dissimilar locations in order to satisfy *Bruen*'s numerosity requirement. The attempt fails.

First, *Bruen* specifically held that crowds do not justify a prohibition on carry. 142 S. Ct. at 2134. Second none of the examples establish an historical tradition.

- The quotation from the 1786 Virginia law conveniently omits the most important language "in terror of the county." This is not a prohibition on carry. This is an affray law that prohibited acting to terrorize the people. This Virginia law and others like it are thoroughly discussed and dismissed in *Bruen*. 142 S. Ct. at 2142-45.

- The 1816 New Orleans and 1870 Texas references to "ball-room" are two outliers, and, as above, are insufficient to establish a tradition. Moreover, the Texas law is well outside the scope of 1791 (even 1816 is 35 years after the Founding). And "ball room" is not one of the challenged places in any event. Recall that Defendants may not analogize here (*see supra*).

- The 1869 Tennessee law is a single outlier for "fair [or] race course" and is from the wrong time frame. The 1877 Missouri law is also a single outlier from the wrong time frame.

- Central Park and Fairmont Park are two outlier from the wrong time frame (1861, 1870). Examples from 1881, 1899, 1893 and the 20th Century are plainly outside the scope of *Bruen*. And even six examples out of what was by 1893

19

44 states cannot form a tradition. If 3 out of 13 (0.23) is not a tradition, then 6 out of 44 (0.13) certainly cannot be.

### v) "Where Vulnerable or Incapacitated People Gather"

This cannot possibly be a valid category under *Bruen*.[5] Vulnerable people are *exactly* the type of people who would benefit from the defensive protection provided by law-abiding citizens carrying concealed handguns. To say otherwise is simply impermissible interest balancing – specifically prohibited under *Bruen*. And no one is arguing that incapacitated people should *themselves* be allowed to carry a handgun.

- The 1867 Kansas law prohibits carry only by *actually intoxicated persons*, not anywhere alcohol happens to be served.

- The 1859 Connecticut law is single outlier which does not even prohibit handgun carry where alcohol is sold or gambling takes place. All it does is prohibit gambling or the sale of alcohol near a military base. Obviously, they did not want soldiers drinking and gambling.

- The 1870 Texas law is an untimely outlier and does not even apply to any of the challenged prohibitions.

---

[5] "It is true that people sometimes congregate in 'sensitive places,' and it is likewise true that law enforcement professionals are usually presumptively available in those locations. But expanding the category of "sensitive places" simply to all places of public congregation that are not isolated from law enforcement defines the category of "sensitive places" far too broadly. Respondents' argument would in effect exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense that we discuss in detail below. *See* Part III–B, *infra*. Put simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department."

*Bruen*, 142 S. Ct. at 2133–34.

### vi) Private Property without Express Permission

Here Defendants cite only two laws—already an insufficient number to satisfy *Bruen*. But even those do not establish what Defendants claim.

- The 1771 New Jersey law is anti-poaching law. It has nothing to do with prohibiting the carry of arms for self-defense. It is entitled "An Act for the Preservation of Deer and other Game, and to prevent trespassing with Guns." It states as it purpose: "Whereas the Laws heretofore passed in this Colony for the Preservation of Deer and other Game, and to prevent trespassing with Guns, Traps and Dogs, have, by Experience, been found insufficient to answer the salutary purposes thereby intended . . . ."

- The 1865 Louisiana law is a single untimely outlier in generally prohibiting the carry of arms in private property without consent of the owner.

### vii) Vehicle Prohibition – Unloaded and Locked Away

Defendants argue that requiring handguns to be unloaded and locked away does not prohibit carry but merely regulates the method of carry. This is nonsense. The right to carry arms outside the home plainly means having a handgun loaded and available for immediate self-defense, that is, "the right to possess and carry weapons in case of confrontation." *Heller*, 554 U.S. at 592; *Bruen*, 142 S. Ct. at 2127. The idea that any rule requiring a person to keep her handgun unloaded and locked up complies with the Second Amendment is ludicrous. If "unloaded and locked up" complied with the Second Amendment then the District of Columbia's law in *Heller*, requiring long arms to be unloaded and locked up in the home, would not have been found to be unconstitutional. *Heller*, 554 U.S. at 630. The Second Amendment is about armed self-defense, which a person cannot do if her handgun is unloaded and locked away. *Heller*, 544 U.S. at 628;

21

*McDonald*, 561 at 749-50; *Bruen*, 142 S. Ct. at 2122.

Defendants' arguments as to public transit are more improper interest balancing. The Second Amendment guarantees the right of the people to arm themselves outside their home for self-defense. Defendants' arguments about crowds merely treat people exercising their right to bear arms as if they irresponsible children, as if law-abiding responsible adults cannot (and do not in 43 other states) account for such conditions by exercising prudence. The State may not interest balance away the people's rights.

Further, Defendants show no historical tradition whatsoever regarding public transit, because the single, untimely, outlier 1880 Iowa law does not prohibit carry of arms, it only prohibits brandishing ("presenting") and discharging of firearms.

Defendants attempt to justify the vehicle prohibition by asserting that as private automobiles became popular, states began restricting firearms in such vehicles. But, there's nothing novel about private modes of transportation, and there is no historical tradition of prohibiting guns in, e.g., buggies. In all events, they did not identify a more modern tradition of automobile prohibitions anyway. They are outliers and they also do not actually prohibit the carry of handguns. If anything, these laws establish that states did *not* prohibit the carry of handguns in automobiles.

- The 1929 Iowa law specifically *exempts* a pistol or revolver from its prohibition.

- The 1919 Maine law entitled "Hunting from Automobiles" only prohibits loaded rifles and shotguns. It does not prohibit handguns, and is clearly is only about hunting, not about prohibiting the ability to engage in lawful self-defense.

Defendants also mischaracterize the 19th Century "journey" laws.

-   The 1838 Arkansas law and 1839 Alabama law only prohibited *concealed* handgun carry not all handgun carry. As the Supreme Court explained in *Heller*, states with 19th Century prohibitions on concealed carry merely required a person to wear a pistol openly. They did not ban the carry of handguns. 554 U.S. at 629.

The rest of Defendants' argument are more improper interest balancing (escaping from gun crimes and vehicle stops). None of these are supported by historical tradition.

Defendants have not shown that *any* of the challenged prohibitions are consistent with historical tradition. Therefore a TRO should be issued enjoining these prohibitions.

Even if they had identified a historical tradition as to *some* places, moreover, Defendants have also entirely ignored Plaintiffs' claim that the prohibitions are overly broad in that they prohibit carry entirely in a multiuse property that includes even a single prohibited use. At the very least, then, the Court should issue a TRO enjoining any prohibition on carry at a multiuse property other than the part of the property actually being currently used exclusively for the prohibited use.

Defendants close their argument on the Second Amendment with an odd claim. They say that they will supplement their argument with additional evidence at the PI stage. But *Bruen* was decided on June 23, 2022, and the Governor and Defendants Platkin and Callahan had already announced the very next day, June 24, 2022, that New Jersey was going to enact a broad prohibition on carry in so-called "sensitive places." It was therefore incumbent on the State to ensure that it enacted prohibitions only to the extent

23

that they could be supported by traditional.  It is, after all, just as incumbent on state legislators and executives as federal ones to follow the Constitution.

Defendants have had *six months* to research and find historical laws to support these prohibitions. In fact, New Jersey should have established that historical support *before* enacting A4769. By stating that they will come up with more historical evidence later, Defendants have admitted that the Legislature passed A4769 without having any idea if it is constitutional or not—nor did they care. For that reason alone the law should be immediately enjoined. The gravity of the *Bruen* decision should have put New Jersey on notice that it had better have a strong constitutional basis for passing any new gun laws. Instead, New Jersey thumbed its nose at the Supreme Court and the Constitution. If Defendants need more time to research historical tradition they can have as much time as they like while these laws are enjoined. To already be violating the fundamental rights of New Jerseyans while admitting that they have not yet figured out whether they can justify the law in the first instance is a constitutional outrage.

These laws should be enjoined while they figure it out.

**b) Void for Vagueness**

Defendants misstate the standard for a facial challenge on the grounds of vagueness. The Supreme Court discussed facial vagueness challenges in *Johnson v. United States*, 135 S. Ct. 2551 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018).

In *Johnson*, 135 S. Ct. at 2560-61, in striking the residual clause of the Armed

Career Criminal Act as void for vagueness, the Court held:

> In all events, although statements in some of our opinions could be read to suggest otherwise, our holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.

*See also Sessions*, 138 S. Ct. at 1222 n.7 (2018) ("But one simple application does not a clear statute make. As we put the point in *Johnson*: Our decisions 'squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.'"); *Kolbe v. Hogan*, 849 F.3d 114, 148 n.19 (4th Cir. 2017); *United States v. Bramer,* 832 F.3d 908, 909 (8th Cir. 2016).

Therefore, to prevail, Plaintiffs do *not* have to show that the challenged law is vague in all its applications or lacks a plainly legitimate sweep.

### i) "Carry"

Defendants argue that the term "carry" is not vague by referencing a variety of sources outside New Jersey. But none of those sources help here. New Jersey has never before criminalized any conduct referred to as "carry," and so what matters is what New Jersey means by the term "carry." But the term is undefined.

Previously, all New Jersey gun law was targeted at "possession" or "transportation." Even a permit to carry a handgun was really a permit to possess because it exempted one from a charge under N.J.S. 2C:39-5(b): "unlawful possession of a handgun." There never was any law criminalizing something called "carry."

The problem with A4769 is that is criminalizes all sorts of activity that could be

25

characterized variously as possession, transportation, or carry, and there is no way for a person to know what specific activity constitutes "carry."

### ii) "Vehicle"

Defendants claim that "vehicle" is defined in N.J.S. 39:1-1. But that definition is not incorporated into A4769, and Plaintiffs certainly cannot rely on Defendants' assertion in a brief. If Defendants wish it to be so then they should urge the Court to enter an order making it so. If nothing else, the Court should enter a TRO ordering that "vehicle" in A4769 shall mean the definition of "vehicle" contained in N.J.S. 39:1-1.

Notably, since the N.J.S. 39:1-1 definition seems to include motorcycles, Defendants have confirmed that the vehicle prohibitions in A4769 make it impossible for Plaintiffs Cook and DeLuca to have a handgun while riding their motorcycles (or at their destinations) since neither Cook nor DeLuca can comply with the locking up or storage requirements of A4769 while riding their motorcycles.

### c) First Amendment

### i) Libraries

By forcing Plaintiffs to abandon their Second Amendment rights just to visit a library, the law violates the First Amendment too. Defendants misunderstand the gravamen of *Kreimer v. Town of Morristown*, 958 F.2d 1242, 1255 (3d Cir. 1992). In *Kreimer*, the court upheld the challenged rule because it only prohibited annoyance, disturbance, and harassment. Not only is none of that constitutionally protected conduct,

but there is nothing inconsistent with the nature of library if a person quietly reads a book while he has a handgun residing in a holster.

Therefore, the library prohibition violates the First Amendment, and the Court should enter a TRO.

### ii) Private Property - Compelled Speech

Since *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 642 (1943), the Supreme Court has consistently "prohibit[ed] the government from telling people what they must say." *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc*., 547 U.S. 47, 61, (2006). This prohibition is not limited to ideological messages; it extends equally to compelled statements of fact. *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc*., 487 U.S. 781, 797-98 (1988) ("These cases cannot be distinguished simply because they involved compelled statements of opinion while here we deal with compelled statements of 'fact': either form of compulsion burdens protected speech.") *See also Antonyuk v. Hochul*, No. 1:22-cv-0986-GTS-CFH, 2022 WL 16744700, at *82 (N.D.N.Y. Nov. 7, 2022).

Nothing in Defendants' brief defeats the claim. All that need be shown is that that the State is compelling a message that the speaker does not want to convey. That is plainly true here, as the state is forcing any private property owner who does not wish to prohibit the carrying of firearms on its property to affirmatively broadcast to all the world that it welcomes firearms. *Id* at 82-85.

### d) Equal Protection – Private Property

Defendants misunderstand Plaintiffs' Equal Protection claim. Plaintiffs do not argue that private property owners do not have the right to exclude. Plaintiffs argue that the State may not impose a different and harsher set of property rules on those choosing to exercise their fundamental constitutional right to bear arms.

The private property rules must be the same for everyone, and the State cannot discriminate on the basis of the choice to exercise one's Second Amendment rights.

Just imagine a default rule that automatically made it a crime for a gay person or black person to enter private property without express permission. And then imagine the State trying to justify such a rule with a study that it alleges shows that most New Jerseyans prefer that as the default rule. The argument that "it's just a default" rule would not be taken seriously.

### 4.      Balancing the Equities

The State cannot seriously claim that balancing the equities favors the State. The status quo ante, prior to enactment of A4769, prevailed for six months since June 23, 2022 while the State did nothing. It took the State six months to pass a law, and all the while it was not worried about law-abiding New Jerseyans exercising their constitutional right to bear arms. Plaintiffs, on the other hand, sued literally as the ink was drying on the Governor's signature.

All a TRO would do is restore the status quo that existed from June 23, 2022

through December 21, 2022.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998), for "the enforcement of an unconstitutional law vindicates no public interest," *K.A. ex rel. Ayers v. Pocono Mountain School District*, 710 F.3d 99, 114 (3d Cir. 2013); *Wrenn*, 864 F.3d at 667.

Balance of the equities generally favors parties seeking to preserve the status quo. *E.g.*, *Hereas Materials Tech. LLC v. Pham*, 2011 WL 13227724, *1 (E.D. Pa. May 5, 2011); *Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 813 (3d Cir. 1989) (the "preservation of the status quo represents the goal of preliminary injunctive relief in any litigation.").

## **CONCLUSION**

This Court should issue a temporary restraining order prohibiting enforcement of the foregoing provisions of law.

Dated: January 4, 2023

Respectfully submitted,

s/ Daniel L. Schmutter
Daniel L. Schmutter
Hartman & Winnicki, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com