

**State of New Jersey**

PHILIP D. MURPHY
*Governor*

SHEILA Y. OLIVER
*Lt. Governor*

OFFICE OF THE ATTORNEY GENERAL
DEPARTMENT OF LAW AND PUBLIC SAFETY
PO BOX 080
TRENTON, NJ  08625-0080

MATTHEW J. PLATKIN
*Attorney General*

January 10, 2023

The Honorable Karen M. Williams, U.S.D.J.
United States District Court for the District of New Jersey
Mitchell H. Cohen Building & U.S. Courthouse
4th & Cooper Streets
Camden, NJ 08101

  Re: *Siegel v. Platkin*, 22-cv-7463-KMW-AMD

Dear Judge Williams,

  Please accept this letter brief on behalf of the State in response to this Court's order to submit supplemental briefing in the above-captioned case. *See* D.E. 23. Yesterday, this Court asked the parties to submit briefing on three issues: 1) the Third Circuit's order granting *en banc* review of *Range v. Attorney General*, 53 F.4th 262 (3d Cir. 2022); 2) the TRO decision in *Koons v. Reynolds*, 22-cv-7464, slip op. (D.N.J. Jan. 9, 2023); and 3) the pending emergency motion to consolidate *Koons* into this case. This letter addresses each in order.

**I. The Third Circuit's *En Banc* Review Of *Range* Does Not Affect This Court's Consideration Of The Instant Issues.**

  The Third Circuit's decision to review *Range en banc* does not affect the analysis in this case because none of the State's arguments depend on the outcome in *Range*. *Range* challenged an unrelated federal criminal statute that prohibits felons from possessing firearms, and that issue is not present here. Further, the State cited *Range* for a proposition that merely reiterated what the Supreme Court expressly held in *NYSRPA v. Bruen*, 142 S. Ct. 2111, 2123 (2022). The State quoted *Range*'s general statement that courts ask whether the cited historical laws are "'relevantly similar'" and do not



inquire whether there is "'an analogy specific to the crime charged.'" State Br. 32 (quoting *Range*, 53 F.4th at 270, 285). That material, however, echoes the mandate from *Bruen*, which explained that the State's burden is to identify a "representative historical *analogue*, not a historical *twin*," and the State's present law need not be "a dead ringer for historical precursors." 142 S. Ct. at 2133 (emphases in original). It thus makes no difference that the particular question in *Range* regarding the felon-in-possession statute is pending *en banc* review, given that the cited material merely reiterates what *Bruen* already held.

## II. This Court Should Deny Plaintiffs' TRO Application, Notwithstanding The Opinion In *Koons*.

As the State explained in its opposition brief, this Court should deny Plaintiffs' TRO application given Plaintiffs' failure to demonstrate irreparable harm and standing, and given the defects in the merits of their smorgasbord of claims. *Koons*, to be sure, does address five of the exact claims the *Siegel* Plaintiffs also raise. See Part III, *infra* (explaining that every single claim in *Koons* is also present in *Siegel*, a basis for consolidation). But the ruling in *Koons* does not change the proper result in this case for two reasons. First, this case involves a number of issues and claims not present in *Koons*. That includes the *Siegel* Plaintiffs' particularly weak showing of irreparable harm and standing. And that includes a number of claims against provisions of Chapter 131 nowhere challenged in the *Koons* Complaint. Second, as to the five challenges to identical provisions of New Jersey law, the *Koons* Court erred in its understanding of the Second Amendment and of state law, and this Court should avoid those mistakes.

### A. This Case Involves Numerous Defects And Claims Not Present In *Koons*, And On Which The *Koons* TRO Has No Bearing.

There are two categories on which the *Koons* TRO most clearly has no bearing: the *Siegel* Plaintiffs' particular failures to show irreparable harm and standing, and the large number of provisions the *Siegel* Plaintiffs challenge but *Koons* did not.

As to the former, the *Siegel* Plaintiffs' TRO application suffers from distinct problems of irreparable harm unique to their proffered evidence, which were not present in *Koons*. **First**, the *Siegel* Plaintiffs' delay in seeking a TRO from any sensitive places restrictions that long *predate* Chapter 131 poses a dispositive hurdle that the *Koons* Plaintiffs (who only challenged Chapter 131 itself) did not have to vault. While the *Siegel* Plaintiffs say they will suffer irreparable harm if this Court does not immediately enjoin restrictions in casinos, schools, parks, and hunting grounds, firearms restrictions in these sensitive places have existed for *decades*. See TRO Br., D.E. 8-1, at 14-15 (admitting pre-existing regulation); *see also* N.J. Admin. Code § 13:69D-1.13 (Mar. 19, 2012) (current iteration of casino restrictions); 1990 N.J. Laws 222, c. 32, § 2 (school restrictions); 39 N.J.R. 1701(a) (May 7, 2007) (parks restrictions); 27 N.J.R. 288a(a)

(Aug. 7, 1995) (game restrictions). That delay "knocks the bottom out of any claim of immediate and irreparable harm" and offers a "dispositive basis" for denying injunctive relief. *Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 382-83 (D.N.J. 2002); *see also Messina v. Coll. of New Jersey*, 566 F. Supp. 3d 236, 249 (D.N.J. 2021). Plaintiffs offer no explanation at all for their decades-long delay, an issue *Koons* did not (and could not) address.

**Second**, a determination that the *Koons* Plaintiffs alleged facts sufficient for standing and irreparable harm[1] hardly proves that the *Siegel* Plaintiffs did so. Indeed, the *Siegel* Plaintiffs have fallen short of demonstrating irreparable injury that will be "actual and imminent" *during the TRO period*. *In re Revel AC*, 802 F.3d 558, 566 (3d Cir. 2015). To obtain emergency relief, it is not enough for a plaintiff show risk of injury during the pendency of the litigation, since a plaintiff must make a "clear showing of immediate irreparable injury" during the period for which he seeks an emergency injunction. *Acierno v. New Castle Cnty.*, 40 F.3d 645, 655 (3d Cir. 1994) (quoting *Continental Grp., Inc. v. Amoco Chem. Corp.*, 614 F.2d 351 (3d Cir. 1980) and collecting cases). In this case, a TRO should not issue if Plaintiffs have not shown they will suffer injury during the TRO period—*i.e.*, the next 14 or 28 days. *See* Fed. R. Civ. P. 65; 11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2953 (3d ed.). After all, an emergency injunction "may not be used simply to eliminate a possibility of a remote future injury." *Acierno*, 40 F.3d at 655; *see also, e.g.*, *Omnistone Corp. v. Cuomo*, 485 F. Supp. 3d 365, 367 (E.D.N.Y. 2020) ("[P]laintiffs' demonstration of irreparable harm must be considered in conjunction with the time frame involved"); *Sunbelt Rentals, Inc. v. McAndrews*, 552 F. Supp. 3d 319, 324 (D. Conn. 2021) ("The Court must examine whether the movants have demonstrated a threat of irreparable harm that will occur *immediately* to justify a [TRO], while the temporal context of a preliminary injunction takes a longer view." (emphasis in original)). In sum, the *Siegel* Plaintiffs must show their need for relief is so immediate that they will suffer injury in the time "even before the hearing for a preliminary injunction . . . can be held." *Shelley v. Am. Postal Workers Union*, 775 F. Supp. 2d 197, 202 (D.D.C. 2011).

The *Siegel* Plaintiffs fall far short of that burden because their averments are far too sporadic to support an inference that they will suffer injury *within the TRO period*. Some

---

[1] The State disagrees with the *Koons* Court's analysis on standing, but that is of no moment here, since those Plaintiffs made different averments than the *Siegel* Plaintiffs in this case, which this Court must evaluate for sufficiency of the emergency-relief standard. For example, while the State disagrees that averments as to past behavior is enough to show imminent harm, *see* D.E. 15 at 14, the *Koons* Court found that Plaintiffs there alleged that at least as to some locations, their frequency of past visitation was "everyday" or "most of the time." *See* slip op. at 57. Most of the *Siegel* Plaintiffs' allegations are devoid of that frequency, and instead rest on more remote or indeterminate intervals like "from time to time," "frequently," or "every year."

examples prove the point: As to public gatherings that require a permit, Plaintiffs only aver that they pass such gatherings "from time to time." Siegel Decl. ¶ 23; Cook Decl. ¶ 23; Deluca Decl. ¶ 15. With respect to zoos, Plaintiffs aver only that they go "several times a year," Cook Decl. ¶11, "from time to time," Deluca Decl. ¶ 8, or "frequently," Siegel Decl. ¶ 13. The only Plaintiff averring that he has visited youth sporting events states merely that he takes his son to Tae Kwan Do competitions, but does not indicate how often those competitions happen. Siegel Decl. ¶ 12. For movie sets, Plaintiffs only aver they would visit one "if [they] encountered them" without specifying when that might be the case. Cook Decl. ¶ 24; Siegel Decl. ¶ 24. As to the Fish and Wildlife regulations, only one Plaintiff alleges an intent to go hunting but is no more specific than "every year." Siegel Decl. ¶ 15. With respect to a bar or restaurant where alcohol is served, Plaintiffs only aver that they "enjoy" dining at such locations, with no timeframe allegations whatsoever. Siegel Decl. ¶ 19; Cook Decl. ¶ 17; Deluca Decl. ¶ 12. And as to transit buses, only Plaintiff Siegel alleged he "sometimes" takes the bus to hockey games. Siegel Decl. ¶ 17. No other Plaintiff alleges a similar intention.

**Third**, the *Siegel* Plaintiffs cannot show traceability and redressability for many of the challenged provisions—meaning, they cannot show Chapter 131 is the reason for their inability to carry in particular locations. While the *Koons* Court addressed traceability for Section 7(a)(24) (the private property default rule),[2] it did not address the issue for other challenged provisions. But multiple places that Plaintiffs here allege they wish to visit with a handgun, such as entertainment venues, zoos, bars, and casinos, *independently* prohibit weapons, regardless of the State prohibitions. As binding Third Circuit caselaw makes clear, to establish traceability and redressability, a plaintiff must demonstrate the challenged provision is the but-for cause of their injury. *See, e.g.*, *LaSpina v. SEIU Pa. State Council*, 985 F.3d 278 (3d Cir. 2021); *Mielo v. Steak 'n Shake Ops., Inc.*, 897 F.3d 467, 480 (3d Cir. 2018); *Finkelman v. Nat'l Football League*, 810 F.3d 187, 193-94 (3d Cir. 2016); *see also, e.g.*, *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446 (D.C. Cir. 2018). In fact, many establishments *Siegel* Plaintiffs aver to visiting expressly restrict firearm carry independent of Chapter 131. *See, e.g.*, Opp. Br. 19 n.6 (policies at MetLife Stadium, Adventure Aquarium, Camden

---

[2] On that specific conclusion, the State disagrees. The State does not believe and has never argued that "for Plaintiffs to demonstrate redressability they must first give up their right to bear arms, and then go on to the private property to inquire as to the proprietor's intent." Slip op. at 27. They do not need to risk prosecution to show redressability, but they do need to show that Chapter 131 itself is the reason that they would not be able to carry a firearm in a particular location. For example, a plaintiff need only email, call, or check the website of private properties that he has imminent plans to visit, like coffeeshops, gyms, retail stores, or neighbors' homes, to find an example of a proprietor who would not expressly prohibit firearms independently of Chapter 131, but would not expressly communicate his preference. That would surely satisfy the causation requirement, but neither set of Plaintiffs has attempted to do so.

County Library). At least in those cases, Plaintiffs cannot show that enjoining Chapter 131 would redress their alleged irreparable injury; a separate carry restriction would remain.

Separately, the outcome of *Koons* provides no support for a wide array of the *Siegel* Plaintiffs's additional challenges. Although there are important issues that overlap between the two cases and justify consolidation, the *Siegel* Plaintiffs request a TRO enjoining multiple aspects of Chapter 131 that were not at issue in *Koons* at all. In addition to the five provisions of Chapter 131 challenged in *Koons* (relating to bars and restaurants, libraries and museums, entertainment venues, the private property default rule, and vehicles), *Siegel* also involves the following:

- A demand for a judicial order that restrains part or all of the following provisions: Chapter 131's Sections 7(a)(6), (7), (8), (9), (10), (11), (18), (20), (21), (22), and (23) (public gatherings, schools, daycares, zoos, parks, beaches, playgrounds, youth sporting events, casinos, airports, transit hubs, hospitals, treatment centers, and movie sets); N.J. Admin. Code § 7:2-2.17(b) (preexisting rule regarding restrictions on State Park Service property); N.J. Admin Code § 13:69-1.19 (preexisting provisions covering casinos); N.J. Stat. Ann. §§ 2C:39-5(e) (preexisting law prohibiting firearms carry at schools); and N.J. Admin. Code §§ 7:25–5.23 (a), (c), (f), (i), & (m) (preexisting Fish & Wildlife regulations). *See* D.E. 8-10.

- A challenge to a number of specific locations the *Siegel* Plaintiffs *interpret* as possibly sensitive places, something the *Koons* Plaintiffs did not do and thus the *Koons* TRO did not address, such as adult Bible classes at church, bagpipe lessons, and drop offs at the airport, *see* Cuozzo Decl. ¶ 10-12; Siegel Decl. ¶ 12, 14; Cook Decl. ¶ 18. But for each of these specific claims regarding their own interpretations of the law, the *Siegel* Plaintiffs are unable to show a likelihood of enforcement. *See Siegel* TRO Opp. 16-18.

- Void-for-vagueness, equal protection, and First Amendment claims, none of which were present in *Koons* and were not addressed by the *Koons* Court.

The State explained in detail why these claims all fail, and the *Koons* TRO necessarily cannot change that calculus.

### B. For The Five Challenged Provisions That Do Overlap, The *Koons* Court Simply Erred In Concluding Plaintiffs Have Demonstrated A Likelihood Of Success On The Merits.

In the absence of consolidation, each judge is assigned the responsibility of reviewing the claims before her and evaluating their merits. And when it comes to those overlapping claims, this Court should not follow the *Koons* TRO.

### i. The *Koons* Court Incorrectly Assumed All Of Plaintiffs' Challenges Fall Within The Scope Of The Second Amendment.

Under *Bruen*, Plaintiffs bear a threshold burden to show "the Second Amendment's plain text covers" the regulated conduct. 142 S. Ct. at 2126. Only if Plaintiffs make that showing does the government then bear the burden of demonstrating that "the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Here, some of the challenged restrictions fall outside of the Second Amendment's scope, and Plaintiffs thus cannot succeed on the merits.

***First***, the private property default rule in Section 7(a)(24) does not implicates the Second Amendment. The *Koons* Court's contrary conclusion springs from its mistaken premise that the Second Amendment "presume[s] the right to bear arms on private property" that belongs to another. Slip op. at 38. But no such presumption exists: *Bruen* only held that "the Second Amendment's plain text … presumptively guarantees … a right to bear arms *in public* for self-defense." 142 S. Ct. at 2135 (quotation marks omitted, emphasis added); *see id.* at 2126 ("[T]he Amendment's core generally covers carrying *in public* for self defense." (citation omitted, emphasis added)); *see* slip op. at 55 (quoting *Bruen*'s description of the Second Amendment as "[t]he constitutional right to bear arms *in public* for self-defense"). Instead, private property owners have an absolute "right to control who may enter, and whether that invited guest can be armed, and the State [may] vindicate[] that right" without implicating the Second Amendment. *GeorgiaCarry.org v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012). Simply put, the handyman has no inherent constitutional right to carry firearms in his customer's home, even if that customer has not spoken to him about the issue.

The *Koons* Court responded that in the absence of the private property default rule in Section 7(a)(24), individuals could carry onto the property of another if the proprietor has not expressly posted a sign forbidding firearms. *See* slip op. at 37. But even if that proposition were true, the mere fact that an individual *could have taken an action* in the absence of a law does not mean they have a *constitutional right* to that particular action. And there is simply no support in precedent for the idea that there is a presumptive right enshrined in the Constitution to bear arms on someone else's *private* property simply because the carrier does not know, and did not try to ascertain, whether the owner would consent. Because the Second Amendment does not cover that conduct in the first place, the analysis of the private property default rule "can stop there; the regulated activity is categorically unprotected." *Bruen*, 142 S. Ct. at 2126 (citation omitted).

Nor is the private property owner herself burdened by Section 7(a)(24). Because the private property owner has control over whether to allow individuals with firearms onto her property, the law requires a default when she has not spoken to the issue. If the law presumes that silence means consent to carry firearms, then the onus is placed on property owners who do not wish to have firearms on their property; if the law presumes that silence means no one can carry firearms, the onus works the other way around. In

that sense, Section 7(a)(24) operates no differently from any number of legal default rules in everyday life, which only regulate the implication of silence and do not impinge on substantive rights. For example, intestacy rules are default rules that individuals can choose to retain or jettison by writing a will. But government's *setting* of default intestacy rules in no way infringes upon the *substantive right* to transfer property. So it is here. Even though the subject of this default rule involves firearms, it likewise burdens no constitutional rights.

*Second*, the *Koons* TRO was silent as to those Plaintiffs' challenge to restrictions on government-owned property: the Second Amendment does not limit the government's right to exclude from its own property those persons who do not conform with conditions of their license. *See Koons* TRO Opp., D.E. 21, at 23-24; *Siegel* TRO Opp., D.E. 15, at 30 (quoting *United States v. Class*, 930 F.3d 460, 464 (D.C. Cir. 2019); *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1126 (10th Cir. 2015)). As these precedents confirm, just as a private property owner has a right to exclude firearms from an establishment, when the government acts as a proprietor, it has the same "power to regulate conduct on its property." *Class*, 930 F.3d at 464. Such prohibitions "do[] not 'impinge[ ] upon a right protected by the Second Amendment.'" *Id.* (quoting *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011)). As such, Plaintiffs cannot succeed on their challenge to firearms prohibitions at spaces where the government acts as a proprietor, such as public libraries, publicly-owned and operated entertainment facilities, public hospitals, public transit hubs, and public transit vehicles.[3]

### ii. The *Koons* Court Deviated From *Bruen* When Evaluating The State's Historical Evidence.

This Court should not rely on the *Koons* Court's incorrect conclusions regarding the historical analogues that support the constitutionality of the five challenged provisions of Section 7 challenged in *Koons*. The State's proffered historical statutes establish that this Nation has a historical tradition of prohibiting firearms in places that were sensitive because they were sites of learning and other First Amendment activity, because they were critical to the functioning of democracy, because vulnerable and/or incapacitated persons gathered there, or because their crowded and chaotic nature create a danger when firearms are introduced into the mix. Each of the challenged provisions of Section 7 prohibit firearms in modern places that are sensitive for these same reasons. Thus, in

---

[3] The *Koons* decision appears to have overlooked the scope of New Jersey law. It stated that Section 7(a)(12) "does not limit libraries and museums to government-owned ones." Slip op. at 30. But that provision only covers "a publicly owned or leased library and museum"—establishments where the government by definition is proprietor. And at the same time, the TRO enjoined the government's ability to exclude firearms from several of its own properties. *See, e.g.*, Ch. 131 § 7(a)(17) (prohibiting firearms in "privately or publicly owned" entertainment facilities). Nothing in the text or tradition of the Second Amendment supports such a holding.

accordance with the test mandated by *Bruen*, the "why" and "how" of Section 7 aligns with this tradition.

As explained more fully below, the *Koons* TRO relied on three general errors: 1) incorrectly dismissing evidence as "outliers," 2) mistakenly deeming evidence as insufficiently identical to the present provisions, and 3) misreading the historical evidence the State proffered.

***First*, the State's historical examples are not "outliers."** While the State provided both the *Koons* Court and this Court with scores of historical analogues supporting the challenged provisions, the *Koons* Court dismissed the historical evidence as "outliers." *See, e.g.*, slip op. at 31 (dismissing 1870 Tex. Gen. Laws 63 (Ex. 5)); 34 (Art. 320, Tex. Act of April 12, 1871 (Ex. 9)); 35 (1870 Tenn. Pub. Acts 23 (Ex. 8)); 36 (Gen. Digest of the Ords. & Res. of the Corp. of New Orleans 371 (1831)); 40 (1865 La. Extra Acts 14, No. 10 § 1 (Ex. 13)).[4] But in finding analogous historical evidence was insufficient to support Section 7, the *Koons* TRO ignored both *Bruen*'s guidance and the principles for constitutional analysis that it espoused. In describing how analogical reasoning will allows courts to identify permissible sensitive place restrictions, *Bruen* said as follows:

> Consider, for example, *Heller*'s discussion of "longstanding" "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings." 554 U.S. at 626. Although the historical record yields *relatively few* 18th- and 19th-century "sensitive places" where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses—we are also aware of no disputes regarding the lawfulness of such prohibitions. *See* D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine, 13 Charleston L. Rev. 205, 229–236, 244–247 (2018). We therefore can *assume it settled* that these locations were "sensitive places" where arms carrying could be prohibited consistent with the Second Amendment. And courts can use analogies to those historical regulations of "sensitive places" to determine that modern regulations prohibiting the carry of firearms in new and analogous sensitive places are constitutionally permissible.

142 S. Ct. at 2133 (citation omitted, emphasis added).

But that reasoning proves fatal to the *Koons* approach to so-called "outliers." The Kopel and Greenlee article cited by the Court identified only *one* example of Founding Era regulations prohibiting firearms at legislative assemblies, *two* such prohibitions at polling places from this period, and *none* at courthouses, schools, and/or government buildings. *See* 13 Charleston L. Rev. at 234-36. Yet *Bruen* did not conclude from this "short list" that sensitive places prohibitions are unconstitutional; to the contrary, the Court looked at this set of uncontested historical prohibitions on firearms at legislative assemblies and polling places and had no trouble finding it "settled" that prohibitions

---

[4] All exhibit numbers in *Koons* correspond to the same exhibit numbers in *Siegel*.

on firearms at schools, government buildings, and courthouses are constitutional. *Id.* Even more to the point, *Bruen* invited further analogy to this "short list" of sensitive places to justify "modern regulations prohibiting the carry of firearms in new and analogous sensitive places." *Id.*

The sort of evidence the State has introduced into the record when defending Section 7(a)'s sensitive places prohibitions are exactly the kind that *Bruen* calls for,[5] and a decision to disregard the historical statutes as "outliers" is inconsistent with *Bruen*. For example, in reaching its conclusion that a prohibition on firearms in "a publicly owned or leased library or museum" was not consistent with historical analogues, the *Koons* Court rejected as an "outlier" a specific historical statute that prohibited firearms in "educational, literary, or scientific" spaces. *See* slip op. at 31 (rejecting 1870 Tex. Gen. Laws 63 (Ex. 5)). Even putting aside the fact that Texas was *not* the only example of such a restriction, *see* Mo. Rev Stat. 1879, at 224 (§ 1274) (Ex. 10), this cannot be a correct application of *Bruen*. After all, the Texas and Missouri statutes were never struck down as unconstitutional, and were instead upheld by contemporary courts against constitutional challenge. *See English v. State*, 35 Tex. 473, 478-79 (1871) ("[I]t appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly, as, for instance into a church, a lecture room, a ball room, or any other place where ladies and gentlemen are congregated together."); *State v. Shelby*, 90 Mo. 302, 305 (1886) (upholding law that "made it an offense for any one to go into any school-room or place where people are assembled for educational, literary, or social purposes" with an open or concealed weapon); *see also Andrews v. State*, 50 Tenn. 165, 182 (1871) ("[A] man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them.").

Nothing about *Bruen*'s analysis changes just because *Bruen* dismissed a specific law as an outlier in the context of assessing New York's "proper cause" standard. *See Koons* slip op. at 31, 34 (citing *Bruen*, 142 S. Ct. at 2153). What concerned *Bruen* about the 1870 Texas statute—offered as a singular example of a flat prohibition on handgun carriage absent special need—was that this regulation *contradicted* other historical evidence that such blanket prohibitions were unconstitutional. *See id.* at 2153 ("[W]e will not 'stake our interpretation of the Second Amendment upon a single law, in effect

---

[5] To be clear, the State's request for additional time to build a full PI record is only focused on the truncated process on a TRO posture, and is not a suggestion that the State lacked time to *introduce* historical analogues for its law into the record. *See* slip op. 19, n.5 (noting State's argument was that additional time was required to provide the full historical context for any challenged historical evidence). The State **has** identified ample historical evidence to support the constitutionality of all the provisions, evidenced by the TRO opposition filing and exhibits in both cases.

in a single [State], *that contradicts the overwhelming weight of other evidence regarding the right to keep and bear arms for defense' in public*." (citing *Heller*, 554 U.S. at 632) (emphasis added)); *id.* at 2131 (adding, in same vein, that "if some jurisdictions actually attempted to enact analogous regulations during this timeframe, but those proposals were rejected on constitutional grounds, that rejection surely would provide some probative evidence of unconstitutionality"). It was this tension between the 1870 Texas regulation and the "consensus view that States could not altogether prohibit" firearm carriage that caused the Court to view the statute skeptically. That tension does not exist in this case, where Plaintiffs have offered no *contrary* evidence that jurisdictions viewed prohibitions of firearms at these sensitive locations as unconstitutional. Rather, the record evidence of judicial decisions consistently supports the validity of the laws on which New Jersey relies.

***Second*, Bruen *emphasized a historical analogue need not be a "historical twin" or a "dead ringer."*** In addition to setting an inappropriately high burden for the number of analogues the State had to proffer (even in the absence of any contrary history), the *Koons* TRO also demanded the historical analogues be identical, contrary to *Bruen*.

For example, the State cited an 1831 New Orleans law (Ex. 7) prohibiting weapons in ballrooms as one of several historical analogues that prohibited firearms at crowded social venues. But *Koons* dismissed that analogue, stating "there appear[] to be many differences between the public ballrooms of 1831 and modern-day concert venues and amusement parks." Slip op. at 36. This assertion lacks evidentiary support in either docket's record. And even if there are *some* differences between 19th century ballrooms and modern-day nightclubs and concert venues, the firearms restrictions at both types of sites are relevantly similar in that they recognize the danger inherent in having firearms at crowded social gatherings. And it was not just New Orleans that had a concern about firearms at congested social venues: Tennessee, Missouri, and Texas prohibited firearms in similar contexts, such as fairs, racecourses, public assemblies, social gatherings, social parties, circuses, shows, and public exhibitions. *See* Exs. 5, 8, 9, 10. *Bruen* does not require "historical twins," and the State's proffered analogues here are striking in their similarity to the challenged restrictions.

To take another illustrative example, the *Koons* TRO attempted to distinguish a 1919 Maine statute (Ex. 17) prohibiting loaded firearms in vehicles because the Maine statute named only a "rifle or shotgun," and not a handgun. Slip op. 50 n.27. But that ignores the key fact: as soon as vehicles became popularized, the Maine legislature restricted loaded firearms in moving vehicles, recognizing the inherent danger in having a loaded gun in such a place. The relevant level of analysis is "how and why" a historic restriction burdened the Second Amendment right, not whether it was the same in all its particulars. *Bruen* 142 S. Ct. at 2133. In short, if these analogues are not similar enough, it is hard to conceive how the *Bruen* standard could be satisfied absent a "historical twin."

***Finally, the* Koons *Court misread or overlooked relevant historical analogues and supportive case law.*** Consider the Court's treatment of the State's evidence supporting

the constitutionality of Section 7(a)(24)'s private property rule. It is difficult to conceive of more on-point historical authority to satisfy *Bruen*'s test than a Founding-era *and* a Reconstruction-era statute, neither of which was challenged and each of which operates identically to a modern law. Yet, that is exactly what the State provided in Exhibit 13, a 1771 New Jersey law that prohibited the "carry of any Gun on any Lands not his own … unle[s]s he ha[s] Licen[s]e or Permi[ss]ion in Writing from the Owner or Owners or legal Po[ss]e[ss]or" of the land, and Exhibit 14, an 1865 Louisiana law that made it unlawful "for any person or persons to carry fire-arms on the premises or plantations of any citizen, without the consent of the owner or proprietor."

Although these are historical twins for Section 7(a)(24) (in other words, substantially more than the "analogue" that is legally required), that was still not enough. The court dismissed the 1771 New Jersey analogue as "a law to address the problem of poaching and trespass," not "gun control legislation." Slip op. at 40. But nothing in Section 1 of the 1771 New Jersey law references poaching. Instead, the law prohibited carrying a gun on another's land without the landowner's written permission, regardless of whether the carrier's intent was poaching. Moreover, the Act's title references a non-poaching aim: "prevent[ing] trespass[] with Guns." *Id*. That *other* sections of the Act prohibited poaching does not suggest that Section 1 specifically—that is, the analogue to Section 7(a)(24)—is limited to poaching. Nor does *Chew v. Thompson*, 9 N.J.L. 249, 249 (1827), a case cited by in *Koons* and by Plaintiff, bolster that view. Rather, in *Chew*, the defendant allegedly violated *both* the trespass and poaching provisions. The court explained that "the first and second sections" of the 1771 law—Section 1's anti-trespass provision and Section 2's poaching provision—"relate to *different matters* and describe and define different offenses." 9 N.J.L. at 250 (emphasis added). And the *Koons* Court's dismissal of the 1865 Louisiana law was based only on the court opinion—without record evidence or case citation-that the analogue "appears historically inconsistent and unconstitutional, and in any event, it is but one example." Slip op. at 40.

Nor should this Court be persuaded by the *Koons* TRO's approach to other historical statutes. Consider entertainment venues. *Koons* rejected reliance on an 1871 Texas statute that prohibited firearms in social gatherings, finding that because the law excluded peace officers and persons otherwise authorized by law to carry firearms in the specific places, it was "distinguishable" from Chapter 131, which "does not have a similar exclusion." Slip op. at 34 (citing Ex. 9). But that is simply error: Chapter 131 likewise excludes from sensitive place restrictions all persons "lawfully carrying a firearm within the authorized scope of an exemption set forth in N.J.S.2C:39-6." *See* Ch. 131 § 7(a).

Another illustrative example comes from the vehicles context. *Koons* failed to recognize the State's evidence that early 19th century legislatures broadly prohibited concealed-carry of firearms when going on day-to-day travel (other than when one goes on an out-of-state journey). *See* slip op. at 51. As the State noted, *see* D.E. 15, at 39-40, Section 7(b)(1)'s restriction on a loaded gun while driving a car within New Jersey is

just like the 1830s Arkansas and Alabama prohibitions (Exs. 18, 19). Section 7(b)(1), like all of Section 7, applies only to in-State conduct, and by definition does not apply to out-of-state "journeys." The decision also overlooked the fact that contemporary courts upheld these historical analogues, *see* D.E. 15 at 40.

*Bruen* instructs this Court on the proper analysis. It does not insist that any particular number of States have maintained a certain historical law. And it does not insist that the historical law be a twin for the modern challenged statute. But it does require a careful parsing of those historical sources, which the State has correctly done here. This Court should thus deny this TRO.

### III.  This Court Should Grant The Emergency Motion To Consolidate.

Every factor in the consolidation analysis cuts squarely in favor of consolidating these overlapping challenges. *See* Fed. R. Civ. P. 42(a). **First**, as the above pages demonstrate, there is no question that both actions involve "a common question of law or fact": both the *Siegel* and *Koons* Plaintiffs challenge Section 7(a)(12), (15), (17), (24), and (b)(1) of Chapter 131 under the Second and Fourteenth Amendments. **Second**, there can be no doubt consolidation will "avoid unnecessary costs and/or delay, and promote judicial economy," *Liberty Lincoln Mercury, Inc. v. Ford Mktg. Corp.*, 149 F.R.D. 65, 80-81 (D.N.J. 1993): hearing these cases together will prevent duplicative briefing and oral argument, especially on an emergent timeline, it will avoid multiple hearings involving expert and fact witnesses as the two lawsuits progress, and it will limit inconsistent scheduling. **Third**, the risk of "inconsistent judgments" from two judges of this Court evaluating identical claims at the same time is self-evident. And ***finally***, consolidation will not prejudice any party: consolidation would only save all parties the time and expense of having to separately litigate identical motions and disputes, since much of the same duplication of resources that would prejudice the State also applies to Plaintiffs.

Yesterday's TRO order in *Koons* illustrates the problems that can arise. **First**, there can be no doubt that both actions involve "a common question of law or fact": the *Koons* Court issued a TRO based on five of the very claims presented in this case. See slip op. at 29-52. Even the *Siegel* Plaintiffs agree. *See Siegel* D.E. 20 (submitting the transcript of the *Koons* TRO hearing into this docket in light of the considerable overlap across the cases). **Second**, the lack of consolidation already produced unnecessary costs and delay, and has undermined judicial economy, even at this early stage. This Court and the *Siegel* parties could not proceed with a scheduled TRO hearing, and the *Siegel* parties must instead file four additional briefs over two days, to address an order in the *Koons* docket that issued mere minutes beforehand. *See Siegel* D.E. 23 (rescheduling Monday hearing to Thursday due to *Koons* TRO). And **third**, to the degree this Court disagrees with *any* of the conclusions in the *Koons* TRO—such as its conclusions that the Second Amendment allows New Jerseysans to carry guns into libraries, movie theaters, buses, and/or bars—then the risk of "inconsistent judgments" in a single

District will no longer be a hypothetical but a guarantee. That is precisely what consolidation avoids.

Plaintiffs' responses are unavailing. Plaintiffs' main objection seems to be that *Koons* only presses *some* of the same claims as in this case. But to be clear, this is not a situation of Venn diagrams but of concentric circles: every single claim in *Koons* is also present in *Siegel*. And in such situations, courts have not hesitated to order consolidation. In *Hanson v. District of Columbia*, 257 F.R.D. 19 (D.D.C. 2009), to take one particularly apt example, the same District confronted two Second Amendment challenges to D.C.'s gun laws. *Id.* at 22. Plaintiffs opposed consolidation on the theory that one of the cases was "a narrow challenge to the constitutionality" of just part of the D.C. law, "whereas [the other lawsuit] not only raise[s] the same challenge, but also take[s] issue with a host of other aspects of the District's gun laws." *Id.* The district court rejected that argument, finding that consolidation would better avoid inconsistent rulings and duplicative work for the Court and parties on those issues present in both cases. *Id.*; *see also, e.g.*, *Nat'l Ass'n of Mortgage Brokers v. Bd. of Govs. of Fed. Reserve Sys.*, 770 F.Supp.2d 283, 287 (D.D.C. 2011) (even where one of the two suits challenges a "small subsection" of the same law, "[t]he conceded overlap in issues presented by both matters confirms the sound basis for consolidation"); *Welch v. Cape May Cnty. Corr. Ctr.*, 2016 WL 1600213, at *2 (D.N.J. Apr. 21, 2016) ("Rule 42(a) does not require that pending suits be identical before they can be consolidated."); *Ocean Cty. Bd. of Chosen Freeholders v. Grewal*, No. 19-18083, Dkt. 11 at 1-3 (Nov. 7, 2019) (C.J. Wolfson granting State's opposed motion for consolidation where Plaintiffs had pressed overlapping claims against identical law). The sequence of events this week bolsters the wisdom of that view: the *Siegel* hearing had to be adjourned, more briefs were required, the risk of inconsistent judgments was heightened—none of which is mitigated by the fact that *Siegel* raises some additional claims as well.

Nor does the fact that a TRO was issued in one proceeding mean consolidation is in any way less appropriate. The TRO, by its very nature, will not last forever, but will "terminate with a ruling on the preliminary injunction." *Hope v. Warden York Cnty. Prison*, 956 F.3d 156, 159 (3d Cir. 2020); *see* 11A Wright & Miller § 2953 (noting this is compelled by Rule 65(b)). Regardless of whether this Court grants or denies a TRO in *Siegel*, both cases will be proceeding on the same track—to a preliminary injunction hearing, and then to a preliminary injunction appeal or onto discovery and ultimately summary judgment. And the problems will only be exacerbated going forward. Without consolidation, witnesses who will testify as to the same facts would have to appear in two proceedings at the preliminary injunction stage, at depositions, and at trial. And different judges would have to resolve identical legal arguments in dispositive motions, not to mention would have to preside over identical discovery disputes and pro forma motions. None of that is obviated by the fact that the first few weeks, the two cases have proceeded under separate dockets.

In short, every consolidation factor militates in favor of consolidation.

## IV. Conclusion

For the foregoing reasons and the reasons set forth in the State's prior briefing, this Court should deny the *Siegel* Plaintiffs' TRO application and consolidate the *Koons* case with the first-filed *Siegel* case.

Respectfully yours,

MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY

By:  /s/  Angela Cai
Angela Cai
Deputy Solicitor General

## CERTIFICATE OF SERVICE

I certify that on January 10, 2023, I electronically filed the foregoing Supplemental Letter Brief with the Clerk of the United States District Court for the District of New Jersey. Counsel for all parties are registered CM/ECF users and will be served via CM/ECF.

                                      By:   */s/Angela Cai*
                                                Angela Cai
                                                Deputy Solicitor General

Dated:  January 10, 2023