UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
───────────────────────────

AARON SIEGEL; JAMES COOK;          )     CIVIL ACTION NUMBER:
JOSEPH DELUCA; NICOLE CUOZZO;      )
TIMOTHY VARGA; CHRISTOPHER         )     1:22-cv-07463-RMB-AMD
STAMOS; KIM HENRY; and             )
ASSOCIATION OF NEW JERSEY RIFLE &  )
PISTOL CLUBS, INC.,                )
            *Plaintiffs*,          )
                                   )
vs.                                )
                                   )
MATTHEW J. PLATKIN, in his official)     MOTION HEARING FOR A
capacity as Attorney General of    )     TEMPORARY RESTRAINING
New Jersey; and PATRICK J.         )     ORDER
CALLAHAN, in his official capacity )
as Superintendent of the New Jersey)
Division of State Police,          )
            *Defendants*.          )
───────────────────────────

RONALD KOONS, et al.               )     CIVIL ACTION NUMBER:
            *Plaintiffs*,          )
vs.                                )     1:22-cv-07464-RMB-AMD
                                   )
WILLIAM REYNOLDS, in his official  )
capacity as the Prosecutor of      )
Atlantic County New Jersey, et al.,)
            *Defendants*.          )

Mitchell H. Cohen Building & U.S. Courthouse
4th and Cooper Streets
Camden, New Jersey 08101
Thursday, January 26, 2023
Commencing at 9:45 a.m.


B E F O R E:            THE HONORABLE RENÉE MARIE BUMB,
                       UNITED STATES DISTRICT JUDGE


        John J. Kurz, Federal Official Court Reporter
              John_Kurz@njd.uscourts.gov
                    (856)576-7094


Proceedings recorded by mechanical stenography; transcript
        produced by computer-aided transcription.

1  **A P P E A R A N C E S:**

2  HARTMAN & WINNICKI, P.C.
   BY:  DANIEL L. SCHMUTTER, ESQUIRE
3  74 Passaic Street
   Ridgewood, New Jersey 07450
4  For the Plaintiffs

5

6  OFFICE OF THE NEW JERSEY ATTORNEY GENERAL
   BY:  ANGELA CAI, DEPUTY SOLICITOR GENERAL
7       JEAN REILLY, ASSISTANT ATTORNEY GENERAL
        JEREMY FEIGENBAUM, SOLICITOR GENERAL
8  R.J. Hughes Justice Complex
   25 Market Street, P.O. Box 080
9  Trenton, New Jersey 08625
   For the Defendants Attorney General Platkin and Superintendent
10 of NJ State Police Callahan

11

12 ATLANTIC COUNTY DEPARTMENT OF LAW
   BY:  ALAN J. COHEN, ASSISTANT COUNTY COUNSEL
13 1333 Atlantic Avenue, 8th Floor
   Atlantic City, New Jersey 08401
14 For the Defendant William Reynolds

15

16 **A L S O   P R E S E N T:**

17 Arthur Roney, The Courtroom Deputy

18 Tate Wines, Judicial Law Clerk

19 Sam Rubinstein, Deputy Attorney General

20

21

22

23

24

25

1    (PROCEEDINGS, held in open court before The Honorable

2  Renée Marie Bumb, United States District Judge, at 9:45 a.m. as

3  follows:)

4         THE COURTROOM DEPUTY:  All rise.

5         THE COURT:  Good morning.  Sorry to keep you all

6  waiting.

7         MR. SCHMUTTER:  Good morning, Your Honor.

8         THE COURT:  Nice to see you all.  You can have a

9  seat.  Thank you.  And you're welcome to remove your mask while

10  you're speaking.

11         All right.  Let me have appearances.  The case is

12  Siegel versus Platkin.  It's been consolidated.  The docket

13  number is 22-7464.  We'll start with the plaintiff.

14         MR. SCHMUTTER:  Good morning, Your Honor.  Daniel

15  Schmutter from the firm of Hartman & Winnicki for the Siegel

16  plaintiffs.

17         THE COURT:  Good morning.

18         MS. CAI:  Good morning, Your Honor.  Deputy Solicitor

19  General Angela Cai for the defendants in this case.

20         THE COURT:  Okay.  Nice to see you again.

21         MS. REILLY:  Assistant Attorney General Jean Reilly

22  for the State.

23         THE COURT:  Good to see you.

24         MR. FEIGENBAUM:  Jeremy Feigenbaum, also for the

25  State.

```
 1              THE COURT:  Okay.

 2              MR. COHEN:  Thank you, Your Honor.  Alan Cohen,

 3    Atlantic County Counsel for William Reynolds, Atlantic County

 4    Prosecutor.

 5              THE COURT:  Good morning.

 6              Do you want to enter an appearance?

 7              MR. RUBINSTEIN:  Sam Rubinstein, Deputy Attorney

 8    General.

 9              THE COURT:  Okay.  Welcome.

10              Okay.  So we are here.  The plaintiff has filed a

11    Motion For A Temporary Restraining Order.  So I think the way

12    that I will do it is I will hear the parties on their

13    arguments, and I'll give you the following guidance:

14              The arguments that relate to the issues that the

15    Court ruled on in Koons, I've not seen much to dissuade this

16    Court of its earlier Opinion.  So if you want to focus on in

17    making those arguments, Ms. Cai, where you believe the Court

18    erred, that would be helpful.  And that's it for now.

19              Okay.  Mr. Schmutter.

20              MR. SCHMUTTER:  Thank you, Your Honor.

21              There's a lot of paper in this file, so I'm not going

22    to repeat, you know, what -- I'm going to try not to repeat

23    what's in the papers.  Your Honor has obviously read them,

24    including hopefully the transcript from the argument in front

25    of Judge Williams.  What I want to do really is answer the
```

1  Court's questions, but I want to just start with one important

2  point that I want to just make sure doesn't get lost in the

3  shuffle because there's a lot of stuff going on here.  And I

4  want to point out one of the major differences between this

5  case and Koons, which is our claim, our multiuse property

6  claim.

7         And that is really a bootstrap where the State of New

8  Jersey is effectively prohibiting carry in places that it

9  otherwise could not prohibit carry merely because of the

10  breadth and scope of the way the statute is drafted.

11         THE COURT:  What provision are you relying upon on

12  the multipurpose?  Can you direct me to that?

13         MR. SCHMUTTER:  I'm sorry, which -- in our Complaint

14  or in the --

15         THE COURT:  In the statute.

16         MR. SCHMUTTER:  Oh.  It covers the entire Section 7,

17  because the way Section 7 is drafted --

18         THE COURT:  Well, what specific language are you

19  relying upon?

20         MR. SCHMUTTER:  The language in Section 7(a) that

21  refers to all of the grounds in parking lots.

22         So the prohibition is broad.  Section (a), 7(a)

23  prohibits -- it has a prohibition on the entire property that

24  contains a prohibited use.

25         So let me see if I can get the Court the exact

1  language, okay.  So it's section 7(a).  We've actually

2  emphasized it on page 11 of our moving brief.  It is, "In any

3  of the following places, including in or" -- I'm sorry, Judge.

4          THE COURT:  Okay.  Yes.

5          MR. SCHMUTTER:  -- "including in or upon any part of

6  the buildings, grounds, or parking area of, colon," and then it

7  lists the sensitive places.

8          THE COURT:  And that's what you designate as

9  quote-unquote multipurpose?  Got it.

10          MR. SCHMUTTER:  Multi, yes.  That creates the

11  multiuse problem.  And the multiuse problem occurs in a variety

12  of contexts.  We've identified two specific ones from the

13  allegations of our plaintiffs, but there's more than that.

14          So one of the really obvious -- I'm sorry, Judge.  Go

15  ahead.

16          THE COURT:  No.  I was going to tell you what you

17  say.  But I'll be patient.  One is schools.

18          MR. SCHMUTTER:  One is schools in places that are not

19  just schools, like churches.  That's a good example.  And we

20  have two church problems or house of worship problems.  One is

21  Mr. Varga's problem where he's on a -- his church is on a

22  14-acre campus and they've got multiple buildings, and one of

23  the buildings they lease to the Christian Academy.  Well,

24  that's easy, right?  We don't have to worry about vagueness

25  because that's a traditional K through 12 school.  So we know

 1  that's a school, so we don't have to go on vagueness there.

 2          THE COURT:  I'm going to just say this to you,

 3  Counsel.  You talk faster than me.

 4          MR. SCHMUTTER:  And -- yes.

 5          THE COURT:  And my court reporter always is telling

 6  me to please slow down, Judge.  So I know he's going to ask you

 7  to slow down.

 8          MR. SCHMUTTER:  Your Honor, we already had the

 9  conversation before we went on the record.

10          THE COURT:  But you didn't listen to him.

11          MR. SCHMUTTER:  I did not, and I apologize.  I'm

12  doing this 30 years and I still can't slow down.  My apologies

13  to the court reporter and the Court.

14          THE COURT:  Well, so if I go like this (indicating),

15  it won't be on the record, but it's like okay.  That means can

16  you please slow down, all right?

17          MR. SCHMUTTER:  Thank you, Judge.

18          So Mr. Varga's church is on a 14-acre campus, and

19  they've got multiple buildings.  Now, his problem and the

20  church's problem is that there's a school on a different part

21  of the property.  But the way this language reads, the entire

22  14 acres is prohibited, including the church building where

23  they pray.  And there may be no prohibited activity going on in

24  the church building, but this language makes carry prohibited

25  in the church building and everywhere else on campus.

```
1        THE COURT:  But do you agree that -- to take that

2   example in the 14-acre parcel, that if the church -- that if

3   the school, the academy is segregated, that that would fall

4   within one of the restrictions, but that the remaining part of

5   that property would not?  You don't agree with that.  That's

6   the argument you're making, right?

7        MR. SCHMUTTER:  Correct.  The language makes the

8   entire parcel prohibited.

9        THE COURT:  But the question is, does it?

10        MR. SCHMUTTER:  Well, I mean, if the State wants to

11   stipulate that it doesn't, if they want to -- if the State

12   wants to solve our multiuse parking problem today -- multiuse

13   property problem today, I'm happy to do it.  But the language

14   doesn't seem to allow for it.

15        If they want to stipulate that in a multiuse property

16   like a strip mall, because strip mall is one of the other

17   situations where this comes up, right?  Let's say you have a

18   day care and then next to it you have a pizza place, a tailor

19   shop, a dry cleaner and a Wendy's.  Under this language, the

20   fact that the day care is prohibited means the Wendy's is

21   prohibited, the pizza place is prohibited, even if they

22   can't -- which they can't -- come up with a *Bruen*-based

23   historical tradition that would allow them to prohibit carry in

24   a pizza place.  They can't prohibit carry in a pizza place.

25   But this language lets them bootstrap themselves into it
```

1   because it's connected or even on the same parcel as a

2   prohibited place that we're not challenging.

3            THE COURT:  Would the plaintiff take comfort if the

4   Court construed that language as opposed to asking the State to

5   stipulate?  If the Court construed that language, so, in other

6   words, to take your example, that the language "any of the

7   following places, including in or upon any part of the

8   buildings, grounds, or parking area of..." that that language

9   construed means -- so to use your example in Mr. Varga's case,

10  it would mean the parking lot of that academy.

11           You don't quarrel with the fact that the academy

12  falls within "school," right?

13           MR. SCHMUTTER:  Correct.

14           THE COURT:  Okay.  The parking area of that academy,

15  it would mean the building, which is the academy itself.  Would

16  you take solace in that construction?

17           MR. SCHMUTTER:  That partially solves the problem.

18           THE COURT:  What remains?

19           MR. SCHMUTTER:  Well, shared parking lots, for

20  example.

21           So strip malls have shared parking lots.  Multiuse

22  commercial buildings or office buildings have shared parking

23  lots.  So you have, let's say, a professional building...

24           THE COURT:  Okay.  Then let me take it one step

25  further.  If the construction were that that parking lot must

1    be associated solely with the restricted place, would you take

2    solace in that construction?

3              MR. SCHMUTTER:  That's excellent.  I'm not sure that

4    gets us all the way there, but we're doing great here.  I

5    appreciate the Court's --

6              THE COURT:  What remains?

7              MR. SCHMUTTER:  Yes.  I'm sorry.

8              THE COURT:  What remains?

9              MR. SCHMUTTER:  Okay.  So if the Court were to limit

10   the construction to a parking lot solely dedicated to that use,

11   right?

12             THE COURT:  Yes.

13             MR. SCHMUTTER:  That would be very helpful.

14             If it limited it to a building solely dedicated -- on

15   a multiuse property solely dedicated to that use, that would be

16   very helpful.

17             We run into a -- we still have two problems that I

18   can think of right off the top of my head, and maybe we can

19   solve them with the Court's assistance.  So --

20             THE COURT:  Well, because I think at the end of the

21   day -- keep thinking -- because I think at the end of the day

22   that was the intent of the legislation.  I don't think that the

23   intent, it certainly seems to me, of the legislation was not

24   to, well, let's designate certain sensitive locations within a

25   strip mall, but, in essence, broaden those restrictions by

1   declaring that the entire parking lot is a sensitive place.  I

2   don't think that was the intent.  Because then why not just

3   make all the parking lots in the state of New Jersey sensitive

4   places?  I think we kind of resolve all of the different

5   subsections; would you agree?

6          MR. SCHMUTTER:  Yeah.  If Your Honor is saying that

7   the Court could find that that was the intent and thereby limit

8   the construction in that way, I agree.  We agree that the Court

9   could do it that way.

10          THE COURT:  Because one of the arguments that the

11   plaintiffs make is that the construction that you have

12   articulated, in essence, deters the plaintiffs from carrying

13   handguns in places that clearly are not sensitive places.

14          MR. SCHMUTTER:  Correct.

15          THE COURT:  Yes.

16          MR. SCHMUTTER:  Correct.

17          THE COURT:  So if the pizza owner welcomes guns, the

18   plaintiff nonetheless, under the plaintiffs' interpretation of

19   the legislation, cannot carry the firearm because there's a

20   shared parking lot.  That's the argument?

21          MR. SCHMUTTER:  That is the argument, Judge.

22          THE COURT:  So now to get back to my question:  Is

23   that concern assuaged by a construction along the lines that we

24   have been discussing?

25          MR. SCHMUTTER:  The parking lot concern is, Judge.

```
 1            THE COURT:  Okay.

 2            MR. SCHMUTTER:  But then we have a couple of other

 3  pieces of this that if we can solve them, that would be

 4  outstanding.  So I really appreciate Your Honor's efforts in

 5  this regard.

 6            THE COURT:  Well, I don't know that it's the Court's

 7  obligation to solve them.  I think it certainly was the

 8  obligation of the legislature to solve them.  But if construing

 9  the terms and in accordance with that the Court solves a

10  legislative intent, then perhaps that solves the problem.  But

11  you have to tell me what remains.

12            MR. SCHMUTTER:  Absolutely, Judge.

13            So one more example is the multiuse building, office

14  building.  So take a professional building that has lawyers,

15  accountants and doctors, okay?

16            THE COURT:  Yeah.

17            MR. SCHMUTTER:  It may be a building filled with

18  lawyers and accountants and on the first floor in the back

19  there's a doctor's office, okay.  Doctor's offices are

20  prohibited now, unless it's restrained and we prevail on the

21  doctor claim.  But if we don't prevail on the doctor claim,

22  then that medical office that's in the corner of that large

23  building makes the entire building prohibited in the same way

24  that we've talked about.

25            So, again, we need a construction that says it's just
```

1    the doctor's office, no other part of the building is

2    prohibited.  And if it's a shared parking lot, the parking lot

3    is not prohibited.  So it's similar to what we've been talking

4    about as far as construction goes.

5            The last piece is a little bit more complicated, but

6    I think it could be solved in exactly the same way, again,

7    because the Court can make a finding that this was the intent

8    of the legislature, and that is Plaintiff Cuozzo's church

9    problem.

10           THE COURT:  Plaintiff what?

11           MR. SCHMUTTER:  Cuozzo.  Nicole Cuozzo, two church

12   plaintiffs.

13           THE COURT:  Yes.

14           MR. SCHMUTTER:  Her problem is a little bit different

15   than Mr. Varga's problem because they don't have multiple

16   buildings.  They have one building.  So that church building

17   that they use is used for multiple purposes.  So you walk in

18   the building.  To the left is the area where they worship, the

19   sanctuary.  To the right they have classrooms where they do

20   Sunday school, where they do adult Bible classes and perhaps

21   other worship, religion-related educational things.

22           Now, Your Honor is aware, of course, that we have a

23   vagueness issue, because we're not actually sure that Sunday

24   school or adult Bible classes or some of these other things

25   that the plaintiffs do count under the school, college,

```
 1   university, other educational institution prohibition.
 2           THE COURT:  Yeah.  On that grounds, and I'm curious
 3   to hear what the State has to say, because they haven't, but we
 4   might have a disagreement.  To me, Bible classes aren't the
 5   same as school.  School is school.  Education institution is
 6   education institution.  University is university.
 7           Is the plaintiffs' concern that Bible classes might
 8   fit within one of those categories a genuine one?
 9           MR. SCHMUTTER:  Yes, it is.
10           THE COURT:  Because?
11           MR. SCHMUTTER:  Well, Judge, look, I apologize.  We
12   would love a narrow construction of school, college,
13   university, and educational institution.  Obviously college --
14           THE COURT:  Which would have been solved had the
15   legislature provided those definitions.
16           MR. SCHMUTTER:  Right.
17           THE COURT:  I agree with you.
18           MR. SCHMUTTER:  Correct.  So college and university
19   are obviously easy, right?  Rutgers, that's easy.  Even some
20   aspects of school, West Orange High School, that is a school.
21   The Christian Academy on Mr. Varga's church's property, that's
22   easy.  But School of Rock, that's a music school.  I don't
23   know.  Does that count?  Adults go there.  Children go there.
24   They teach you trombone.  They teach you guitar.  They teach
25   you drums.
```

```
 1              THE COURT:  Well, why wouldn't the School of Rock be

 2    a school?

 3              MR. SCHMUTTER:  Because you take music --

 4              THE COURT:  I mean, it doesn't matter what the

 5    subject matter is.

 6              MR. SCHMUTTER:  Well, because I could -- that's the

 7    question.  I mean, school, most people when they think of

 8    school, they think of a traditional K through 12 or college or

 9    university.  That's what people think of when they think of

10    school.  And that's typically what --

11              THE COURT:  Or an academy or a beauty school or a --

12              MR. SCHMUTTER:  Well, School of Rock is not a degree.

13    It's not like you're getting your degree in composition,

14    arrangement, or cello.  This is where people go to take guitar

15    lessons, you know, after school or where adults go to take

16    guitar lessons.  Same thing with the karate school.  This is

17    why we raised this issue.  And it is a genuine issue, Judge,

18    because we're actually very concerned about this.

19              THE COURT:  So whose obligation is it -- maybe it's a

20    rhetorical question.  Does it really come down to the Court

21    defining what "school" is?  Or does the Court -- you're asking

22    the Court to find that the legislation is vague because the

23    plaintiffs don't know what school means, which just seems to

24    the Court that the traditional notion of what a school is

25    controls.  And if there's any ambiguity, what the plaintiffs
```

1    say is there shouldn't be any ambiguity because I should be

2    permitted to carry my firearm into the School of Rock because I

3    don't believe that fits within the school's definition.

4         But let's just play this out.  Let's say that there

5    was a definition provided by the legislature, which would have

6    been wise.  Could not the plaintiff still come before me and

7    say the definition just doesn't solve the problem?

8         MR. SCHMUTTER:  Well, that, of course, would depend

9    on the definition.  Some definitions are good and some

10   definitions are terrible.  You can still have a vague statute

11   if the definition is not effective.  But some definitions are

12   excellent.  I mean, it's really just a drafting thing.  You

13   know, nothing is perfect, right?  Language is inherently dicey.

14   We know this as lawyers and judges.  But there are good --

15   there's good drafting and there's bad drafting.

16        THE COURT:  Right.  But it just seems to me to be a

17   little -- a little -- I mean where are we headed?  That the

18   School of Rock by its title, it's a school.  I'm just -- this

19   is just a hypothetical.  The School of Rock by its definition

20   is a school.  Are the plaintiffs then going to come back and

21   say, well, but you can't go on what you title it?

22        MR. SCHMUTTER:  Correct.

23        Well, for example, I mean, the karate school, a

24   karate school could be called the Tae Kwon Do School of

25   Medford.  It could also be called the Wing Chung Kung Fu Center

```
 1   of West Orange.  It can't turn on the name.

 2           And Your Honor was correct, I think, in focusing on

 3   the traditional notion of school.  I think if you ask a person

 4   on the street and say what's a school, the first thing they're

 5   going to think of is K through 12, college, university.  That's

 6   what people -- that's the image of school that's going to pop

 7   into people's minds.  That's the first thing I think of when I

 8   think of school.  But all these other things raise the question

 9   of -- because this is a criminal statute, and that's the

10   problem.  That's the key to the due process issue, the void for

11   vagueness.  Criminal statutes have to be well-defined.  People

12   have to be able to tell readily what's prohibited and what's

13   not.

14           And if it turns on the sign that's on top of the

15   building, that can't be the standard.  Because they can call

16   themselves school.  They can call themselves not school.

17   Rutgers can't say we're not a school.  Obviously they're a

18   school.  West Orange High School can't say we're not a school.

19   Obviously they're a school.  But that's where the trouble is.

20   The trouble is these other things.

21           You know, I teach CLE classes regularly, and

22   sometimes they're held in a hotel conference room.  So is that

23   school?  Is that an educational -- because here's the problem,

24   it's "other educational institutions."  So it's not just the

25   word "school" like School of Rock or karate school.  "Other
```

```
 1    educational institution" is intended to be broadly inclusive.
 2           THE COURT:  Okay.  Your points are fair, and they're
 3    well-taken.
 4           And it's unfortunate that the legislature didn't
 5    provide these definitions.  That would have been an easier
 6    solution -- an easy solution.
 7           MR. SCHMUTTER:  There's a whole educational -- I'm
 8    sorry.
 9           THE COURT:  My question is:  Have you read this
10    legislation in pari materia, with other statutes that might
11    provide that answer?  In other words, are there other statutes
12    on the books that define the terms?
13           MR. SCHMUTTER:  There are other statutes.
14           THE COURT:  Okay.
15           MR. SCHMUTTER:  But they're all -- they're different
16    because unfortunately, and this is where the complication comes
17    in, the legislature could have solved this problem by referring
18    to one.  I'll note, Your Honor, that in the previous argument
19    before Judge Williams, the vagueness issue regarding vehicles,
20    the State took the position that vehicle means the definition
21    in Title 39, which is the Motor Vehicle Code.  That's fine, but
22    they didn't say that.
23           So --
24           THE COURT:  They didn't say it in this legislation.
25           MR. SCHMUTTER:  In the statute.  The statute doesn't
```

```
1    say vehicle shall mean what vehicle means in Title 39:1-1.

2    That's a very clear definition.

3              THE COURT:  But can't the statutes be read in pari

4    materia?

5              MR. SCHMUTTER:  They can.  But the Court should

6    construe it that way, right?

7              THE COURT:  Okay.

8              MR. SCHMUTTER:  So the problem with "other

9    educational institution" and "school" is that there are many

10   statutes that refer to schools and educational institution and

11   they're not necessarily consistent, which is why it's actually

12   very important for the legislature to tell us which definition

13   are they talking about.

14             THE COURT:  So here's my question:  If the Court were

15   to construe those terms however it construes them, and the

16   Court were to construe what parking lot area means, in other

17   words, is the parking area solely dedicated to the sensitive

18   place designation, then what is left is part of the building,

19   and the Court were to construe that to mean solely that -- the

20   sensitive place is solely that sensitive place, the medical

21   office and no other areas, would that solve the problem?

22             MR. SCHMUTTER:  Just about, yeah, Judge.

23             I would also, because the same location, and this is

24   particularly relevant for Nicole Cuozzo and her church, the

25   same space can be used for multiple purposes.  So what I
```

| | |
|---|---|
| 1 | wouldn't want to see is a construction that if although they |
| 2 | normally pray in the sanctuary, if they have Bible classes or |
| 3 | if they have Sunday school, it overflows into the sanctuary, I |
| 4 | don't want that to become suddenly a permanent sensitive place. |
| 5 | So the restriction should be when it's used as that use. |
| 6 | So I don't want a nonsensitive place to become a |
| 7 | school forever simply because they've had school functions. |
| 8 | THE COURT:  Okay. |
| 9 | MR. SCHMUTTER:  So it's a temporal thing as well. |
| 10 | And finally, Judge, the -- |
| 11 | THE COURT:  It seems very odd that the Court should |
| 12 | be sitting up here drafting the legislation. |
| 13 | MR. SCHMUTTER:  I wish the legislature had done it |
| 14 | the right way.  The problem is the legislature did this very |
| 15 | fast, very sloppy. |
| 16 | Judge, we followed this bill from its inception, and |
| 17 | there was loads of stuff in there that made no -- you know, we |
| 18 | were able to get some of the terrible language out of there. |
| 19 | But this was drafted, this was thrown together in -- I'm going |
| 20 | to say it -- in a fit of rage.  That's what this is.  This is |
| 21 | an angry response to *Bruen*.  And they threw everything they |
| 22 | possibly could into this bill and this was not carefully |
| 23 | drafted.  And there's some real mess here. |
| 24 | Now, I understand that it's not the job of the Court |
| 25 | to clean it up, but we're asking the Court, and we do think |

1   it's the job of the Court to say when something is drafted in a

2   way that's unconstitutional.  And that's the problem that the

3   State has.

4           THE COURT:  Well, and I'm being called upon to

5   resolve the issue of whether or not to restrain the

6   enforcement, but within that calculation, it seems to me, the

7   Court would be obligated to construe those terms.  Because once

8   I've construed those terms, which I think should be narrowly

9   construed because that's what *Bruen* calls for, I think to

10  construe them quite broadly disobeys the dictate of *Bruen*.

11          But if I were to construe them narrowly, then that

12  would then go to the issue of irreparable harm, et cetera, that

13  the plaintiffs have brought forth.

14          Do you agree with that?

15          MR. SCHMUTTER:  We do, Judge, if the construction

16  eliminates the constitutional defects.

17          THE COURT:  I understand.

18          MR. SCHMUTTER:  Which it might.  I mean, it could.

19  And we agree that the Court has the power to construe the

20  statute that way, in fact, the obligation under *Bruen*.  We

21  agree with that.

22          THE COURT:  Okay.

23          MR. SCHMUTTER:  I'll just add one final gloss.  The

24  Court's view or the Court's thought about how parking lot might

25  be narrowly construed should be expanded to all aspects of the

```
 1    grounds.  So it's not just a parking lot that should be

 2    construed to be solely for the use of that use, but any part of

 3    the grounds that's solely for the use of that use similarly

 4    should be narrowly construed that way.

 5               THE COURT:  Try that again.

 6               MR. SCHMUTTER:  So as the Court pointed out, it might

 7    be the case that there's a shared parking lot and therefore the

 8    parking lot can't be -- it might be the case the parking lot

 9    could not be prohibited.  But there might be a clearly

10    designated parking lot for the day care.  The day care may have

11    its own clear, designated, segregated parking lot, in which

12    case a construction that says it's only the day care's parking

13    lot that can be prohibited, that would be a reasonable

14    construction.

15               But it might not just be parking lots.  There might

16    be grassy areas.  There might be other grounds.  Real estate

17    comes in a million different forms.  There might be other

18    things, not just parking lots, but other structures, grassy

19    areas, fields, whatever, that might be shared, in which case it

20    should not be construed as part of the prohibition, or it might

21    be specific to the prohibited use, in which case it could be

22    part of the prohibition.  We're just asking that this parking

23    lot concept of narrow construction apply to things that aren't

24    just parking lots.  It's other parts of the grounds that also

25    are specifically designated for that use.
```

```
 1              THE COURT:  Okay.  Fair enough.

 2              MR. SCHMUTTER:  Judge, I think that really does, to

 3   the extent that it successfully eliminates the overflow

 4   problem, that does appear to solve the problem.

 5              THE COURT:  Okay.

 6              MR. SCHMUTTER:  And, Judge, that's really -- that's

 7   really -- that's the thing I wanted to sort of focus on that's

 8   different about this case from Koons, because we think that's

 9   potentially a major problem unless there's a good, narrow

10   construction as appropriate.  Otherwise, Your Honor, I'm

11   available to answer your questions.

12              THE COURT:  All right.  Let me have a conversation

13   with the State then.

14              MR. SCHMUTTER:  Thank you, Judge.

15              THE COURT:  Okay.  Ms. Cai.

16              MS. CAI:  Your Honor, I assume you want to first

17   address the issues raised by the plaintiff?

18              THE COURT:  Yes; the multipurpose.

19              MS. CAI:  Yes.

20              THE COURT:  Because it does seem to me that -- well,

21   answer this question, please:  How can the State justify this

22   multiuse restriction?  Because it does seem to be far more

23   expansive than what Bruen dictates.

24              MS. CAI:  So I --

25              THE COURT:  Because Bruen dictates that the sensitive
```

1   place designations must be narrow and must be restrictive.

2   That's the dictate of *Bruen*.  So it seems to me for the State

3   to come along and say, well, it's any parking lot that's

4   adjoining or associated with, there's no definition here, but

5   that's the argument the State makes.  If it's a parking lot,

6   it's a sensitive place.  So can you talk to me about that?

7            MS. CAI:  Your Honor, yes.  I think the question here

8   is not really a *Bruen* question but a legislative intent

9   statutory interpretation problem.  And I'm not sure if there is

10  really a problem on the specific scenarios that plaintiffs are

11  presenting.

12           So plaintiffs focus on Section 7(a).  But they

13  completely ignore the other scenarios the legislature has

14  already thought about in Section 7(c) and (d).  And so I want

15  to point Your Honor to Section 7(c)(4) in which the legislature

16  is contemplating what happens when someone is transporting a

17  concealed handgun from a prohibited parking lot area.

18           THE COURT:  Wait.  Let me just get there, please.

19           MS. CAI:  Oh, sure.  Yes.

20           THE COURT:  (c)(4), okay.

21           MS. CAI:  Yes.  So that provision contemplates a

22  scenario in which someone is transporting a concealed handgun

23  between your car and a prohibited parking area and a place that

24  is not prohibited.  So exactly the kind of strip mall situation

25  where perhaps they're parking in an area where there is a day

1   care and there are kids coming in and out, but you're going to

2   the pizzeria on the other end of the strip mall.  And it says,

3   "provided that the person immediately leaves the parking lot

4   area and does not enter into or on the grounds of the

5   prohibited place with a handgun," i.e., the day care.  This is

6   not -- they're permitted to do that under Section 7(c).

7           THE COURT:  Okay.  So let's assume you're correct.

8   That deals with parking lot.

9           MS. CAI:  Yes.

10          THE COURT:  Okay.  What about the other argument?

11          MS. CAI:  Yeah.  And then Section 7(d) talks about

12  how a person would not be in violation if they're traveling

13  along a public right-of-way that touches or crosses any of the

14  places enumerated as sensitive, if they abide by the other

15  carry provisions, you know, like carrying it on a holster and

16  all that, which plaintiffs don't challenge.  So if we think

17  about what it is that plaintiffs are theorizing --

18          THE COURT:  Okay.  But you're ignoring the building.

19  That's a concern.  So let's talk about the -- so you've talked

20  about -- okay.  So going back to the language that the

21  plaintiff takes issue with, any part of the buildings, grounds,

22  or parking area of.  So assume I agree with you on the parking

23  area and the grounds, assume I agree with you on that, how do

24  you get around the buildings?

25          MS. CAI:  So the building -- so let's take the

```
 1   scenario, the specific scenario presented by the plaintiff,

 2   Mr. Varga, is the 14-acre church, that the property has a

 3   church and then somewhere else on the property there is a

 4   school.

 5            THE COURT:  Yeah.

 6            MS. CAI:  And he admits that.  The school is

 7   obviously a sensitive place.

 8            THE COURT:  Yeah.

 9            MS. CAI:  And so the building where firearms are

10   prohibited is the school, not the building that is the church.

11   And if an individual is traveling along the pathway between

12   those places, under Section 7(d), they would not be in

13   violation of the statute.  Now --

14            THE COURT:  Let's take the more difficult, the one

15   that he -- so let's assume the pizzeria is on the 3rd floor,

16   the day care is on the 1st floor.

17            MS. CAI:  Right.  So if there's a public staircase

18   from the day care up to the pizza parlor, and assuming the

19   pizza parlor is fine with you carrying firearms, that would not

20   be a violation.

21            THE COURT:  Tell me why.

22            MS. CAI:  Because --

23            THE COURT:  Cite to me the --

24            MS. CAI:  Sure.  Because Section 7(d) says you are

25   not in violation of subsection (a) if the holder is traveling
```

```
 1   along a public right-of-way, i.e., the staircase, that touches
 2   or crosses any of the places enumerated as sensitive.
 3           THE COURT:  So it sounds to me that what you're
 4   saying is that Mr. Schmutter's concerns are really -- he
 5   shouldn't be concerned.
 6           MS. CAI:  I do agree with that, Your Honor.  I think
 7   the haste with which some of these challenges are brought,
 8   they're -- we made the argument that there is no credible
 9   threat of enforcement for some of these specific scenarios.
10   And that's exactly the problem here.  There is no --
11           THE COURT:  So when he stood up, he asked for a
12   stipulation.  It sounds like he got it.
13           MS. CAI:  I don't -- you know, so there are some
14   questions that we would have on -- because we haven't seen the
15   properties in question, right?  So we don't know, you know, are
16   there situations which the day care is run out of the back of
17   the pizza parlor.  There may be a problem.  I mean, that's not
18   even an actual scenario they presented.  But we haven't seen
19   the property at issue for the Varga church scenario.  So are
20   the buildings touching in a way where kids are going in and out
21   of the school into the church?  We don't know.
22           And so if the church is a totally separate building
23   from the school and there's no school activity within the
24   church, then that's fine, yes.  Then we can stipulate to that.
25           Without knowing more about the specific scenario, the
```

```
 1   State can't know, you know, you're not going to be enforced
 2   because we haven't seen the issue that's actually fleshed out.
 3   So I don't want to be in the business of saying Mr. Varga would
 4   not be in violation without having seen the actual property and
 5   what it actually says.  But in general, I do think that there
 6   is a haste to sort of create controversy when there is no
 7   actual controversy.
 8             THE COURT:  Well, I think that I would be a little
 9   reluctant to accuse the plaintiffs of haste if I were standing
10   in your shoes.
11             But it sounds to me that what you are saying is that
12   the concerns that the plaintiffs have are really alleviated by
13   the subsections that you have identified and that if there is a
14   shared parking lot, they are not prohibited from carrying as
15   long as they're going from the parking lot to the location that
16   permits firearms; that if they are in a multipurpose building,
17   they're not in violation of the statute as long as they're
18   going directly from where they're going to the place that
19   permits firearms.  And I think that assuages your concerns,
20   Mr. Schmutter.
21             MS. CAI:  And I can address the specific school's
22   definition.
23             THE COURT:  We're going to get there.  I think
24   that -- there you have it.
25             MR. SCHMUTTER:  If the Court construes these various
```

```
 1    provisions --

 2              THE COURT:  Why do I need to construe it?  You just

 3    got a stipulation.

 4              MR. SCHMUTTER:  Because Sections 7(c) and 7(d) don't

 5    work the way counsel just described them.  They don't do

 6    what --

 7              THE COURT:  Well, if they're stipulating to it and I

 8    so order it, at least for purposes of this temporary

 9    restraining order.

10              MR. SCHMUTTER:  Sure.  It --

11              THE COURT:  So there you have it.

12              MR. SCHMUTTER:  If -- if that -- if it works out the

13    way -- if it solves the specific problems that we identified in

14    the ways we've identified them, yes, it solves the problem.

15              THE COURT:  Okay.

16              MR. SCHMUTTER:  And the TRO could reflect that.  As

17    long as -- I don't want to be caught in the specific language

18    of 7(c) and 7(d).  They don't do what Ms. Cai said they do.

19    And so I want to -- if the Court is going to order something in

20    a TRO that says --

21              THE COURT:  I'm going to -- I'm going to say,

22    assuming however I rule, that this is what they've stipulated

23    to and the plaintiffs need not be concerned that they will be

24    criminally charged with violating this subsection.  There you

25    have it.
```

1          MR. SCHMUTTER:  As I said, Judge, as long as I don't

2     have to live with specific language in 7(c) and 7(d) at my

3     clients' peril, because these don't actually do what they say.

4          If the Court construes it and the order reflects that

5     our actual concerns that were articulated today are in fact

6     solved by this stipulation, then we're fine.

7          THE COURT:  And I think counsel just solved those.

8     Okay.

9          MR. SCHMUTTER:  Thank you, Judge.

10         THE COURT:  So here's my question, Ms. Cai:  Is the

11    School of Rock a school?

12         MS. CAI:  I actually don't know what the School of

13    Rock is.  And I don't think that's actually raised in the -- I

14    don't know what it does.  I don't know if, you know, people go

15    every day and it's regulated by the Department of Education and

16    all that.  But what I can tell you is this:  The school,

17    college, university or other educational institution language

18    has existed in Section 2C:39-5 for at least 30 years.  And

19    plaintiffs have never challenged it before, at least these

20    plaintiffs as far as I know.  So it cannot be a genuine issue

21    to say I'm confused now by what the word "school" means.

22         I will tell Your Honor that we think "school" means

23    the meaning that it has in other parts of the New Jersey code.

24    So it means places where people are regulated by other things

25    that schools must have.

1          So the Department of Education sets a number of

2    restrictions that apply to schools and educational

3    institutions.  You have to have a certain number of fire exits.

4    You need to have certain safety precautions.  You need to have

5    COVID restrictions, all of that.  And I don't think that going

6    to Mrs. Smith's house for bagpipe lessons, even if she calls it

7    Mrs. Smith's School of Bagpipes, makes that place a school.

8          THE COURT:  Okay.

9          MS. CAI:  And I don't think that Mr. Schmutter

10   teaching a CLE class at a law firm turns the law firm into a

11   school.

12         THE COURT:  Fair enough.

13         Are there any concerns -- again, because we are here

14   on a TRO, are there any places that the plaintiffs frequent,

15   and I'm specifically referring to those who have carry

16   permits -- the four of them, right?

17         MS. CAI:  Yeah.

18         THE COURT:  There's four?

19         MR. SCHMUTTER:  Well, we have seven plaintiffs.

20         THE COURT:  But four have permits.

21         MR. SCHMUTTER:  Now five, I think, because Mr. Varga

22   got his permit while this was pending.

23         THE COURT:  Okay.  Are there any places where the

24   plaintiffs who have carry permits who are concerned that they

25   might be in violation of the legislation because it might come

```
 1   within the penumbra of a school?  And the one that comes to

 2   mind is the plaintiff who goes to Bible classes.

 3          Are there any of those -- can I get the State to

 4   commit, are there any of those that the State would genuinely

 5   say constitutes school or educational institution?

 6          MS. CAI:  I don't think so on the facts alleged.

 7          I will say this, Your Honor:  Some of the allegations

 8   as to continuing education classes are so vague that I don't

 9   know what it is that they're going to.

10          THE COURT:  Fair enough.

11          MS. CAI:  So, you know, if it's actually nursing

12   school for an additional degree, then, yes, that's a school.

13   But I can tell you Sunday school within a church, you know,

14   when the adults gather on Wednesdays to study the Bible, that's

15   not a school.  A Tae Kwon Do class is not a class.  A bagpipe

16   lesson is not a school under the definition.

17          So I think for the particular place, I think there

18   are only three plaintiffs that have any --

19          THE COURT:  Motorcycle classes and firearms training

20   were the other ones.

21          MS. CAI:  I don't think those are schools.

22          THE COURT:  There you have it, Mr. Schmutter, see.

23   They're not schools.

24          MR. SCHMUTTER:  Judge, that's very helpful.

25          THE COURT:  For purposes of today's temporary
```

```
 1   restraining order; yes.

 2           MS. CAI:  So I don't think there are any other

 3   questions on the multiuse property and schools definitions, but

 4   if there are, I'm happy to answer them.

 5           THE COURT:  I think it's been resolved for today's

 6   purposes, for the purposes of this motion.  Obviously the

 7   parties are going to have their quarrels down the road, and

 8   this will need to be fleshed out, but I think in terms of a

 9   temporary restraining order.  Okay.

10           MR. SCHMUTTER:  Can I make a suggestion, Judge?

11           THE COURT:  I am always open to suggestions.

12           MR. SCHMUTTER:  Thank you, Judge.

13           THE COURT:  Maybe the two of you should just go talk

14   and we can resolve this.

15           MR. SCHMUTTER:  That would be great actually.

16           If -- however the Court ends up ruling on this, one

17   thing that could be helpful for the PI phase is for the State

18   to proffer a definition that they actually want to live with.

19   Because counsel referenced the Department of Education,

20   referenced regulatory statutes with respect to schools and

21   standards and things like that.  That gets much closer to what

22   folks would understand a traditional school to be.  So maybe --

23           THE COURT:  Right.  And I think that, again, it just

24   seems so odd that the parties should be standing before me and

25   defining what it means.  So how does it work?  That the Court
```

```
 1    adopts the definition that the parties have come up with, which

 2    I'm perfectly willing to do?

 3            MR. SCHMUTTER:  Maybe it results in a stipulation.  I

 4    don't know, Your Honor.  But I'm just saying between now or

 5    when the Court rules, between today or when the Court rules and

 6    the PI phase, maybe there's a conversation to be had about what

 7    counts as school, university, college, or other educational

 8    institution.  Maybe we present the stipulation to the Court as

 9    to what the definition actually is going to be.

10            THE COURT:  And then how does that become implemented

11    for the future?

12            MR. SCHMUTTER:  It becomes -- well, perhaps it

13    becomes a finding, a ruling, a finding by the Court --

14            THE COURT:  Oh, I see.

15            MR. SCHMUTTER:  -- in a preliminary injunction.  It

16    becomes a finding for -- I'm not sure.  It becomes a finding

17    for the preliminary injunction for the rest of the case or

18    stipulation that governs the case through trial.  I'm not sure

19    exactly the mechanics.  But surely the parties can resolve less

20    than the whole case, can resolve certain issues by stipulation,

21    and the Court I believe -- the Court can adopt those.  So that

22    might be the mechanism.  I'm just kind of thinking about it.

23            THE COURT:  I'm open to it.  The parties, I would

24    certainly encourage the parties to talk.  I certainly don't

25    want to be put in the position that I have to prejudge as to
```

```
 1  every single case what a school is or isn't.  If it resolves

 2  the issue, then I welcome it.  Okay.

 3          MS. CAI:  I'll make one just sort of clarification on

 4  that.

 5          THE COURT:  Yeah.

 6          MS. CAI:  We're happy to talk.  I will say plaintiffs

 7  are bringing a void for vagueness challenge.  And that does not

 8  and has never turned on are there examples of circumstances a

 9  plaintiff can think of where they're not sure of what the law

10  is.  And so cases like, you know, Third Circuit's case Fullmer,

11  Supreme Court case Grayned that we've cited talk about just

12  because the law doesn't explicitly cover your CLE class or

13  doesn't say X, Y or Z doesn't make it unconstitutionally vague.

14  And so I think on a PI posture, TRO posture, plaintiffs can't

15  say, well, we have a live controversy just because we've

16  thought of a scenario that in our minds may or may not be.

17          Now, I have come here to alleviate the specific

18  concerns for these specific plaintiffs as described in their

19  affidavits, but --

20          THE COURT:  And I welcome that.  And I think that's

21  welcomed by the plaintiffs.  But to be fair to their argument,

22  though, Ms. Cai, what they are saying is that have been exposed

23  or will be exposed to criminal liability because they're just

24  not quite sure because the legislation reads too broadly, too

25  expansively, and they're just not quite sure whether or not
```

1    having a firearm during Bible class is -- I mean, one could

2    quarrel about whether that's really genuine argument or not;

3    but if it's a genuine fear, then I think that's alleviated by

4    what we just -- by what has occurred here.

5              MS. CAI:  I agree that it has been alleviated.  My

6    point is just that, as a matter of sort of zooming out from

7    this particular case and this particular argument, for the

8    purposes of a plaintiff establishing a successful void for

9    vagueness claim, every plaintiff who brings such a claim says I

10   have confusion or I am going to be affected by this.

11             Many of them under this Court's precedence and the

12   Supreme Court's precedence are not successful and cannot be

13   successful just because they've raised a situation which is

14   theoretically possible.  That's all I'm saying in terms of the

15   precedence.

16             THE COURT:  Fair enough.

17             MS. CAI:  That said, I think we have resolved the

18   specific dispute here.

19             THE COURT:  Fair enough.

20             MS. CAI:  Thank you, Your Honor.

21             THE COURT:  Okay.  So let me hear you as to the

22   remaining arguments that you have.  And if you could focus on

23   in your remarks to me the issue of standing.

24             MR. SCHMUTTER:  Well, Judge, I'd like to answer Your

25   Honor's questions in regard to standing if Your Honor has

```
 1   questions.  I mean, I really think it's been fully briefed.  If
 2   Your Honor wants me to go through the argument, I can, but I
 3   think if Your Honor has any questions or issues, I'm happy to
 4   answer them.
 5           THE COURT:  So I am confident that you read the
 6   Court's prior decision in Koons.
 7           MR. SCHMUTTER:  Yes.
 8           THE COURT:  And so one of the issues that the Court
 9   focused on in Koons with respect to standing, in the Koons
10   case, the sensitive places that were challenged there really
11   were part and parcel to their everyday life.  And so that
12   motivated the Court.  That was what animated the Court's
13   decision to find standing.
14           Museums I didn't parse out, libraries and museums.  I
15   didn't parse that out as specifically as perhaps I could have.
16   But some of these sensitive places designations here seem to me
17   one could say are not necessarily part of one's everyday life.
18   Could you respond to that?
19           MR. SCHMUTTER:  Yes, Your Honor.
20           So let me just take a slight step back and point out
21   that our facts are more granular and more specific than in
22   Koons.  We think that the Court's ruling in Koons as to how to
23   understand and look at standing is actually correct, but we
24   actually present the Court with even more granular facts.
25           We have people specifically going to museums and
```

1    libraries.  We have people going to parks and beaches and

2    playgrounds.  We have people going to racetracks specifically.

3    So we actually provide the Court with a very full and detailed

4    record as to those standing facts.

5           Now --

6           THE COURT:  And I don't necessarily -- you'll agree

7    with this:  I don't necessarily need to resolve the issue --

8    although I think I will -- resolve the issue of standing as to

9    the sensitive place designations in Koons because I've already

10   restrained the enforcement of those.

11          MR. SCHMUTTER:  Right.

12          THE COURT:  So focus your argument, your comments, if

13   you will, please, on the other designations.

14          MR. SCHMUTTER:  Absolutely.

15          And we note that it's actually very interesting the

16   breadth issue, because the State -- the legislature very

17   specifically grouped certain things together.  And we think it

18   is correct to look at the groups as a whole for standing

19   purposes.

20          So you don't need standing for each element of

21   7(a)(9) -- I'm just picking one out of thin air -- or 7(a)(10).

22   You don't have to have standing for each one of those to knock

23   out that whole.

24          And we believe the reason --

25          THE COURT:  Oh, is that so?

1    MR. SCHMUTTER:  Well, we believe the reason for that

2    is because what the State has actually done here -- and we've

3    briefed this in a slightly different context.  The State is

4    intending to aggregate categories for the purposes of the

5    historical analysis under *Bruen*.  So what they're doing is

6    they're creating these sort of artificial categories of

7    unrelated things and saying constitutional activities or

8    crowded areas.  And by doing that, they are trying to solve

9    their numerosity problem.

10    As the Court is aware, because this is all over the

11    Koons decision and all over *Bruen*, of course, you cannot

12    establish historical tradition with outliers.  One, two, three,

13    none of that counts.  And of course, the Court was talking

14    about 3 out of 13 colonies.  If they're going to try to rely on

15    19th Century citations, which of course we've addressed, we've

16    talked about that, but if they're going to try to rely on 19th

17    Century, we're talking about 30 and 40 states already.  So one,

18    two and three examples are absolutely not going to count.

19    So this is what they're doing.  Their strategy is to

20    group things in ways that allow them to try to sort of truck in

21    these piles and try to say, well, no, it's not just one, two or

22    three.  It's actually four, five, six or whatever because these

23    are all similar in some important way.  But you can't do that.

24    THE COURT:  Right.

25    MR. SCHMUTTER:  You can't take dissimilar items and

1    say it's crowds.  I mean, we know that *Bruen* specifically

2    disallowed the concept of crowdedness as a basis for this.

3              And it's pretty clear what they're doing and why

4    because they don't have numerosity.  They don't have a

5    tradition of any of this stuff.  These are all isolated

6    examples, none of which count.

7              THE COURT:  And by "numerosity," because you use that

8    in your brief, numerosity you mean?

9              MR. SCHMUTTER:  Having enough.

10             THE COURT:  Analogs.

11             MR. SCHMUTTER:  Having enough citations, correct.

12   Having enough citations to be a tradition.  Remember*, Bruen*

13   says you have to show a tradition.  Traditions have a

14   numerosity element and a longevity element.  And so a tradition

15   is widespread, right?  Can't just be Tennessee.  It's got to be

16   a widespread tradition in the United States.  That's the

17   numerosity problem.  And it has to be long-lasting.  So a

18   statute like in Texas that's around for a year and then gets

19   repealed or amended doesn't count either.  And *Bruen* is very

20   clear about this.

21             What's great about *Bruen* is it goes into so much

22   detail about how to think about these things and how to

23   understand the historical record, which is why the Court in

24   *Bruen* discards all of the stuff that New York tries to throw at

25   it because it's just random things here and there.  That's

```
 1    exactly what New Jersey is doing.  And so they're trying to
 2    end-run around that by aggregating things that really should
 3    not be properly aggregated.  And it relates to standing because
 4    that's what they've done in the statute.  They've aggregated
 5    things in the statute.
 6            Their position is, a particular line of them,
 7    7(a)(9), 7(a)(10), 7(a)(11), whatever, to the extent that it
 8    lists four or five things, they're saying those are similar in
 9    relevant ways, therefore, we get to -- we don't have to show
10    numerosity for parks because we can show parks, beaches,
11    playgrounds, the similar things as they've aggregated them.
12            So if they're going to try to do that, if the
13    legislature is going to try to do that, which we think is not
14    proper for --
15            THE COURT:  Then you're going to try to do it with
16    respect to standing?
17            MR. SCHMUTTER:  We're saying that the Court can find
18    standing in the aggregate as well.
19            Now, we don't think the Court needs to in our case
20    because we have such granularity and such detailed standing
21    facts, but the Court can find standing in the aggregate in that
22    way because of the choice that the legislature made.  That's
23    really the only reason I addressed that.  We don't think the
24    Court has to do it to give us the relief we're looking for, but
25    we think the Court can do it, and we think that would be an
```

```
 1  appropriate --

 2          THE COURT:  Let me see -- I want to make sure that I

 3  understand your argument.

 4          So are you saying that -- because in the Koons case

 5  the Court restrained the entire subpart, I called it, and I did

 6  so because for the reasons that I set forth in the Opinion.

 7  Are you saying that I should not -- and I left that issue open

 8  in Koons, by the way.

 9          MR. SCHMUTTER:  Correct.

10          THE COURT:  That I should not parse out the subpart?

11  So, in other words, if I find that there's standing as to

12  zoos -- so let's do parks and beaches and recreational

13  facilities, they are all in one subpart, right?  Am I right?

14          MR. SCHMUTTER:  I'm sorry.  Parks and beaches, yes.

15          THE COURT:  Parks, beaches, and recreational

16  facilities.

17          MR. SCHMUTTER:  That's one subpart, Judge.

18          THE COURT:  One subpart.

19          Are you saying that I need not parse those out if I

20  find standing as to parks and I don't need to find standing as

21  to beaches or recreational facilities; is that what you're

22  saying?

23          MR. SCHMUTTER:  Correct.  Because let's take the best

24  example which is number 21.  There are 17, 18, 20 different

25  lists there.  Healthcare facility including, but not limited
```

1    to, general hospital, special hospital, psychiatric -- I'm not

2    going to list all of them.  It's an entire paragraph.  There's

3    probably 25 different items.  The idea that plaintiffs have to

4    show standing as to all 25 of those is preposterous.

5         The State has deliberately said we think these are

6    similar in a relevant way and therefore -- because they could

7    create a list, they could get as granular as they want to and

8    create a list of 50 different things just by giving them

9    different names.  The idea that you have to have standing as to

10   each one of those 50 items simply because they've given them

11   slightly different names can't possibly be required under

12   *Lujan*.

13        THE COURT:  At this stage or at any stage?

14        MR. SCHMUTTER:  At any stage.

15        THE COURT:  Because that's what the Court in *Antonyuk*

16   did.  The Court in *Antonyuk*, of which I find the reasoning in

17   that case very persuasive, that Court went through every single

18   sensitive place designation, parsed out parks, zoos.  You're

19   saying that I need not?

20        MR. SCHMUTTER:  It's not required.  The Court doesn't

21   have to do that.

22        Now, as I indicated -- well, for example, let's look

23   at 21 because it's a great example.  Our best plaintiff as to

24   21 and 22, which are these sort of medical and treatment

25   facilities, is Mr. Siegel.  Mr. Siegel is a nurse practitioner.

 1   Mr. Siegel is in the healthcare business.  Does he have to go

 2   to every one of these 25 things in order for us to challenge,

 3   broadly challenge 21?  You know, you're going to have 50

 4   plaintiffs.  You're going to have 100 plaintiffs to do that.

 5   That's not -- the standing doesn't require that.

 6          And, again, one of the most important reasons why

 7   that's true is because this is a choice that the legislature

 8   made.  The legislature grouped these together on purpose

 9   because the legislature thought that these were relevantly

10   similar in why they are entitled under *Bruen* to prohibit these.

11          And so if we're going to do it -- if this is a *Bruen*

12   challenge, which it is, we get to hold the legislature to that

13   choice and say if you think these are similar, we get to

14   challenge them as similar; and therefore, we don't have to get

15   as granular as 25 different items.  That would be the

16   reasoning.  It's based on the choice of the legislature.  And

17   although we don't think the Court has to do it for everything

18   because we actually have a lot of --

19          THE COURT:  Overlapping.

20          MR. SCHMUTTER:  -- facts, the burden would be

21   overwhelming and not required by *Lujan*.  That's basically what

22   we're saying there, Judge.

23          THE COURT:  Okay.

24          MR. SCHMUTTER:  I think I answered Your Honor's

25   question.  Was there something I didn't get to on the question,

1   standing question that Your Honor raised?

2         Oh, yes.  Your Honor was asking about non -- things

3   that are not part of one's daily life.  And I don't think I got

4   to that, right?

5         THE COURT:  Yes.

6         MR. SCHMUTTER:  Right.  I want to make sure I get to

7   that.

8         So I'm assuming Your Honor is talking about things

9   like movie sets or I assume that includes news.

10        THE COURT:  There's probably -- most of us in this

11  courtroom have never come upon a movie set.

12        MR. SCHMUTTER:  I have, many times.  I mean, Your

13  Honor, here's a good example actually --

14        THE COURT:  Yeah.

15        MR. SCHMUTTER:  -- when they were filming the

16  Sopranos movie.  I was at the courthouse in Newark and I was

17  walking to Hobby's Delicatessen to get lunch and one of the

18  scenes was filmed right in front of Hobby's.  That whole street

19  was shut down.  So it is my tendency to -- I came upon this

20  street where it looked like it was with cars from the '60s.  I

21  saw cameras.  I saw everything.  I walked right up to them and

22  said, Oh, what are you filming?  And they said, Oh, we're

23  filming a documentary on the history of Newark, which I knew

24  was not true because I knew they were filming Sopranos.  But

25  the point is I engaged them, and I was also going to Hobby's

```
 1   for lunch.  Well, the only way to get to Hobby's was to walk

 2   across the set.  So people run into this stuff all the time.  I

 3   mean, maybe I just happen to attract movie sets, but --

 4            THE COURT:  Well, I think that you -- I don't want to

 5   get too bogged down in movie sets, but --

 6            MR. SCHMUTTER:  It could also be a news site where

 7   they're filming a news report.  That seems like it would fall

 8   within the language here.

 9            THE COURT:  But I think that your arguments are more

10   persuasive at the preliminary injunction stage as opposed to

11   the temporary restraining stage, Mr. Schmutter.  I mean,

12   unless -- and I didn't see it in the declarations, unless

13   there's a movie set going on within the near future that the

14   plaintiff knows about, it seems to me that it's sort of a *Lujan*

15   problem, which is it might happen some day, which I'm not

16   quarreling with you for which there would be standing.  I'm

17   just not so sure there's standing at this stage.

18            MR. SCHMUTTER:  May I offer something in response,

19   Judge?

20            THE COURT:  Sure.

21            MR. SCHMUTTER:  So we understand that the standing

22   analysis is a little bit different for this than for a

23   restaurant, right?  I go to restaurants all the time.  I go to

24   restaurants with liquor licenses.  I go to Chili's and they

25   serve beer, whatever.  The problem under *Lujan* is that if this
```

```
1   is an insufficient showing of standing, you're never going to

2   be able to show standing and never be able to challenge this

3   because these are --

4           THE COURT:  No.  Mr. Schmutter, at this stage.

5   Remember, we're here on temporary restraints.  We're not here

6   on a preliminary injunction hearing.

7           I don't think the State's going to stand up and

8   quarrel that you have an issue on standing at all.  I think

9   they're quarreling with the -- and there's always a blur

10  between imminent injury, there's a blur with respect to

11  standing, and it's hard to sometimes parse those out.  I

12  don't -- I think that it's an issue that's going to be

13  resolved.  I'm just not so sure at this juncture you've shown

14  standing.

15          MR. SCHMUTTER:  Judge, if the State is willing to

16  stipulate that they're not going to object to that aspect of

17  standing at the PI stage, we'll be happy with that.

18          THE COURT:  Oh.

19          MR. SCHMUTTER:  I mean, I think they're going to

20  continue that argument.  I think they're going to --

21          THE COURT:  Oh.  We're getting somewhere.  Let me

22  find out.

23          Ms. Cai, you agree they have standing at the PI

24  stage?

25          MS. CAI:  It depends on the -- well, so we have four
```

1  different standing arguments.  Right now I think we're only

2  talking about the imminence problem, with respect.

3          THE COURT:  Yes.

4          MS. CAI:  So without conceding anything on the other

5  three.

6          I think there are a few places where the plaintiffs'

7  own allegations are so vague that they would ever go back to

8  that place or at least within the scope of the litigation that

9  there may be a problem.

10         But with respect to some of these where they say they

11 go a few times a year, we're not challenging their ability to

12 show imminence for that at the time, yeah.

13         THE COURT:  Okay.  Let's have that conversation,

14 okay?

15         MS. CAI:  Yeah.

16         THE COURT:  Because if it alleviates the Court having

17 to resolve them at the temporary restraining order stage, I

18 would welcome that opportunity.

19         Let's go through them.  Public gathering, what's the

20 State's position?  They'll eventually show standing or not?

21         MS. CAI:  Sorry.  I couldn't hear Your Honor.

22         THE COURT:  Public gathering.

23         I think there you will concede standing because your

24 argument there is, well, if they want to know if it's a public

25 gathering, go to the website, which, you know, we can talk

```
 1   about that some other day, but --
 2              MS. CAI:  Sure, Your Honor.
 3         So I think with respect to public gatherings, you
 4   know, their current allegation is they -- so the only three
 5   plaintiffs who talk about it are Siegel, Cook and DeLuca.  They
 6   say the same thing, that they have chanced upon it from time to
 7   time.
 8              THE COURT:  Okay.
 9              MS. CAI:  You know, for me that's a little harder to
10   know whether or not within even the timing of this litigation
11   or even, you know, in the next few years whether or not that's
12   going to happen.  So we would say the plaintiffs have a burden
13   to show something more specific on that particular claim.
14              THE COURT:  Well, but the State is in possession of
15   that.  The State is in possession of permits that are in the
16   area where the plaintiffs live, right?
17              MS. CAI:  I suppose that's true.  But that doesn't
18   mean that the plaintiffs are, you know, likely or, you know,
19   will chance upon them in the future.
20              THE COURT:  Well, let's see how it goes.
21         How does the argument go, that they don't have
22   standing because they haven't been able to show that there's a
23   public gathering scheduled any time soon during the pendency of
24   the litigation?  Is that how the argument goes?  That seems a
25   little silly.
```

```
 1           MS. CAI:  For the PI stage, yes, it is.  Because the

 2   PI would have -- well, so just as the TRO -- sorry, Your Honor.

 3   I should be standing.  Just as the TRO inquiry is whether or

 4   not the plaintiff will suffer irreparable harm during the

 5   period in which the TRO is in effect, so for this case perhaps

 6   the next three weeks or so, that's their burden to prove.  For

 7   the PI stage, it is a longer time frame.

 8           THE COURT:  Yeah.

 9           MS. CAI:  But it would be within -- you know, we

10   don't know exactly how long the litigation is so they don't

11   have to be so specific.  But it can't be, "At some point in my

12   life I may chance upon a movie set."

13           THE COURT:  Fair enough.  Let me rephrase.  Do you

14   concede that there will be a public gathering between now and

15   the end of the PI stage?

16           MS. CAI:  I don't know with respect to these

17   plaintiffs in particular.  But I admit that that's a closer

18   question.  There are some other ones where there are more

19   serious questions.

20           THE COURT:  No.  I'm just trying to resolve some of

21   these issues that I, frankly, don't think need to be addressed,

22   because I think -- let me just put it out there.  I think that

23   by the time we get to the PI stage, the State could not

24   challenge plaintiffs' standing as to public gathering.  It's an

25   issue that has to be resolved.  And I don't know how else a
```

 1    plaintiff resolves the issue other than the State denying that

 2    there will be no public gatherings for which a permit is

 3    required for the next six months.  And I don't think the State

 4    can do that.

 5              MS. CAI:  Understood, Your Honor.  I will say, we are

 6    here on a TRO, not the PI.  And so all that Your Honor has to

 7    resolve today is whether or not a TRO is required for that

 8    provision.

 9              THE COURT:  I know, Ms. Cai.  But he's willing not to

10    pursue a TRO on a public gathering if there's a concession that

11    the plaintiffs have standing at the PI stage.  He's willing not

12    to push that.  Why wouldn't the State take that?

13              MS. CAI:  Okay.  So, Your Honor, I think -- I think

14    for that one, fine, sure.  But not -- you know, we have to go

15    through them one by one.

16              THE COURT:  We are.  We're going to.

17              MS. CAI:  Okay.  All right.

18              THE COURT:  I don't know why the State wouldn't

19    accept what Mr. Schmutter's offering; that if the State is not

20    going to object as to standing at the PI stage as to some of

21    these issues, he is willing to withdraw his application for a

22    temporary restraining order as to some of these.  Why wouldn't

23    the State take that?

24              MS. CAI:  I'm sorry.  I did not understand

25    Mr. Schmutter to be saying that.

```
 1              THE COURT:  Am I right?

 2              MR. SCHMUTTER:  Yes.

 3              THE COURT:  Yes.

 4              MS. CAI:  Okay.

 5              THE COURT:  You got a concession on public gathering.

 6              What's the other ones that we were discussing?

 7              MR. SCHMUTTER:  Film location.

 8              THE COURT:  Film location.  Stipulation on that?

 9              MS. CAI:  No, Your Honor.  And that one, the

10    plaintiffs, so the only plaintiffs who talk about it are Siegel

11    and Cook.  So at least for public gatherings they say they

12    chance upon them from time to time and that will happen.

13              THE COURT:  Yeah.

14              MS. CAI:  For movie sets they have no allegation as

15    to imminence at all in their allegations.

16              THE COURT:  No.  No.  No.  And he's willing to

17    concede and he's willing to withdraw the TRO if the State

18    agrees that there's standing at the PI stage.  And they have

19    alleged that they've come upon movie sets.

20              MS. CAI:  Right.  So I think the problem there is

21    that for movie sets, they not only have a PI stage problem,

22    they have a general Lujan problem.  So just as the plaintiff in

23    Lujan said I will at some point go to Egypt and Sri Lanka and

24    all these places to view the endangered species, I can't tell

25    you when, I don't have a plane ticket, the Court said that is
```

1   not enough for standing.  The same is true for the movie set.

2   So the State cannot stipulate that at the PI stage or in

3   general there is standing.

4            Now, plaintiffs can cure the defects in standing from

5   their affidavits by just submitting more specific future

6   intentions.

7            THE COURT:  What would they say?  We know that

8   there's going to be a film, there's going to be a movie filmed

9   in May in Camden, New Jersey and we want to go to it?  Is that

10  what they would say?

11           MS. CAI:  They could say, you know, my block or the

12  street that I go to often has had movie sets frequently, and I

13  anticipate having this problem, facing this problem within the

14  scope of the litigation and so therefore I need a PI to address

15  that.

16           THE COURT:  But isn't that what they said already?

17           MS. CAI:  No, they have not said that.  Their

18  allegation says they have at some point in the past encountered

19  a movie set and approached to inquire.  But we have no idea if

20  that was 10 years ago, 20 years ago, whether or not it is at

21  all likely that it will happen to them within the scope of the

22  timing of the litigation.

23           So on that, the plaintiffs -- or sorry, the State

24  cannot concede that there would be no imminence problem for

25  standing during the scope of the litigation.

1            THE COURT:  Okay.

2            MR. SCHMUTTER:  Judge, the standard that the State

3    just articulated, no plaintiff will ever have standing to

4    challenge that.

5            THE COURT:  It seems to me.  And that seems

6    problematic, doesn't it?

7            MR. SCHMUTTER:  Yes.

8            THE COURT:  Yeah.

9            MS. CAI:  Your Honor --

10           MR. SCHMUTTER:  I'm sorry.  They're asking for

11    someone who says, well, my block has a lot of movies so I'm

12    going to be going to those movies.  Nobody can say that.

13    Nobody can say that unless you live in Manhattan maybe, but you

14    know...

15           THE COURT:  Well, I guess the issue that concerns me

16    is so that this entire litigation is resolved, at the end of

17    the day, the Court finds, if I agree with the State, that the

18    Court finds that there's been no standing challenge as to --

19    let's just take their position -- as to the movie sets and as a

20    result that issue can't be resolved; but what happens is the

21    next time someone wants to go to a movie set carrying a

22    firearm, a new lawsuit is filed, it just seems to be such a --

23    it just seems -- why wouldn't the State be interested in

24    resolving the challenges to this legislation at once?  Why the

25    piecemeal litigation?  Seems to me, but --

1          MR. SCHMUTTER:  The State is trying to take a

2     position to prevent any plaintiff from ever really having

3     standing.  That's what they're doing.  And that's

4     inappropriate.  *Lujan* doesn't require that.

5          MS. CAI:  Your Honor, may I respond?

6          THE COURT:  Sure.

7          MS. CAI:  So, first of all, the standing problem is

8     not the State's burden to prove or disprove.  It's the

9     plaintiffs' burden at all times.

10         THE COURT:  I agree with that.

11         MS. CAI:  And with respect to whether or not

12    theoretically it's true that no plaintiff could challenge the

13    statute, I disagree with that.  Even if that were true, the

14    Supreme Court has explicitly said in *Clapper* that is not a

15    reason to find standing.  So even under that extreme

16    hypothetical, which I don't think is accurate, that is not a

17    basis to find standing, and that's plaintiffs' only argument

18    for why there is standing.

19         THE COURT:  Right.  But the question that I posed to

20    the State, though, Ms. Cai, is why wouldn't the State want to

21    waive its challenge to standing and resolve all of the

22    constitutional challenges to this legislation to prevent the

23    merry-go-round of litigation revolving around this litigation?

24    That's the question.

25         MS. CAI:  So --

```
 1              THE COURT:  The Court can't force you to do that.
 2    But wouldn't it be a wise thing to do?
 3              MS. CAI:  Your Honor, the initial premise is standing
 4    is a jurisdictional question.
 5              THE COURT:  Which you can waive.
 6              MS. CAI:  No, we cannot.
 7              THE COURT:  You can't waive the opposition --
 8              MS. CAI:  We cannot waive standing.  So that is a
 9    fact of, you know, black letter law.  Jurisdictional questions
10    as to the Court's jurisdiction for whether or not it has
11    Article III jurisdiction over the case is not something we can
12    waive.
13              THE COURT:  No; I agree with that.  But if you
14    stipulate to it --
15              MS. CAI:  That does not prevent the --
16              THE COURT:  If you stipulated to it, then I have
17    jurisdiction.
18              MS. CAI:  I do not believe that is correct, Your
19    Honor.  I'm sorry.  Parties cannot waive jurisdiction.  And
20    that is a black letter tenet of how courts operate under
21    Article III.
22              THE COURT:  So here's where we're going to leave it.
23    We're going to move on.
24              MR. SCHMUTTER:  Can I help, Judge?  I'm sorry.  I
25    interrupted Your Honor.  I apologize.
```

1          THE COURT:  Well, maybe.  Go ahead.

2          MR. SCHMUTTER:  The parties can't stipulate to

3    subject matter jurisdiction, but the parties can stipulate to

4    facts or law that the Court may use to find jurisdiction.

5          THE COURT:  Okay.

6          MR. SCHMUTTER:  I believe that's what Your Honor is

7    asking the State.

8          THE COURT:  And that is my understanding of the law.

9    And we're going to leave it at this.  Here's what I would say:

10   It seems to me to be a prudent decision on the part of the

11   State to stipulate to the issue of standing as to all of the

12   challenges of this legislation so that the constitutionality of

13   it can be resolved in one fell swoop as opposed to inviting a

14   merry-go-round of litigation.  That's all I'm saying.  Can I

15   force the State to do that?  Of course I can't.  And we're

16   going to leave it at that, okay?

17         All right.

18         MR. SCHMUTTER:  Are there any other questions I can

19   answer, Your Honor?

20         THE COURT:  No.  Let me have a conversation with

21   Ms. Cai.

22         MR. SCHMUTTER:  Thank you, Judge.

23         THE COURT:  Thank you.

24         Ms. Cai, I wanted to focus on the arguments that --

25   and as I indicated earlier, I don't see a reason why I should

```
 1  deviate from my finding in Koons.  But I did want you to focus

 2  on the two arguments that you have made that have criticized

 3  the decision: the private property argument as well as the

 4  government as proprietor.  Could you address those comments?

 5          MS. CAI:  Sure.  Do you want me to do it in that

 6  order?

 7          THE COURT:  Well, however you wish.  Yeah.

 8          MS. CAI:  Okay.  So I'll do that first and then sort

 9  of come back because I do want to respond to some of what

10  Mr. Schmutter said as well as go over some of the new

11  provisions that are being challenged here that I think do

12  not -- the conclusion does not follow from the Koons decision.

13  But I'm happy to start.  I can start with the government as

14  proprietor example.

15          And so I think in the provisions challenged in Koons,

16  the issue came up with respect to public libraries and public

17  transit vehicles, and I think, you know, the same problem will

18  also --

19          THE COURT:  And I agree with you that my comment

20  about not limited to public museums was erroneous.

21          MS. CAI:  Understood, Your Honor.

22          THE COURT:  It doesn't -- I'm not persuaded that I

23  should change my Opinion.  That will be for you to tell me to

24  do so and persuade me, but I agree with that.

25          MS. CAI:  Sure, Your Honor.  And we weren't coming
```

1  today to try to, you know, reverse the TRO decision.  The PI

2  schedule we proposed is relatively quick, and so we can revisit

3  all of that at that stage.

4            THE COURT:  Which we have to talk about, by the way,

5  yeah.

6            MS. CAI:  Yes, Your Honor.

7            So with respect to the government as proprietor

8  issue, I think that actually wasn't really fleshed out very

9  much I think in Your Honor's Opinion in Koons because that just

10  didn't come up in that same way.  And it applies in this case

11  both to the provisions that I just mentioned in Koons, but also

12  to things like airports and other buildings that the government

13  happens to own that, you know, just are in the marketplace, so

14  to speak.

15            And so there, I think, the Court of Appeals decisions

16  in *Bonidy*, which is about the postal service, and *Class*, which

17  is about the Capitol building parking lot, are very

18  instructive.  And --

19            THE COURT:  But they all predate *Bruen*, though.

20            MS. CAI:  Yes, Your Honor.  But specifically -- so if

21  you look at *Class*, for example, the decision as to the

22  government as proprietor aspect of it was specifically not

23  about the interest balancing at all.  It was about whether or

24  not the text of the Second Amendment even covers these types of

25  buildings to begin with or these types of properties to begin

1  with.

2         And I think one sort of concept to think about is if

3  the parking lot happened to be owned by a private owner, and

4  that's the same for, you know, I believe the Prudential Center

5  has a private owner, but PNC Bank Arts Center is partly owned

6  by the state, for example, the government as proprietor would

7  be subject to different rules about what weapons it can

8  prohibit or other things to protect its customers if it

9  couldn't -- versus the private owner, right?  And so that's the

10  problem with the government as proprietor.

11         If the government happens to own a building,

12  especially if it's just competing in the marketplace with other

13  private owners, and you see this concept in the Commerce Clause

14  context as well.  So when the government is a market

15  participant, it's exempt from some of these Commerce Clause

16  challenges for the same reasons.  That's what we're getting at

17  with some of these provisions.

18         And I think with respect to certainly some of these

19  entertainment venues, buses, right?  There's the Lakeland Bus

20  which is private and there's NJ Transit.  You can take either

21  to go to Newark Penn Station.  No one would dispute that

22  Lakeland, the company, can say no guns on our buses.  And so

23  when the government happens to be competing with the private

24  bus service, we don't think it's logical to say -- and this is

25  just all about whether or not the Second Amendment even covers

1   this kind of restriction -- it's not logical to say the

2   government can't similarly prohibit firearms on the public

3   buses that compete with the private buses.

4           THE COURT:  But it seems to me *Bruen* changed that

5   entire analysis.  It seems to me that *Bruen* said that if the

6   State is going to preclude firearms on its own property, it

7   must comply with *Bruen* and there must be a historical

8   tradition.  Because, otherwise, are you saying then that the

9   State of New Jersey can say no firearms in all of the highways

10  that we own?

11          MS. CAI:  So I think that's a little different.

12          THE COURT:  How so?

13          MS. CAI:  Because there, the highways are not the

14  government participating in the marketplace, right?  There are

15  no private highways as far as I'm aware.  So I do agree with

16  Your Honor that the public squares, the proverbial public

17  square is not a place where the government can use the "this

18  doesn't fall within the Second Amendment" argument when it

19  prohibits -- if it chooses to prohibit firearms, and which we

20  have not.  Instead, we're focused on the government as a

21  competitor to private enterprise, and so --

22          THE COURT:  So it sounds like you're saying -- so in

23  those cases, the government's really not the government?

24          MS. CAI:  It is.  Of course, it's still the

25  government.

```
 1              THE COURT:  Right.

 2              MS. CAI:  But the context in which it exists and its

 3  relationship with the public is no different.  So when I go to

 4  a concert at PNC, it's not different from when I go to a

 5  concert at Prudential.  And just because PNC happens to be

 6  partly owned or wholly owned -- actually I'm not sure -- by a

 7  branch of the government doesn't mean that its relationship to

 8  me has changed.

 9              And so I think the Bonidy case talks about the postal

10  service as, you know, it is a government institution but it

11  also, for all intents and purposes, serves the same purpose as

12  a UPS or FedEx or any number of deliverers.

13              THE COURT:  All right.  So square that with Bruen

14  then.  Square what you're saying to me with Bruen.

15              MS. CAI:  Yeah.  So I --

16              THE COURT:  Because Bruen did not make that

17  distinction.  The Bruen Court was very clear, it seems to me.

18  Whether it was privately owned or publicly owned, Bruen didn't

19  make that distinction.  I know the State disagrees with that.

20  Didn't make that distinction whether it's privately owned or

21  publicly owned.  But you got to meet the Bruen test.

22              MS. CAI:  So, Your Honor --

23              THE COURT:  How do you square -- and, again, those

24  cases you rely upon are before Bruen.  Help me understand how

25  you square that with Bruen.
```

1          MS. CAI:  Yes, Your Honor.  I think *Bruen* doesn't

2    squarely address the question of the government as proprietor

3    in the situations I'm talking about.  So that's why we're here.

4    I don't think it forecloses or changes the analysis that the

5    Court -- the Tenth Circuit in *Bonidy* and the D.C. Circuit in

6    *Class* had analyzed.  Because what *Bruen* said was what you can't

7    do is start balancing whether or not the restriction is an

8    appropriate one that serves the government's interest.

9          And I will acknowledge there are parts of the *Bonidy*

10   Opinion that went forward and did that also.  That's not what

11   we're relying on.  And with *Class*, that is absolutely not what

12   we're relying on, because the discussion of whether or not that

13   parking lot adjacent to the Capitol building is protected by

14   the Second Amendment or not is a question about what the Second

15   Amendment covers and not whether or not there are analogous

16   restrictions or whether or not it's a good policy or bad

17   policy.  So none of that was discussed in the part that we're

18   talking about.

19         So I think *Bruen* certainly doesn't answer -- I agree

20   with Your Honor, it doesn't answer the question of what happens

21   when the government happens to be a proprietor and competing in

22   the marketplace with private actors, can it also restrict

23   firearms.  But I think that the logic still applies.

24         There's a separate part of *Bruen*, obviously the part

25   that talks about government buildings as presumptively

1   constitutional sensitive places.

2           THE COURT:  Right.  And I want to set those to the

3   side, okay?

4           MS. CAI:  Yes; understand.

5           THE COURT:  So courthouses, legislative assemblies, I

6   think the *Bruen* Court was very clear that those are

7   appropriately deemed "sensitive places."

8           But I'm still having difficulty understanding the

9   State's argument that if it's government owned, just like the

10  pizzeria owner can say no guns so can the government; that just

11  seems to eviscerate *Bruen*.  And I'm just trying to understand.

12  It sounds to me like you're qualifying that statement, that if

13  it's "government owned."  But I'm not understanding how you're

14  qualifying it.

15          MS. CAI:  So I'll offer this, Your Honor, for this

16  part of the argument, separate from the government buildings as

17  "sensitive places" argument.  I think what you can do is

18  qualify it as when the government acts as a private owner would

19  for that property.

20          THE COURT:  Boy, that seems to be giving -- that

21  seems to be grounds for mischief on the part of the government.

22          MS. CAI:  I'm not quite sure I understand, Your

23  Honor.

24          THE COURT:  Well, because if you're saying well, if

25  they're acting like a private owner, it's giving them, the

1    government, a little bit of wide latitude to decide what they

2    want to do.  And if the dictates of *Bruen* say there's no

3    historical analogs to support the restriction and the

4    government can come back and say oh, but we're acting like a

5    private owner, we can do what we want, it seems to sort of go

6    in circles and eviscerate the holding in *Bruen*.

7            MS. CAI:  Well, the analysis doesn't stop there.  So

8    you can interrogate whether or not that's true.  And courts do

9    that all the time in the Commerce Clause context, right?  Is

10   the government actually acting as a market participant?  You

11   have all kinds of cases about whether or not that's true.  I

12   don't have them at the tip of my tongue today, but we can

13   certainly talk about that in further briefing.

14           But I think that the scope of the Second Amendment

15   issue for both this argument and for the private property

16   argument is something that, you know, that I think the State

17   wants to emphasize.  You know, Your Honor's sort of inviting me

18   to talk about these issues that sort of were addressed in the

19   Koons decision.  I don't want to belabor them too much, but I'm

20   happy to give a few more bars on it if Your Honor wants.

21           THE COURT:  No.  I want to just -- let me just

22   hear -- let me hear what you had to say.  Hang on a second,

23   please.

24           Okay.  I would be interested in knowing the cases

25   that discuss the government acting as a market participant in

1   the Commerce Clause.  I don't think that the State has made

2   that argument clearly.

3              MS. CAI:  Sure, Your Honor.

4              THE COURT:  Certainly at the PI stage.

5              MS. CAI:  I'm happy to do that.  And I think

6   that's -- I don't remember if they cited those cases exactly in

7   *Class*, but what I remember from *Class* is that it talks about

8   how the Capitol grounds ban doesn't even impinge on a right

9   protected by the Second Amendment as opposed to there's a

10  historical tradition or we think that the right violates or

11  impinges on the Second Amendment, but its interest is

12  outweighed by that prior analysis.  That was not even at issue

13  in *Class*.

14             THE COURT:  Okay.

15             MS. CAI:  It was at the very first textual:  Does the

16  Second Amendment cover this stage?  And I believe that the

17  cases were cited there.  But we are happy to give the Court a

18  more fulsome analysis of that.

19             THE COURT:  Okay.  So your argument is and therefore

20  it does not come within the penumbra of the Second Amendment?

21             MS. CAI:  Correct.

22             THE COURT:  Okay.  I think that's going to need to be

23  fleshed out at the PI stage, because I don't think that the

24  State has done a sufficient job in making that argument.

25             MS. CAI:  Surely, Your Honor.  We can do that.

1          And Your Honor wanted me to address the private

2    property issue again.

3          THE COURT:  Yes.

4          MS. CAI:  Okay.  So I think the main point I just

5    want to -- I don't want to belabor this at all -- is just the

6    question of whether or not someone has a presumptive Second

7    Amendment right to carry on someone else's private property,

8    even if the question of permission is unclear, is not something

9    protected by the Second Amendment.

10         THE COURT:  Yeah.  How can you say that?  Help me

11   understand that.

12         MS. CAI:  Yeah.  So there's a few reasons for that.

13   So the first is that *Bruen*, *Heller*, *McDonald* talk about the

14   right to carry under the Second Amendment as a presumptive

15   right in public.  And I think that's very, very important.  And

16   that's language that the Court had used time and again.  And

17   there's no question that whether or not it's a private

18   residence or a small business or any other private property,

19   that's not what the Court was talking about when it said in

20   public.  So --

21         THE COURT:  And so that's how the State is construing

22   the term "in public"?  In public also means in the community,

23   right?  Out in the open and in the community.  And in the

24   community includes private property.

25         MS. CAI:  I think, Your Honor --

1          THE COURT:  I don't see anywhere in *Bruen* where they

2     said it's limited to publicly-owned property.

3          MS. CAI:  I think, Your Honor, the issue with that

4     comes with -- it's important to think about in terms of what a

5     property right does.

6          So I don't think -- and I don't think the plaintiffs

7     are arguing, although I could be wrong -- that there is

8     anything that would support the idea that with respect to the

9     right to exclude at trespass, that there is a different form of

10    property right for someone who has fee simple in their private

11    residence versus their agricultural property versus their

12    coffee shop.

13         THE COURT:  Right.

14         MS. CAI:  The right to exclude could be limited by

15    other laws, such as law against discrimination, you know,

16    *Shelley versus Kraemer*, all of that.  But with respect to

17    whether or not you can exclude individuals from coming onto

18    your property with a firearm, that is not different depending

19    on if you have a home or if you happen to open up that home to

20    selling baked goods, to whether or not you are running a baked

21    goods shop.  You as the property owner has the same right to

22    exclude that has been enshrined from *Blackstone* to present,

23    from *Locke* to present in the same way.  And nothing in *Bruen*

24    would change that.

25         THE COURT:  Right.  And the plaintiffs don't quarrel

```
 1   with that.  The plaintiffs acknowledge that a private property
 2   owner has the right to exclude, right?  And the State can
 3   assist in the regulation of those property rights by if a
 4   private property owner puts up a no guns sign and the plaintiff
 5   ignores it, then that can be enforced under traditional laws,
 6   the no trespassing laws, violating the homeowner's or the
 7   pizzeria's owner's sign.
 8             But it seems to me that what the State is then doing
 9   is saying because the private property owner has that right to
10   exclude, it translates into therefore there is no presumption
11   of the right to carry.  I don't know how you get to that leap.
12   You'd have to show me historical analogs that show that when --
13   let's go to the colonial times -- that when Thomas Jefferson
14   rode on his horse, he stopped at the edge of the acreage and,
15   what, ask if he could carry his firearm onto the property?  I
16   don't think you're going to find such analogs.  What do you say
17   to that?
18             MS. CAI:  Your Honor, we -- so putting aside whether
19   or not the Second Amendment even covers the conduct, we have --
20             THE COURT:  Why wouldn't it?  Tell me about that.
21   Why wouldn't it?
22             MS. CAI:  So if all the government is doing is
23   changing the law of trespass, so the government can change the
24   law of trespass without infringing on the Second Amendment.  So
25   if the government said instead of telling people you need to
```

1  put up a sign to tell people that they are trespassing on your

2  property, instead of doing that, you can actually not put up a

3  sign and instead you can put it on the Internet, if the

4  government said that, for example, in a law and clarified you

5  don't need to put up a sign for any kind of trespass, you can

6  just put it on your own personal website, you know, that's a

7  law that the government can change.  There may be other issues

8  with that, but that's not a Second Amendment problem.

9       THE COURT:  But you're only changing the law of

10  trespass to make it harder for them to carry their firearms.

11  That's the only reason you're doing it.  The law of trespass

12  has worked quite fine over the centuries.  And so aren't you

13  just really dressing up the ability to carry a firearm?  Why

14  are you interfering -- well, not you, why is the State

15  interfering with the law of trespass that has worked quite fine

16  over the years?

17       MS. CAI:  So two things, two responses to that, Your

18  Honor.  So the first is that -- so we can talk about the

19  interests at issue, although I will say that's not really a

20  Second Amendment inquiry.

21       THE COURT:  No.  I don't want to --

22       MS. CAI:  And the Supreme Court has told us not to do

23  that.  But I'm happy to address that, Your Honor, if that's

24  helpful.

25       THE COURT:  Yes.

```
 1              MS. CAI:  Yes.

 2              THE COURT:  Because I don't understand -- I don't

 3   understand the argument.  I want to understand the argument.

 4   But it seems to me that this is a -- that this private property

 5   subsection is a clever way for the State to try to say on the

 6   one hand it's protecting private property owners, but what it's

 7   really doing is preventing the right to carry.

 8              And so you can say what you say, but what you're

 9   doing is not appropriate.  It's unconstitutional.  So you have

10   to persuade me that what you're saying and that what you're

11   doing can live in harmony, and that's where -- that's your job.

12              MS. CAI:  Let me offer up something in the record

13   that demonstrates why the law that the State enacted solves a

14   property rights problem that individuals in the state have.

15   And that is -- so in Exhibit 21 is an empirical study of what

16   people in the public, and there's a, you know, statistically

17   significant sample and all that and at the state level as well.

18   So there are New Jersey respondents to this empirical study

19   that demonstrates not only do people believe that you shouldn't

20   be able to bring a firearm onto someone else's property without

21   their explicit permission, importantly in table A5 and A6, what

22   they demonstrate is that people don't actually think the law

23   does that.

24              So, for example, so I'm quoting to the Court the

25   nationwide data, but --
```

1          THE COURT:  But, Ms. Cai, I'm sorry, then educate the

2     public.  Don't punish the lawful abiding citizens who have a

3     right to carry firearms.  It's that simple, isn't it?

4          MS. CAI:  Well, Your Honor, I think --

5          THE COURT:  Educate the public.

6          MS. CAI:  I think what the State chooses as the most

7     effective method of protecting property owners' rights is a

8     question of state interest and not of the Second Amendment, and

9     here's why:

10          So if the government -- and I think we discussed this

11     the last time we were here as well, but let me just make it a

12     little more crisp, I guess.  If the government went on a radio

13     campaign, TV campaign, saying, you know, instead of enacting

14     section A24, a know-your-rights campaign, telling people you

15     should be putting up signs to prevent firearms on your

16     property --

17          THE COURT:  Not "you should."  Not "you should," but

18     "you may."  "You may."

19          MS. CAI:  I'm sorry.  If you want.  If you want.  If

20     this is your preference.  If you wanted that preference as a

21     property owner known and enforced, this is what you would need

22     to do.  If the government was telling people that and if it was

23     doing that super effectively --

24          THE COURT:  Yeah.

25          MS. CAI:  -- and then 90 percent of the people went

1   out and did that --

2          THE COURT:  Yeah.

3          MS. CAI:  -- it would have the same effect of not

4   allowing individuals to come upon their property, right?

5          But if the plaintiffs' argument is that the effect of

6   the government's choice of protecting private property owners'

7   own preferences gives them less of an ability to carry

8   firearms, they don't have a very successful Second Amendment

9   argument, because it's the preferences of the private property

10  owner that's stopping them from carrying firearms.

11         The government can take action to let the property

12  owners effectuate their personal right to not allow firearms on

13  their property, the complete right to exclude that's been

14  recognized for centuries, but that doesn't affect the Second

15  Amendment.

16         Now, I want to talk about the historical analogs as

17  well because that's the second step of the *Bruen* analysis,

18  whether or not even if the conduct impinges on the Second

19  Amendment, it is nonetheless constitutional if it's rooted in

20  historical tradition.

21         And we can provide the Court more exhibits on this

22  and more historical evidence on this at the PI stage.  But I

23  will note, it doesn't get much better than a pre-founding,

24  lasting through the founding New Jersey law for this very state

25  that has prohibited the same conduct in terms of guns and

| | |
|---|---|
| 1 | trespass.  And I know Your Honor thought that perhaps that |
| 2 | statute only applied to individuals who are trying to poach. |
| 3 | As we pointed out in our supplemental briefs, that is not what |
| 4 | the statute does. |
| 5 | THE COURT:  Well, but you ignored the title of it. |
| 6 | MS. CAI:  Your Honor, the title says both poaching |
| 7 | and guns with trespass.  There are two objects in that title. |
| 8 | And different provisions of the statute prohibited different |
| 9 | actions.  And so poaching was a separate prohibition in section |
| 10 | 2.  To violate section 1, there needed not be any intention to |
| 11 | poach, hunt or anything like that.  And had the government |
| 12 | wanted it to be a poaching-only prohibition, it would not have |
| 13 | enacted section 1. |
| 14 | We have a lot more on this, Your Honor, including |
| 15 | examples of what the statute used to say, what it said |
| 16 | afterwards to give more context. |
| 17 | THE COURT:  Why haven't you presented it to me now? |
| 18 | MS. CAI:  Because, Your Honor -- |
| 19 | THE COURT:  I offered it in Koons.  You see, the |
| 20 | State stands up and says we have so much more, we have so much |
| 21 | more.  But the time for giving that to me has passed.  And I |
| 22 | would appreciate it if you had given it to me now because it |
| 23 | just makes more sense.  Why -- what is the -- what are you |
| 24 | hiding? |
| 25 | MS. CAI:  Sorry, Your Honor.  We're not hiding it. |

```
 1  It was -- we did not think it was appropriate to introduce new

 2  evidence when the TRO has already been fully briefed.  You

 3  know, because Your Honor raised those questions that we

 4  honestly did not anticipate because we thought the law was

 5  clear on its face in the Koons TRO, we were going to try to

 6  revisit that on the PI stage, which is happening very soon.

 7  And so we are not necessarily asking for the Court, like, at

 8  this time to vacate its TRO.

 9          THE COURT:  I know.  All I'm going to say is if you

10  think I got it wrong, I'd rather know I got it wrong sooner

11  than later.  And it's just unfortunate that I keep hearing from

12  you, Ms. Cai, and I don't -- you know, I'm trying to be as fair

13  as I can.  I keep hearing that the State has this evidence, it

14  has this evidence, and I keep asking well, where is it?  Why

15  are you hiding it?  That's the Court -- I think it's a fair

16  question.

17          MS. CAI:  Your Honor, the core evidence is the 1771

18  New Jersey statute, and we think that statute is clear on its

19  face that the prohibition was as to trespassing, just carrying

20  guns on someone else's property without prior written consent,

21  which is even stricter than what we have.

22          THE COURT:  I will look at it again.

23          MS. CAI:  Yes, Your Honor.  But to the extent that

24  Your Honor has questions and thinks that that is ambiguous, we

25  would like to introduce additional evidence to show that it is
```

```
1  not.  And I will point out also that, of course, the 1865

2  Louisiana statute doesn't say anything about hunting, and, you

3  know, that's another example, but there are other ones as well

4  that we can point the Court to if it wishes.

5         So we thought that a founding-era statute and a

6  reconstruction-era statute, especially when one of them was

7  this state, is more than sufficient to demonstrate a historical

8  analog.

9         To the extent that Your Honor is skeptical, we are

10 happy to provide more context for that.

11        THE COURT:  I really do hope to be able to avoid the

12 issue of what governs the reconstruction era or the colonial

13 era.  But that's for another day.  That's for the PI stage

14 obviously, yeah.

15        MS. CAI:  I would love to go through some of the

16 other provisions.  But if you want Mr. Schmutter to respond,

17 I'm happy to do that as well.

18        THE COURT:  Well, I do have a couple of other

19 questions, but let's -- since we're doing it in this order.

20 Thank you, Ms. Cai.  Let me hear you on the private property

21 and anything that you want to respond to.

22        MR. SCHMUTTER:  Yes, Judge.  I'll go in reverse order

23 if that's okay.

24        THE COURT:  Okay.  I'm going to give you folks about

25 ten more minutes.
```

1      MR. SCHMUTTER:  Counsel just said that, referring to

2   the New Jersey statute from 1771, we fully briefed it.  It's a

3   single outlier.  Obviously can't satisfy *Bruen*.  But

4   interestingly, counsel said why would they have -- if it was

5   just about poaching, why would they have enacted section 1 that

6   talks about possession?

7          New Jersey does that all the time.  That is a

8   standard thing that New Jersey does.  It prohibits conduct but

9   also prohibits the conditions that might give rise to that

10  conduct.

11         So one of the best examples is one of the fish and

12  game regs that we're challenging.  You can't possess an uncased

13  firearm in a vehicle if you're out hunting.  That's not

14  because -- that's not because there's anything really

15  inappropriate for having an uncased firearm in a vehicle.  It's

16  they don't want people shooting animals from cars, right?

17  Because in some states you can do that.  In some states it's

18  perfectly legal to hunt from a vehicle.

19         New Jersey doesn't want people to do that, so New

20  Jersey prohibits hunting from a vehicle and then goes the next

21  step to prohibit possession of uncased firearms in the vehicle.

22  That's about hunting from a vehicle.  That's not about any

23  reason why a person should not have an uncased firearm in a

24  vehicle on hunting lands.

25         Now, the effect of that is it prevents the right to

 1   bear arms.  It prevents carry.  But New Jersey is loaded with

 2   that kind of regulatory approach.  They do that constantly.  So

 3   it shouldn't shock me that they tried to do it in 1771.  But

 4   it's incredibly obvious, as the Court already found, that's not

 5   about self-defense.  That's not about somebody walking around

 6   with a pistol or a knife to protect themselves against a

 7   violent attack.  It's about poaching.  It's completely obvious.

 8        Let me deal with the other aspect of private

 9   property, which is that, interestingly, they walked right into

10   the equal protection claim.  Because as the Court commented,

11   you can't just have special rules for people exercising a

12   constitutional right.  You can't.  And it's in our reply brief,

13   and it's an incredibly obvious example.  You could not possibly

14   have a rule that said if you are gay or Black, you have to get

15   explicit permission before you can walk onto private property.

16   You just can't do that.  I don't think anybody would think you

17   can.  It's literally the same.

18        Firearms owners are exercising their constitutional

19   right to bear arms, and it is no different than any other

20   constitutional right.  You can't have special rules.

21        THE COURT:  You would not quarrel with the -- this is

22   my question:  Would you quarrel with the State of New Jersey's

23   efforts to educate the public as to what their rights are?

24        MR. SCHMUTTER:  They did that, for the Eagles-Giants

25   game.  The Attorney General, I think it was on Twitter or maybe

1    on their website or both, the Attorney General said I want to

2    make sure nobody thinks that they can't put a sign up on their

3    bar saying no guns.  That's exactly what they did.  They can do

4    that.

5            THE COURT:  And would you -- if the State ran a

6    public campaign advising its citizens as to what the law

7    provides, would you be coming into court saying that violates

8    your Second Amendment?

9            MR. SCHMUTTER:  If they did specifically what?

10           THE COURT:  Fair question.

11           If the State ran a campaign that said:  Citizens of

12   this state, you should know that you have a right to post a

13   sign that says no guns allowed.  Would you say that violates

14   the Second Amendment?

15           MR. SCHMUTTER:  I'm actually not sure.  I mean, I

16   don't know that -- I don't know that we have to resolve that

17   for this hearing.

18           THE COURT:  It's a hypothetical.

19           MR. SCHMUTTER:  Yeah.  It's actually a really good

20   question.

21           I don't know -- I don't know what the government can

22   and can't say to encourage people to discourage the exercise of

23   a constitutional right.

24           THE COURT:  Well, perhaps therein lies the nuance.

25   Is it encouraging or educating?  We'll leave it at that.

```
 1              MR. SCHMUTTER:  Thank you, Judge.  I -- yeah.

 2              THE COURT:  Fair enough.  Okay.  What else?

 3              MR. SCHMUTTER:  On the government as proprietor, they

 4    get the government/proprietor concept completely wrong.  So,

 5    number one, the government as proprietor cases don't say that

 6    when the government is acting as a proprietor, they get to do

 7    all the same things private parties can do.  They can't.  And

 8    we see this in the First Amendment context.  The government as

 9    proprietor concept in the First Amendment context is entirely

10    based on a form analysis.  You cannot -- the government cannot

11    discriminate on the basis of content of speech even as a

12    proprietor.  So the government cannot prohibit constitutionally

13    protected activity merely because they're a proprietor.  So --

14              THE COURT:  What about the Commerce Clause argument?

15              MR. SCHMUTTER:  Well, I'm not sure what cases they're

16    referring to.  I'd like to read the cases as well, as I know

17    the Court would.  So, of course, for the PI stage we'll be

18    happy to respond to that.

19              THE COURT:  Yeah.

20              MR. SCHMUTTER:  But it's definitely not the case that

21    the government gets to do all the same things a private party

22    can do merely because they're operating some sort of business

23    like a, you know, a concert venue or whatever.

24              THE COURT:  Well, I think their argument is that if

25    it's passing muster under the Commerce Clause cases, of which
```

```
 1    it hasn't been briefed, then it falls within that exception, if
 2    you will.  But, okay.  So --
 3              MR. SCHMUTTER:  But Your Honor's correct, though.
 4    That's all pre-Bruen.  Bruen makes very clear rules.  And this
 5    is one of the very important reasons why that's true.
 6              Even when the government is acting as a so-called
 7    "proprietor," the government still has the ability to implement
 8    government policy in those contexts.  So the government -- if
 9    the government were simply operating a business like another
10    business owner, they might be able to argue, well, you know,
11    they're no different than TGI Friday's, but that's not true.
12    Governments routinely implement government policy when they
13    operate so-called proprietary activities.
14              A state-run hospital, you can be sure that the
15    operation of a state-run hospital implements government policy,
16    political policy.  All government operations do that.  And
17    whether or not they actually do that in a given context, the
18    fact that the government has the power to do that and the
19    ability to do that means they are constrained by Bruen even as
20    a proprietor.  That's a very important concept there.  And
21    that's why Bruen governs even the government operating, let's
22    say, a post office or a government hospital or a PNC Bank Arts
23    Center.  They cannot have the right to implement an antigun
24    policy even in those venues because of Bruen, and Bruen
25    prohibits that.
```

1          THE COURT:  All right.  It will be an issue that I

2     certainly will need further briefing on.

3          MR. SCHMUTTER:  Thank you, Judge.

4          THE COURT:  Okay.  All right.  Thank you all.  I

5     thank you both.  Thank you all.  Yes.

6          MS. CAI:  You wanted to talk about the schedule, Your

7     Honor.

8          THE COURT:  I do.  So I will reserve.  I hope to get

9     a decision as expeditiously as possible.

10          I do want to talk about the schedule.  I don't have

11     any specific dates in mind.  I'm going to give the parties some

12     guidance.

13          I did get the schedule that the State was proposing.

14     In fairness, Mr. --

15          MR. SCHMUTTER:  Jensen.

16          THE COURT:  Is not here.

17          MR. SCHMUTTER:  Right.

18          THE COURT:  And so I want all of you, including

19     Mr. Jensen, to have a conversation about the dates.  I think

20     the dates that are proposed by the State present the

21     problems -- yes.

22          MR. SCHMUTTER:  I'm sorry.  I just wanted to ask, did

23     Your Honor get our letter?

24          THE COURT:  Yes.

25          MR. SCHMUTTER:  Oh, okay.  Because Your Honor didn't

1    mention that.

2             THE COURT:  I was just going to say, present the

3    problems that Mr. Schmutter raises, which is that if I adopt

4    the schedule that's being proposed, it's going to be -- there's

5    going to be a revolving door through the court.  I don't want

6    that.

7             I want to just resolve all of the issues as

8    expeditiously as possible.  I think that Mr. Schmutter makes a

9    good point, which is otherwise we're talking about appeals and

10   remands and appeals and remands.  And that's just -- that

11   doesn't serve any purpose.  It certainly doesn't serve -- well,

12   I'll leave it at that.

13            So I want a proposal that can resolve the litigation

14   all together.  It might be an ambitious one, but I think it's

15   the fairer one.  I think it serves the interest of both parties

16   and certainly the Court that this litigation get resolved in

17   one fell swoop.

18            So the schedule that the State has proposed, I think,

19   does not do that.  I do want you to speak with Mr. Jensen and

20   Mr. Schmutter, Ms. Cai, and come up with when the evidentiary

21   hearings will take place, et cetera, and propose it to me.

22            I know there's been a motion to intervene by the

23   state legislators, and I don't know exactly how that will

24   impact everything.  So I want you to go back sort of to the

25   well and figure that all out.  Yeah.

 1              MS. CAI:  So, Your Honor, I just want to make sure I

 2      understand correctly, so Your Honor wants a PI submission and

 3      hearing on all of the claims from Mr. Schmutter's clients even

 4      though they were not challenged in the TRO stage?

 5              THE COURT:  Yes.  I want everything resolved.  I know

 6      that's ambitious, but I think it serves no -- clearly there

 7      will be an appeal of this Court's decision.  And so it just

 8      doesn't serve while that appeal is pending that we're still

 9      working through other matters which will ultimately get

10      appealed.  I mean, it doesn't serve anyone's interest to have

11      this revolving door, it seems to me.  So I'd like the entire

12      litigation, to the extent practicable -- and it may not be;

13      you'll all tell me that -- to be resolved.  And then you folks

14      can take your controversy elsewhere.

15              MR. SCHMUTTER:  Thank you, Judge.

16              THE COURT:  Okay.  All right.  So I'll wait to hear.

17      I will try to get my ruling to you as expeditiously as

18      possible.

19              I am asking the parties to all get together,

20      including Mr. Jensen, and come up with a schedule that is in

21      line with the comments I've given you.  Yeah.  Any questions?

22              (No response.)

23              THE COURT:  No?  All right.  Good to see you all.

24      Thank you.

25              MR. SCHMUTTER:  Thank you, Judge.

1          THE COURTROOM DEPUTY:  All rise.

2          (Proceedings concluded at 11:27 a.m.)

3          _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

           **FEDERAL OFFICIAL COURT REPORTER'S CERTIFICATE**

4          _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

5      I certify that the foregoing is a correct transcript

6  from the record of proceedings in the above-entitled matter.

7

8

9  /S/John J. Kurz, RDR-RMR-CRR-CRC            January 27, 2023

10 Court Reporter/Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25