## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| RONALD KOONS, *et al.* <br><br> *Plaintiffs* <br><br> v. <br><br> WILLIAM REYNOLDS, *et al.* <br><br> *Defendants* <br> ------------------------------------------------ <br> AARON SIEGEL, *et al.* <br><br> *Plaintiffs,* <br><br> v. <br><br> MATTHEW PLATKIN, *et al.* <br><br> *Defendants.* | Civil Action No. 1:22-cv-07464-RMB-AMD <br><br> **CIVIL ACTION** <br><br> **(ELECTRONICALLY FILED)** <br><br><br> **CONSOLIDATED ACTIONS** |

**SIEGEL PLAINTIFFS' ORAL ARGUMENT REBUTTAL BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION**

Daniel L. Schmutter
HARTMAN & WINNICKI, P.C.
74 Passaic Street
Ridgewood, New Jersey 07450
(201) 967-8040
(201) 967-0590 (fax)
dschmutter@hartmanwinnicki.com
*Attorneys for Siegel Plaintiffs*

## TABLE OF CONTENTS

1. Individualized Ad Hoc Disqualifiers Are Unconstitutional ............................... 1

2. Plaintiffs Have No Burden to Produce Historical Evidence ............................... 2

3. New Jersey's New Permit Fees Are Unconstitutional ......................................... 3

4. Reconstruction Era Bans Were Not Designed to Protect Newly Freed Slaves ... 6

5. New Jersey Casinos Did Not Ban Firearms Prior to Chapter 131 ...................... 6

6. The State Cannot Prohibit Carry with Signs any More Than with a Statute ....... 7

7. Defendants' Statement of the Vagueness Doctrine is Wrong ............................. 7

8. Airports are no Different than Any Other Crowded Place .................................. 8

9. Unconstitutional Special Classification .............................................................. 9

10. No Historical Tradition Supports the Insurance Requirement ........................... 9

**1. Individualized Ad Hoc Disqualifiers Are Unconstitutional.** Plaintiffs have shown that the ad hoc disqualifiers in Chapter 131 and prior law have no basis in historical tradition and therefore fail the requirements of *Bruen* and the Second Amendment. In fact, Defendants have made no attempt to show any historical tradition supporting stripping a person of her right to keep and bear arms based solely on individualized criteria as determined by a single public official such as a police chief. And there are none.

Every historical citation, in this and every case, purporting to support the divestiture of a person's right to keep and bear arms has been to a concrete categorical classification created by a legislature.[1] There is no historical tradition from the time of the Founding of a person being stripped of her constitutional right to keep and bear arms based on the judgment of a public official that her individual circumstances warrant it. Every historical example cited by Defendants is a clearly defined legislative category.

Ad hoc disqualification also fails *Bruen* by introducing subjectivity rejected by *Bruen* footnote 9 and by reintroducing prohibited interest balancing at an individualized level.

In addition to an ad hoc approach failing *Bruen*, stripping a person of the right to keep

---

[1] Even the New Jersey Appellate Division cannot find such historical citations. In a case challenging the previous version of the ad hoc disqualifier found in N.J.S 2C:58-3(c)(5) ("not in the interest of the public health, safety or welfare"), Plaintiff Association of New Jersey Rifle & Pistol Clubs, Inc. ("ANJRPC") filed an amicus curiae brief advancing the same position (there is no historical tradition of ad hoc stripping of the right to keep and bear arms). The court completely ignored the argument of amicus ANJRPC and instead upheld the provision by citing the same *categorical* legislative disqualifiers cited as in every other case. *Matter of M.U.*'s *Application for a Handgun Purchase Permit*, --- A.3d ----2023 WL 2577324, 6, 13-17 (N.J. App. Div. March 21, 2023).

and bear arms based solely on the individualized judgment of a single public official ensures the arbitrary result that similarly situated people will be treated differently. A police chief in Camden could view a set of individual facts as disqualifying and deny a permit, while another police chief in Glassboro could view the same facts applied to an applicant in her town as not disqualifying. Two similarly situated individuals would have their fundamental constitutional right to keep and bear arms applied differently. Relying solely on legislatively specified categories treats all similarly situated people the same.

Ad hoc rules also fails to provide notice. Without the clarity of a statute laying out specific disqualifying factors, a person can only guess at what *their* police chief will consider disqualifying circumstances. *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983).

At argument the Court asked how a legislature can specify a full set of disqualifying categories. In fact, at least 23 of the 49 states that issue permits do exactly that.[2]

**2. Plaintiffs Have No Burden to Produce Historical Evidence.** Defendants have attempted an incorrect burden shift. They argued that the absence of historical evidence that a regulation was disapproved or held unconstitutional supports the constitutionality

---

[2] *See* Alaska Stat.18.605.705; Ariz. Rev. Stat.13-3112(E); Ark. Code 5-73-309; Fla Stat. § 790.06(2); Ga. Code 16-11-129; Idaho Code § 18-3302(11); Ind. Code 35-47-2-3; Kan. Stat.75-7c-4; Ky. Rev. Stat. 237-110(4); Mich. Comp. Laws. 28.422(3); 28.425b(7); Miss. Code 45-9-101(2), (3); Neb. Rev. Stat. 69-2433; N.H. Rev. Stat. 159:6; N.M. Stat. 29-19-4; N.C. Gen. Stat. 14-415.12;  Ohio Rev. Code 2923.125(D)(1); Okla. Stat. 1290.10; S.C. Code Ann. 23-31-215(A); Tenn. Code 39-17-1351(c); Wash. Rev. Code 9.41.070(1); Wis. Stat. 175.60(3); W. Va. Code, § 61-7-4(b); Wyo. Stat. § 6-8-104(b). The remaining 26 states either include an ad hoc disqualifier or it cannot be determined without extensive additional research whether they do or do not.

of a law. This is exactly the opposite of what the Court held in *Bruen*.

The burden is on *the State* to show a widespread tradition (not merely a few outliers) supporting the challenged regulation at the time of the Founding. If no such historical tradition could be found, then courts should conclude that such regulation is *not* part of the Nations historical tradition and is therefore contrary to the Second Amendment. *Bruen*, 142 S. Ct. 2111, 2131, 2156 (2022) ("the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.") Such burden rests entirely on the State. If no broad tradition can be shown then the State cannot prevail.

**3. New Jersey's New Permit Fees Are Unconstitutional.** Defendants make no genuine attempt to defend the fees set forth in Chapter 131. They say nothing in their papers, and at oral argument the Legislative Defendants say only that Plaintiffs have not shown that the fees are exorbitant as contemplated by *Bruen* footnote 9.

But exorbitance is only one of the problems with these fees. The fees plainly violate *Cox v. State of New Hampshire,* 312 U.S. 569, 577 (1941) twice over. Not only do Defendants make no attempt to show that the fees are directly calculated to cover the costs of the permit process, *The Nationalist Movement v. City of York*, 481 F.3d 178, 183–84 (3d Cir. 2007), but a portion of the fees explicitly goes to something other than the permit process which makes them a forbidden "revenue tax," *Cox*, 312 U.S. at 577. Defendants' only response is that they can allocate funds how they wish. But that is circular. They can only charge what the process costs. If the State wishes to fund a favored

3

project, it may do so from general revenues, not fees collected from individuals seeking to exercise a fundamental constitutional right. The burden to satisfy *Cox* is on the State, and they have not come close to carrying that burden.

Defendants also ignore that before they get to *Cox*, they must carry their burden under *Bruen* to show that the extreme process the statute compels is supported by historical tradition. Again, Defendants have made no attempt to do so. They have offered not a single historical citation in support of the extreme process they have chosen to impose.

Finally, the fees are, in fact, plainly exorbitant within the meaning of *Bruen* footnote 9. The chart below shows every state's carry permit fee, the permits' duration, and accordingly, the calculated cost per year of such permits.[3]

The average cost per year of a permit to carry in states other than New Jersey is $13.44. At $200 for a 2 year permit, the cost per year for a permit to carry in New Jersey is now a whopping $100 – grossly outside the norm. Notably, the $50 fee that applied in New Jersey prior to the passage of Chapter 131 amounted to a $25 annual cost – an amount much closer to the national average. The fact that New Jersey's response to *Bruen* was to dramatically increase the fee well beyond the national norm strongly indicates both (1) the fee increase is calculated to unlawfully suppress the exercise of the right to bear arms, and (2) there is no justification for charging such a high fee when almost no other jurisdiction in the nation finds the need to do so.

---

[3] As outlier states similar to New Jersey, New York and California have been omitted.

**Cost of Permit to Carry, Duration in Years, and Cost Per Year**

| State | Fee | Yrs | Cost/Yr | |
|---|---|---|---|---|
| AL | $25 | 5 | $5.00 | Ala.Code §13A-11-75(f) |
| AK | $40 | 5 | $8.00 | AS 18.605.700(d); AAC 30.040 |
| AZ | $43 | 5 | $8.50 | A.R.S.13-3112(K); AAC 9-102(A) |
| AR | $50 | 5 | $10.00 | A.C.A. 5-73-302, 311 |
| CA | n/a | n/a | n/a | |
| CO | $100 | 5 | $20.00 | C.R.S.A. 18-12-204, 205(2)(b) |
| CT | $120 | 5 | $24.00 | C.G.S.A. 29-30 |
| DE | $65 | 3 | $21.67 | 11 Del. C.1441(a) |
| FL | $55 | 7 | $7.85 | F.S.A. 790.06(1), (5) |
| GA | $30 | 5 | $6.00 | Ga. Code Ann. 16-11-129 |
| HI | $10 | 1 | $10.00 | HRS 134-9 |
| ID | $20 | 5 | $4.00 | I.C. 18-3302(7), (15) |
| IL | $150 | 5 | $30.00 | ILCS 66/10(c), 66/60 |
| IN | $0 | Life | $0.00 | IC 35-47-2-4 |
| IA | $50 | 5 | $10.00 | I.C.A. 724.7, 724.11 |
| KS | $132 | 4 | $33.00 | K.S.A. 75-7c03, 05 |
| KY | $60 | 5 | $12.00 | KRS 237-110(2), (7) |
| LA | $125 | 5 | $25.00 | LRS 40-1379.3(H)(2) |
| ME | $25 | 4 | $6.25 | 25 M.R.S.A. 2003(8), (15) |
| MD | $75 | 2 | $37.50 | MDPS 5-304(b), 309 |
| MA | $100 | 6 | $16.66 | M.G.L.A.140-131(i) |
| MI | $100 | 5 | $20.00 | M.C.L.A. 28.425(b)(5), (l) |
| MN | $100 | 5 | $20.00 | M.S.A. 624.714(3), (7) |
| MS | $80 | 5 | $16.00 | Miss. Code Ann. 45-9-101(b) ,(5) |
| MO | $100 | 5 | $20.00 | V.A.M.S. 571.101(1), (11) |
| MT | $50 | 4 | $12.50 | MCA 45-8-321(1), 322 |
| NE | $100 | 5 | $20.00 | Neb.Rev.St. 69-2436 |
| NV | $100 | 5 | $20.00 | NRS 202.3657(7); 202.366(4) |
| NH | $10 | 5 | $2.00 | N.H. Rev. Stat.159:6 |
| **NJ** | **$200** | **2** | **$100.00** | |
| NM | $100 | 4 | $25.00 | N.M.S.A. 29-19-3, 5 |
| NY | n/a | n/a | n/a | |
| NC | $80 | 5 | $16.00 | N.C.G.S.A. 14-415.11(b), 419 |
| ND | $60 | 5 | $12.00 | NDCC, 652.1-04-03(6); NDAC 10-12-01-02 (4) |
| OH | $67 | 5 | $13.40 | O.R.C. 2923.125(B)(1), (D)(2) |
| OK | $100 | 5 | $20.00 | 21 Okl.St.Ann. 1290.5, 1290.12(A) |
| OR | $100 | 4 | $25.00 | ORST 166.291(5), 292(4) |
| PA | $20 | 5 | $4.00 | 18 Pa. CSA 6109 |
| RI | $40 | 4 | $10.00 | Gen. Laws 11-47-12 |
| SC | $50 | 5 | $10.00 | SDCL 23-31-215(P) |
| SD | $0 | 5 | $0.00 | [1] |
| TN | $65 | 6 | $10.83 | T. C. A. 39-17-1366(b)(5), (d) |
| TX | $40 | 4 | $10.00 | V.T.C.A., Gov. Code § 411.174, 183 |
| UT | $25 | 5 | $5.00 | U.C.A. 53-5-704(1)(c), 707 |
| VT | $0 | n/a | $0.00 | [2] |
| VA | $50 | 5 | $10.00 | VA Code Ann. § 18.2-308.02(A), 03(A) |
| WA | $36 | 5 | $7.20 | RCWA 9.41.070(1), (5) |
| WV | $50 | 5 | $10.00 | W. Va. Code, § 61-7-4(A), (h) |
| WI | $37 | 5 | $7.40 | W.S.A. 175.60((7),15) |
| WY | $50 | 5 | $10.00 | W.S.6-8-104(b), (E) |

**ANNUAL COST OF CARRY PERMIT:**

| | |
|---|---|
| **U.S. AVERAGE:** | **$ 13.44** |
| **NEW JERSEY (OLD):** | $ 25.00 |
| **NEW JERSEY (NEW):** | **$100.00** |

---

[1] https://sdsos.gov/general-services/concealed-pistol-permits/cc-default.aspx

[2] Vermont has no permit system and regulates carry through possession disqualifiers. 13 V.S.A. § 4017.

5

**4. Reconstruction Era Bans Were Not Designed to Protect Newly Freed Slaves.** Defendants make the novel argument that Reconstruction era firearm restrictions in the South were enacted to protect newly freed slaves from attack. The exact opposite is true. Such laws in the South were designed to disarm newly freed slaves and free blacks and render them unable to defend themselves from terrorist groups like the Ku Klux Klan, *See McDonald v Chicago* 561 U.S. 742, 770-79 (2010).  Such laws were specifically intended not to be enforced against white folks. *See Watson v Stone*, 148 Fla. 516, 524-25 (1941) (Buford, J., concurring) ("The statute was never intended to be applied to the white population and in practice has never been so applied.") Clayton E. Cramer, *The Racist Roots of Gun Control*, Kan. J.L. & Pub. Pol'y, WINTER 1995, at 17.

**5. New Jersey Casinos Did Not Ban Firearms Prior to Chapter 131.** Additional evidence that the casinos are doing the bidding of the State by now banning firearms at their premises can be found in the simple fact that most of them never previously banned them prior to Chapter 131. Prior law only banned firearms on casino floors, not restaurants or other appurtenances as with Chapter 131. *See* N.J.S. 5:12-6 defining "casino" as limited to the casino gambling floor. Thus, prior to being pressured by the State, the casinos never thought carriage of handguns on their properties was a problem. Only since the State decided to expand its firearm ban to *all* portions of casino property did the casinos themselves suddenly feel pressure to, allegedly, act.

Such manipulation by the State cannot be used to defeat standing and avoid a ruling on the merits of Chapter 131's unconstitutional provisions.

**6. The State Cannot Prohibit Carry with Signs any More Than with a Statute.**

The government-as-proprietor argument still fails, even if State agencies choose to infringe on the right to bear arms with signs rather than with statutes. Government agencies do not have the same rights as private proprietors. *See* Siegel Plaintiffs' Reply Brief at 52-54. For example, government proprietors cannot impose content based restrictions on speech. This is because government operated premises can use their powers as proprietors to implement government policy preferences, including unconstitutional policy preferences, just as effectively with signs as by statute.

For this reason, where the restrictions of Chapter 131 are unconstitutional, so are government erected "no guns" signs.

**7. Defendants' Statement of the Vagueness Doctrine is Wrong.** Defendants insist, incorrectly, that a law must be vague in all its applications to be void. If that was ever the law, it has not been the law since *Johnson v. United States,* 135 S. Ct. 2551 (2015) and *Sessions v. Dimaya,* 138 S. Ct. 1204 (2018) in which the Supreme Court invalidated portions of the Armed Career Criminal Act notwithstanding that the challenged sections of the law in both cases had plenty of non-vague applications.[4] *See also Bruni v. City of Pittsburgh*, 824 F.3d 353, 362–63 (3d Cir. 2016).

---

[4] Defendants' incorrect formulation comes from *U.S. v. Salerno,* 481 U. S. 739 (1987). Justice Stevens concurred that he was not sure that the rule from *Salerno* was ever actually applied by the Court. *See Washington v. Glucksberg*, 521 U.S 702, 739-40 (1997).

**8. Airports are no Different than Any Other Crowded Place.** Defendants' position on airports is particularly flawed. They make the strawman argument that Plaintiffs wish to carry their loaded guns on airplanes. No one has argued for carrying a loaded gun on a commercial airliner or within the secure TSA areas. Plaintiffs argue that they have the right to carry their guns:

1) While dropping passengers at the airport and helping them inside the terminal and/or to the counter with their luggage.

2) While picking up passengers in a similar manner *outside* the secure TSA areas.

3) When boarding, flying, and arriving at their destinations in their private planes from general aviation airports like Monmouth Executive.[5] If one may carry at the places of departure and arrival he surely has the right to have his gun with him on his plane.

4) When at a general aviation airport repairing/maintaining their private planes. *See* Declaration of Ronald D'Angelo.

5) When lawfully walking through a commercial airport terminal to declare an unloaded firearm locked in checked baggage *at the ticket counter* as required by federal law when flying with a firearm.[6] Such individuals *have* been arrest at Newark Airport. *See Revell v. Port Authority of New York, New Jersey*, 598 F.3d 128 (3d Cir. 2010).

In this regard, Chapter 131's airport prohibition has nothing to do with airline security.

---

[5] General Aviation airports like Monmouth Executive or Cape May Airport are wholly unlike commercial airports such as Newark Liberty. They have no TSA security or scheduled flights and function largely like parking lots for private airplanes. As explained by Ronald D'Angelo, airplane owners drive up, park, and get in their planes. *See* https://www.faa.gov/airports/planning_capacity/categories#:~:text=General%20Aviation%20Airports%20are%20public,the%20NPIAS%20are%20general%20aviation.

[6] https://www.tsa.gov/travel/transporting-firearms-and-ammunition (last visited March 27, 2023).

8

The areas Chapter 131 restricts are no different than any ordinary sometimes crowded and sometimes not crowded location. *Bruen* explicitly prohibits such a crowd based restriction and Defendants have shown no historical tradition to support it.

**9. Unconstitutional Special Classification.** Defendants attempt to justify the special treatment of judges, prosecutors, and attorneys general by reference to other previous special treatment rendered in the past. But those apply to different restrictions, and to the extent they also relate to carry, these Plaintiffs did not have standing to challenge such classifications until after *Bruen*.

Further, they cannot be justified by reference to vetting, oaths, or codes of conduct. Ordinary permit holders are subject to extreme vetting and are otherwise subject to severe laws against misconduct. Further, the idea that the State may discriminate in the exercise of a fundamental constitutional right on the assumption that ordinary people are somehow likely to be less law-abiding than the favored individuals is wholly foreclosed by *Bruen*.

Further, claiming that the favored categories have a greater need than ordinary individuals to carry at, say, a power plant or a doctor's office is simply the same impermissible interest balancing explicitly rejected by *Bruen*.

**10. No Historical Tradition Supports the Insurance Requirement.** Defendants recognize there is no historical tradition supporting the insurance requirement. Thus, they misdirect by resorting to impermissible interest balancing.

They also wholly ignore that the law is not limited to not "accidental discharge." The statute says "loss resulting from liability imposed by law." The statute therefore

potentially creates an obligation to cover intentional acts that no one can satisfy. Defendants are simply pulling a construction out of thin air.

They entirely ignore that Plaintiffs Cook and Cuozzo do not have the required insurance and will be forced to buy more, and that only 37% of renters have insurance.

Further, they ignore that their expert is literally guessing as to what the insurance market will look like once post-*Bruen* renewals begin. All policies currently in effect were written prior to *Bruen* and therefore would naturally not have contained exclusions for carry liability. There is simply no way Mr. Kochenburger can predict what insurance companies will do post-*Bruen*. Defendants have not satisfied their burden under *Bruen*.

Finally, an insurance requirement as a condition on the exercise of a fundamental constitutional right is inherently suspect as a tool of selective suppression in light of the absence of such requirements for many common risky activities. *See* Eric Neisser, *Charging for Free Speech: User Fees and Insurance in the Marketplace of Ideas*, 74 Geo. L.J. 257, 308 (1985).

The insurance requirement is unconstitutional.

Dated: March 27, 2023

> Respectfully submitted,
> s/ Daniel L. Schmutter
> Daniel L. Schmutter
> Hartman & Winnicki, P.C.
> 74 Passaic Street
> Ridgewood, New Jersey 07450
> (201) 967-8040
> dschmutter@hartmanwinnicki.com

10